# In The Matter Of:

*Geline v.*
*Northwest Trustee Services, et al*

*H. John Kennerty*
*May 20, 2010*

*Van Pelt, Corbett, Bellows*
*Court Reporters*
*401 Second Avenue South, Suite 700*
*Seattle, Washington 98104*

Original File KENNERTY.txt
Min-U-Script® with Word Index

Geline v.
Northwest Trustee Services, et al

H. John Kennerty
May 20, 2010

---

**Page 1**

1                    SUPERIOR COURT FOR THE STATE OF WASHINGTON
                              IN AND FOR THE COUNTY OF KING
2    _____

3
     LYDIA GELINE,                    )
4                                     )
                      Plaintiff,      )
5    v.                               ) Case No. 09-2-46576-2 SEA
                                      )
6                                     )
     NORTHWEST TRUSTEE SERVICES,      )
7    INC.; WELLS FARGO BANK, N.A.     )
     dba WELLS FARGO HOME MORTGAGE;   )
8    LINEAR HOME, L.P. dba QUADRANT   )
     HOME LOANS; U.S. BANK, N.A. as)  )
9    Trustee for and Doe Defendants   )
     1 through 20, inclusive,        )
10                                    )
                      Defendants.)    )
11   _____

12        DEPOSITION UPON ORAL EXAMINATION OF
                     H. JOHN KENNERTY
13   _____

14                    9:00 a.m.
                      May 20, 2010
15   LAW OFFICES OF MELISSA A. HUELSMAN
          705 Second Avenue, Suite 1050
16          Seattle, Washington 98104
                     May 20, 2010
17                    9:00 a.m.

18

19

20                  JUDITH A. ROBINSON
21           VAN PELT, CORBETT, BELLOWS
          401 Second Avenue South, Suite 700
22                Seattle, WA 98104

23

24

25

---

**Page 2**

1              A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:

4    MELISSA A. HUELSMAN
     LAW OFFICES OF MELISSA A. HUELSMAN
5    705 Second Avenue, Suite #1050
     Seattle, Washington 98104
6    Phone  206.447.0103
     Fax    206.447.0115
7    Email mhuelsman@predatorylendinglaw.com

8

9

10

11   FOR THE DEFENDANTS,
     WELLS FARGO:
12
     ANDREW G. YATES
13   LANE POWELL
     1420 5th Avenue, Suite #4100
14   Seattle, Washington 98101-2338
     Phone  206.223.7034
15   Fax    206.223.7107
     Email  yatesa@lanepowell.com

16

17

18

19

20
     Court Reporter:   JUDITH A. ROBINSON
21                     VAN PELT, CORBETT, BELLOWS
                       100 South King Street, Ste. 560
22                     Seattle, WA 98104

23

24

25

---

**Page 3**

1            I N D E X   O F   E X A M I N A T I O N

2

     Witness              Examination              Page
3

4    H. John Kennerty

5              By Ms. Huelsman ............. 4-76

6

7

8            I N D E X   O F   E X H I B I T S

9
     No.                  Description              Page
10

11   1........... Certification Of Loan Documents ......... 37

12   2........... Appointment Of Successor Trustee ........ 41

13   3........... Assignment Of Mortgage/Deed Of Trust ...... 50

14   4............... Fixed/Adjustable Rate Note ........... 53

15   5........... Beneficiary Declaration (Note Holder)
                   (Attorney In Fact For Beneficiary) ...... 56

16   6........... Assignment Of Deed Of Trust ........ 65

17   7........ Declaration Of Amy Brodish In Support
                   Of Defendant's Response ........... 69

18

19

20

21

22

23

24

25

---

**Page 4**

1         SEATTLE, WASHINGTON; THURSDAY, MAY 20, 2010;

2                    9:00 A.M.

3                  * * * * * * * *

4    H. JOHN KENNERTY         having been first duly

5                             sworn by the Notary

6                             Public, appeared and

7                             testified as follows:

8              E X A M I N A T I O N

9    BY MS. HUELSMAN:

10       Q.  Will you please state and spell your name.

11       A.  Herman John Kennerty, K-E-N-N-E-R-T-Y.

12       Q.  Thank you.  So you're here today pursuant to a

13   notice of deposition that I sent to your Counsel; is that

14   correct?

15       A.  Yes.

16       Q.  I should clarify and say Counsel for your employer;

17   correct?

18       A.  Yes.

19       Q.  Can you please tell me your address?

20       A.  Work or home?

21       Q.  Work is fine.

22       A.  3476 Stateview Boulevard, Fort Mill, South

23   Carolina.

24       Q.  By whom are you employed?

25       A.  Wells Fargo.

Geline v.
Northwest Trustee Services, et al

H. John Kennerty
May 20, 2010

Page 5

1    Q.  Can you tell me which part of Wells Fargo?
2    A.  Wells Fargo Home Mortgage.
3    Q.  Which is a subsidiary of Wells Fargo Bank?
4    A.  Right.
5    Q.  Can I get your educational background starting
6    after high school?
7    A.  I attended Appalachian State University and went
8    into the military after that and then joined HFC in 1984.
9    Q.  That's Household Finance?
10   A.  Yes.  I was with Household until May of 2008, then
11   then in August of 2008 I joined Wells Fargo.
12   Q.  Did you get a degree from Appalachian State?
13   A.  No.
14   Q.  What was your job at HFC?
15   A.  It varied.
16   Q.  Why don't you start with your first job and take me
17   through.  I'm also going to tell you I want a little job
18   description.  If you could provide that, that would be
19   fantastic.
20   A.  When I first started with HFC, I was a branch
21   representative manager in training.  I went through the ranks
22   and became a manager.
23       From there I went into their first mortgage
24   program.  I stayed in that for a brief period.  Then I went
25   into the collections, real estate collections.

Page 6

1    Q.  Can you kind of give me some time lines?
2    A.  Sure.  The original branch representative manager
3    in training program was July '84 through '85 or thereabouts.
4    Q.  I understand we're not going to be totally precise.
5    But if you can give me ballpark that would be great.
6    A.  Sure.
7    Q.  Thank you.
8    A.  I was a manager in the '85-'86 time frame, through
9    '87-'88.  First mortgage program, '88 to '89.  Real estate
10   collections, '89 through '92, March of '92.
11      From there I went into policy and compliance, and I
12   was in the compliance department as a state manager.  Then I
13   was the manager of the forms group within the compliance
14   group until 2001.
15      2001 through 2008 I was specifically with Decision
16   One Mortgage which is a subsidiary of Household as the
17   operations manager, reconciling sales to investors as well as
18   managing the processing and posting of payments.
19   Q.  And that's what you're doing now?
20   A.  No.  With Wells Fargo I am a --
21   Q.  Sorry.  I lost track.  Go ahead.
22   A.  With Wells Fargo, I am a loan administration
23   manager managing our default document group.
24   Q.  Why don't you tell me what your job duties are of
25   that.

Page 7

1    A.  There's three main areas within the default doc.
2    group.  The first one is the ordering and obtaining of
3    collateral documents for loans.  The assignment team, the
4    execution of assignments, as well as the executable team
5    which is the executing of other foreclosure-related
6    documents.
7    Q.  So in summary is it -- your department goes and
8    gets original loan documents when they're necessary and it
9    executes documents in connection with foreclosures, whether
10   it's assignments or other necessary documents?
11   A.  Correct.
12   Q.  Is that pretty much what your unit does all day
13   long?
14   A.  Pretty much, yes.
15   Q.  And does it do it for the entire country for your
16   employer?
17   A.  Yes.
18   Q.  Are there other locations as well, or is your
19   office the one that handles all of it?
20   A.  My office is the one that handles all of it.
21   Q.  So your title is Loan Administration Manager?
22   A.  Yes.
23   Q.  Are you also vice president?
24   A.  Of loan documentation.
25   Q.  Have you had the vice president title since you

Page 8

1    became employed there?
2    A.  Shortly thereafter.
3    Q.  So the official title is vice president of Loan
4    Administration?
5    A.  No.
6    Q.  I'm sorry.  Can you --
7    A.  Vice president of Loan Documentation.
8    Q.  Vice president of Loan Documentation.  I'm sorry.
9    My fingers are faster than my brain.
10      How many employees do you supervise?
11   A.  53 full-time employees.  And we currently have 15
12   contract workers.
13   Q.  Are they the people who are actually executing the
14   documents that you were just describing?
15   A.  Yes.
16   Q.  And you're their supervisor?
17   A.  I manage the department.  I have direct reports
18   that are supervisors that manage the day-to-day.
19   Q.  So you supervise the supervisors?
20   A.  As well as the processors.
21   Q.  Right, okay.  And when is it that you -- or I
22   should say, excuse me.
23      How often do you actually sign documents?
24   A.  Daily.
25   Q.  Can you tell me about how many documents you sign a

Geline v.
Northwest Trustee Services, et al

H. John Kennerty
May 20, 2010

Page 9

1 day?
2    A.  Anywhere from 50 to 150.
3    Q.  That actually reminds me because I was running late
4 and again I apologize.
5        Have you ever had your deposition taken before?
6    A.  It has been quite some time.
7    Q.  Did you have it taken when you were an employee of
8 HFC?
9    A.  No.
10    Q.  For what reason did you have your deposition taken?
11    A.  It was a child custody hearing.
12    Q.  So you have never had your deposition taken in
13 connection with your employment at Wells Fargo?
14    A.  No.
15    Q.  Going back to the question we were on, you said
16 from what I understood just a second ago, you're the
17 supervisor or you manage the unit, and then there are
18 supervisors who actually then manage the day-to-day
19 operations of the unit; correct?
20    A.  Correct.
21    Q.  Do you know how many documents per day on average
22 the supervisors sign documents?
23    A.  I would -- roughly the same amount.
24    Q.  Is it the same then for the people that are
25 subordinate to the supervisors?

Page 10

1    A.  Not quite.  Simply because if they process it, they
2 obviously can't sign it.
3    Q.  I'm sorry.  Why is it obvious that they can't sign
4 it?
5    A.  They -- not all the processors or any of the
6 processors hold a title of vice president of Loan
7 Documentation, so they can't sign it, depending upon the
8 nature of the document.
9    Q.  So only people who have a title can sign documents,
10 depending upon the nature of the document?
11    A.  Yes.
12    Q.  What kind of documents require a title?
13    A.  Just about everything that we do, with the
14 exception of when we order collateral files.
15    Q.  We'll go through that in a second.
16        So what kind of documents do you regularly sign?
17    A.  Assignments; declarations; various affidavits.
18    Q.  Are they all in connection with foreclosures or
19 motions for relief to stay in bankruptcy?
20    A.  More so foreclosure.
21    Q.  You would still also participate in bankruptcy
22 motions for relief?
23    A.  It's rare --
24    Q.  Oh, okay.
25    A.  -- that I would.

Page 11

1    Q.  Usually those two departments are combined so
2 that's why I was asking.
3        And are there other people that you supervise who
4 also have a title?
5    A.  Yes.
6    Q.  And do all the supervisors then have a title that
7 you supervise?  I'm talking about your unit.
8    A.  Not all of them.
9    Q.  So is it only the ones that have titles that are
10 allowed to sign the documents?
11    A.  Yes.
12    Q.  What titles do supervisors have?
13    A.  Other than supervisor it would be vice president of
14 Loan Documentation.
15    Q.  So is it true that they have that title simply for
16 purposes of signing documents?
17        MR. YATES:  Object to the form.  It misstates
18 prior testimony.  You can answer.
19    A.  Can you repeat the question?
20        (Requested testimony was read.)
21    A.  I can't really answer that question.  That's not --
22 I mean, I don't grant authorizations for that title, so I
23 really can't answer that.
24 BY MS. HUELSMAN:
25    Q.  Do they act as officers of the company to perform

Page 12

1 other functions?
2        MR. YATES:  Object to the extent it calls for
3 a legal conclusion.  You can answer.
4    A.  With respect to the execution of documents, yes.
5 BY MS. HUELSMAN:
6    Q.  But that's their only function as the vice
7 president; correct?
8    A.  For loan documentation, yes.
9    Q.  So in other words, they are not going to board
10 meetings or interacting with the board of directors or other
11 corporate officers; correct?
12    A.  They interact with other officers of the company.
13 Now, as far as board members, I can't answer that.
14    Q.  What other officers of the company do they interact
15 with?
16    A.  They interact with vice presidents as well as
17 assistant vice presidents.
18    Q.  Those are just other people that perform similar
19 functions in the company; correct?
20    A.  Similar --
21        MR. YATES:  I'm just going to object to the
22 extent it misstates prior testimony.  You can answer.
23    A.  Similar how?  I don't understand your --
24 BY MS. HUELSMAN:
25    Q.  You understand that I do not want you to have to

Geline v.
Northwest Trustee Services, et al

H. John Kennerty
May 20, 2010

**Page 13**

1  come to a legal conclusion. I just want to get your general
2  understanding regarding the role of a president of the
3  company, you understand what a president of the company is;
4  correct?
5      A.  Yes.
6      Q.  And the other officers underneath a president.
7  Vice president and secretary and things like that.
8          You understand that; correct?
9      A.  Yes.
10     Q.  Are you and the supervisors who work for you in
11 what would be kind of a stereotypical vice president role, in
12 other words, involved in operations of the company?
13     A.  With respect to operations of the company, with the
14 execution of documents, yes.
15     Q.  But that's what I'm saying. It's limited to the
16 execution of documents; correct?
17     A.  Yes.
18     Q.  You're not making decisions about shareholders or
19 things like that; correct?
20     A.  No.
21     Q.  In your role as a supervisor of the department, the
22 loan documentation department, do you ever sign anything
23 other than the assignments and declarations using the title
24 vice president?
25     A.  Yes.

**Page 14**

1      Q.  What other documents do you sign using that title?
2      A.  There's two declarations that come to mind. One is
3  for California and one for Washington.
4      Q.  Those are the beneficiary declarations?
5      A.  For Washington there's a loss mitigation
6  declaration, as well as in California there's actually two
7  types of declarations. There is a default and notice of
8  sale.
9      Q.  But whenever you're filling out say internal forms,
10 or I guess I'm assuming you probably do evaluations of
11 employees or sign off on, you know, write ups of employees
12 and things like that.
13     A.  Yes.
14     Q.  I'm assuming that's what you do as a supervisor.
15         Do you ever use your title, vice president, when
16 you're filling out those types of internal company documents?
17     A.  Title is not required.
18     Q.  So internal company documents, you never use your
19 title?
20     A.  No.
21     Q.  You described your department as being involved in
22 ordering collateral files; is that correct?
23     A.  Correct.
24     Q.  Can you explain to me what that means?
25     A.  The collateral files are held by various

**Page 15**

1  custodians.
2      Q.  First of all, I'm going to have you define what a
3  collateral file is. I know what it means, but just to put it
4  in the record.
5      A.  A collateral file would consist of an original
6  signed note or loan agreement. An original signed and
7  recorded mortgage or deed of trust. Final title policy. And
8  it could also contain original signed documents such as
9  writers and various other documents associated with the loan
10 itself signed by the borrower or borrowers.
11     Q.  So those are the only kinds of documents that are
12 in collateral files; correct?
13     A.  Correct.
14     Q.  Those are all the original documents; correct?
15     A.  Correct.
16     Q.  That's because the rest of the time -- excuse me --
17 most of the time when you're using -- you're operating your
18 department, you're using electronic records of documents;
19 correct?
20         MR. YATES: I'm going to object to the extent
21 that misstates prior testimony. I understand you want to
22 lead to little bit to save time, but I have to make that
23 objection.
24 BY MS. HUELSMAN:
25     Q.  How do you look at documents normally when you're

**Page 16**

1  performing your job?
2      A.  Depends upon the state. Approximately half the
3  states are copy states.
4      Q.  What do you mean by "copy states"?
5      A.  The actual state does not require original loan
6  documents to proceed with any type of foreclosure or
7  bankruptcy action.
8      Q.  So when it's a copy state where are the records
9  kept?
10     A.  They are kept with a custodian. However we request
11 them if they have not been previously imaged. And if they
12 have not been previously imaged then we order them and they
13 get reimaged and then returned to the custodian.
14     Q.  So in -- in copy states, really all you're using is
15 the images; right?
16     A.  Correct.
17     Q.  In non-copy states, explain your process.
18         You still have images of the documents; correct?
19     A.  Yes.
20     Q.  Right.
21     A.  We refer to them as original document states where
22 we order the collateral file from the custodian. They are
23 processed by being imaged, and then we actually receive that
24 collateral file and retain it until the file or the loan goes
25 active in foreclosure.

Geline v.                                                                                    H. John Kennerty
Northwest Trustee Services, et al                                                              May 20, 2010

---

**Page 17**

1    Q.  Okay. So I want to make sure I'm understanding
2    you.
3        So I guess we actually -- your department becomes
4    involved only when there's a foreclosure pending; is that
5    correct?
6    A.  Prior to foreclosure.
7    Q.  So in other words, when there has been some kind of
8    default?
9    A.  Yes.
10   Q.  And it's involved in anticipation of a foreclosure
11   proceeding; correct?
12   A.  Yes.
13   Q.  So in other words, if some homeowner gets a loan,
14   pays on time, never has any problem, your department is not
15   going to be involved; right?
16   A.  Not entirely true.
17   Q.  Okay.
18   A.  If they filed bankruptcy we would still order that
19   collateral file.
20   Q.  But aside from some kind of default event which
21   would be nonpayment or bankruptcy or something like that?
22   A.  Correct, we would not be able to.
23   Q.  So I understand you're employed by Wells Fargo.
24       But do you only respond to inquiries regarding
25   loans that are serviced by Wells Fargo, or do you also

---

**Page 18**

1    respond to someone using servicing that's not Wells Fargo?
2    A.  Only Wells.
3    Q.  All right. I realize that puzzled you, but you
4    know.
5    A.  I was making sure that --
6    Q.  Okay, okay. So in other words, if your department
7    has to become involved, it's done so because somebody
8    involved with Wells Fargo has determined that the loan is
9    going into default; is that correct?
10   A.  Correct.
11   Q.  Can you explain to me how that process occurs?
12   A.  Which process?
13   Q.  That a file gets referred to you at the loan
14   documentation department.
15   A.  We -- there are several criteria that we look at
16   prior to ordering the file. One of course is delinquency, as
17   well as if the property is occupied, and who the investor is
18   will help us determine how far in advance of the anticipated
19   foreclosure we would order the collateral file.
20   Q.  So although your referrals are coming from Wells
21   Fargo's servicing entity it could well be that they're
22   servicing for somebody other than Wells Fargo; correct?
23       MR. YATES: Object to the extent it misstates
24   prior testimony. You can answer.
25   A.  Can you read that back, please?

---

**Page 19**

1        (Requested testimony was read.)
2    A.  Yes, we would be the servicing.
3    BY MS. HUELSMAN:
4    Q.  Right. Because you referred to investor.
5        So that means there's somebody other than Wells
6    Fargo that owns the loan when you refer to an investor;
7    correct?
8    A.  Correct.
9    Q.  Wells Fargo could also be an investor; right?
10   A.  Correct.
11   Q.  But when you use the phrase investor it refers to
12   the owner of the loan; is that correct?
13   A.  Yes.
14   Q.  Even when you use the phrase, "investor," similarly
15   you could well also be referring to a full trust; correct?
16   A.  Correct.
17   Q.  I just want to make sure I understand your
18   terminology.
19   A.  Sure.
20   Q.  So the Wells Fargo servicing arm identifies that
21   there has been a default or some kind of problem with the
22   loan and makes the referral over to your department, okay?
23   A.  The -- the term, "referred it over to my
24   department" is -- it's -- misleading is not the word I'm
25   looking for, but it's not entirely accurate.

---

**Page 20**

1    Q.  It's done by computer instead of in an old-
2    fashioned sense of making a referral; correct?
3    A.  Right. It's a referral to obtain the documents.
4    Not to -- in essence -- at that point that's as far as it
5    goes.
6    Q.  Why don't you explain how it occurs.
7    A.  The referral?
8    Q.  Yes.
9    A.  The -- once the collection department has completed
10   their process, it goes to our foreclosure referral group who
11   ensures that -- obviously depending upon the state, that the
12   criteria has been met, and then they actually refer it for
13   foreclosure.
14   Q.  So -- sorry. It goes from the servicing arm to,
15   what was the department called?
16   A.  Well, it would be in collections.
17   Q.  And then collections sends, essentially the message
18   to your department?
19   A.  No. It goes to the foreclosure referral group.
20   Q.  That's what I was actually looking for.
21       So the foreclosure referral group is actually
22   separate from your department?
23   A.  Yes.
24   Q.  Do they operate out of the same offices as you?
25   A.  There's a second building.

---

Geline v.
Northwest Trustee Services, et al

H. John Kennerty
May 20, 2010

Page 21

1    Q.  But it's there at the same location?
2    A.  Yes.
3    Q.  And just generally what does the foreclosure
4  referral group do?
5    A.  I -- I could only give you a very high level,
6  because I'm not, nor have I worked --
7    Q.  I just want you to give me your basic understanding
8  just because I'm trying to make sure that I'm following the
9  whole process.
10   A.  My understanding is they review these loans to
11 ensure that the proper due diligence has been completed, and
12 then they run this through their automation and the loans are
13 referred for foreclosure.
14   Q.  So it goes from collections to the foreclosure
15 referral group and then to your department?
16   A.  To order collateral files, yes.
17   Q.  And again, all this is just done really by computer
18 messaging on a software program; correct?
19   A.  Yes.
20   Q.  What software program is that?
21   A.  It's our -- off our main frame which is Daisy.
22   Q.  D-A-I-S-Y?
23   A.  Yes.
24   Q.  Is that an acronym?
25   A.  If it is I don't know what it means.

Page 22

1    Q.  So it goes from collections, foreclosure referral
2  group, your department.  And your department's sole purpose
3  is to get collateral file and execute documents; is that
4  correct?
5           MR. YATES:  Object to the extent it misstates
6  prior testimony.
7    A.  Yes.
8  BY MS. HUELSMAN:
9    Q.  Yes?
10   A.  Yes.
11   Q.  Is there anything else it does?  I mean I'm not
12 trying to --
13   A.  No.  We order the collateral file.  We execute
14 assignments and other --
15   Q.  Declarations?  Affidavits?
16   A.  Correct.
17   Q.  And that's it?
18   A.  We have a small file room where we store the files
19 until they're needed.
20   Q.  Anything else?
21   A.  No, that's it.
22   Q.  I'm going to get back to what you do.  But what
23 happens to the foreclosure referral after it comes to your
24 department?  Where does it go on from there?
25   A.  I can't answer that because I don't know.

Page 23

1    Q.  You don't know any information from your --
2    A.  We just refer it to an attorney.
3    Q.  Okay.
4    A.  But the mechanics of that I can't speak to.
5    Q.  All right.  So it's going from your department to
6  whoever is then ultimately going to handle the foreclosure?
7    A.  It's actually going from the foreclosure referral
8  group to the foreclosing attorney.
9    Q.  That's what I'm trying to get at.
10          After you're finished performing your tasks in the
11 loan documentation department you're giving the information
12 back to the foreclosure referral group?
13   A.  No.
14   Q.  No?
15   A.  Once it's referred at that point, it's going to the
16 foreclosure attorney.
17   Q.  And that is also done through the software?
18   A.  Yes.
19   Q.  Okay.
20   A.  It's a parallel process.
21   Q.  That's just trying to understand.
22          So foreclosure referral group is sending off the
23 message through the computer software to whatever attorney is
24 going to handle the foreclosure.  And concurrent to that a
25 message is being sent out to your group to perform your

Page 24

1  functions?
2    A.  Correct.
3    Q.  And when your group performs its function, all the
4  information is simply uploaded back into the software system;
5  is that correct?
6    A.  Yes.
7    Q.  So where it goes from there you don't know?
8    A.  With respect to the information that we upload, it
9  goes into the system.
10   Q.  Right.  But I mean that's the end of your
11 department's involvement in the process; right?
12   A.  Other than sending the documents to the attorney,
13 yes, that would be the end of it.
14   Q.  So why don't you explain to me what happens when
15 the referral comes into your department from the foreclosure
16 referral group?
17   A.  We look to see -- well, we have a daily report that
18 will -- that is generated to let us know what files we need
19 to forward to the attorney, and once those files are pulled
20 they are processed out and literally checked out with the
21 information of what attorney they are going to and the
22 tracking number in which they are being sent with.
23   Q.  I'm going to go through this in a lot of detail.
24 So let's go through that process, okay?
25          So the report comes in every day and that's how

Geline v.
Northwest Trustee Services, et al

H. John Kennerty
May 20, 2010

---

**Page 25**

1 your department knows what new matters it's working on; is
2 that correct?
3    A.  Correct.
4    Q.  Who does that report come to?
5    A.  It's generated to our file room.
6    Q.  Okay.  And is there a person there that retrieves
7 it and disseminates it to everybody else or does everybody in
8 the department also get it?
9    A.  No.  It goes into a shared directory.  It's pulled
10 from there and printed out and then, depending upon how many
11 loans are on for that particular day it's allocated out to
12 the team members.
13    Q.  How is it allocated to the team members, is there
14 organization by state or alphabetical?  How is it organized?
15    A.  Based on volume, and it's printed in numerical
16 order, and so then you pull it.  You know, if there's five
17 team members that are available to pull, then you know,
18 depending upon how many are on the list it could be several
19 sheets.  And then you get one sheet or two sheets or
20 something from there.
21       Their task is to go to the shelves and pull those
22 off.
23    Q.  So these are -- I'm sorry.  What is their position
24 called?
25    A.  They are, a general term is clerk but their

**Page 26**

1 official title is operations clerk.
2    Q.  Operations clerk.  And these are the people that
3 the supervisors supervise?
4    A.  Yes.
5    Q.  And then you supervise the supervisors as well as
6 the clerks?
7    A.  Correct.
8    Q.  Making sure I understand you.
9    A.  Correct.
10    Q.  So you said that the operations clerks pull the
11 file.  Can you explain to me what you mean by that?
12    A.  They physically go get the file off the shelf.
13    Q.  By that you mean the collateral file?
14    A.  Yes.
15    Q.  The collateral file which includes these original
16 documents then is already there at your location by the time
17 the operations clerks are getting the print out; correct?
18    A.  Yes.
19    Q.  So can you describe to me the process -- let's
20 backtrack a bit.  About how the collateral files end up at
21 your location.  I know you've given it to me generally but I
22 want to go through it in some detail.
23    A.  Depending upon the delinquency and the occupancy of
24 the property would determine at what stage of actual
25 delinquency we would request that file.  We run a process on

**Page 27**

1 a daily basis to determine what files we need to order based
2 on that criteria.
3    Q.  Okay.
4    A.  Depending upon the custodian and the nature of the
5 file, and by that is it a Freddie or Fannie type loan would
6 determine how we actually order that file.  And that's
7 whether it be an electronic request or a paper request, and
8 depending upon which way it falls, we would order directly
9 from that particular custodian.
10    Q.  Do you know how many custodians you have to deal
11 with regularly?
12    A.  There are five that we order from more frequently
13 than others.  There are 22, 25 that may or may not have
14 files.  But there's five that we order from on a regular
15 basis.
16    Q.  Can you tell me what those five are?
17    A.  Wells Fargo dot custody; La Salle; US Bank and
18 there's various arms of US Bank depending upon the location.
19 And Deutsche Bank.
20    Q.  That was four.
21    A.  City would be the fifth one.
22    Q.  And you still deal with La Salle even though it was
23 acquired by B of A?
24    A.  Yes.
25    Q.  Do they still run a custodian operation?

**Page 28**

1    A.  Yes.
2    Q.  So some other part of the company makes that
3 determination regarding the request with the collateral file;
4 right?
5    A.  We run the automation ourselves.
6    Q.  I'm sorry?
7    A.  That's part of our department.
8    Q.  So there's some other report that you get.
9       I'm trying to understand.  You told me there's one
10 report where you actually are getting the collateral file.
11 I'm trying to figure out and understand the process of how
12 the collateral file gets to your location.
13    A.  That would be the front-end piece, the ordering of
14 the collateral file, and that is also again based on
15 delinquency.
16    Q.  Sure.
17    A.  And occupancy.  Those types of factors.
18    Q.  Sure.
19    A.  That is set up with respect to the referral, the
20 foreclosure referral process.
21    Q.  But that's still your department that performs that
22 function, making the request to get the collateral file?
23    A.  Yes.
24    Q.  So is it also the foreclose referral group then
25 that tasks you with that or tells you, hey, this one, you

Page 29

1   know, needs to be obtained?

2    A. No. There's -- there's no type of communication

3   like that. It's -- again, it's based on the criteria that

4   has been established.

5    Q. So if I'm understanding you correctly, it's simply

6   a function of the computer software program. In other words,

7   when a particular type of loan meets this particular criteria

8   the software program simply sends a message to your

9   department that the collateral file needs to be obtained.

10    Is that what you're saying?

11    A. When we run the automation process it would fall on

12   that particular process. There really is no type of message,

13   per se.

14    Q. So something gets triggered in the software system

15   and when you're doing your daily batching, I guess, or

16   reports, it comes up?

17    A. Correct.

18    Q. I'm trying to use -- just so you understand, when I

19   say things like "messages," I do want you to clarify.

20    A. Sure.

21    Q. I'm trying to use familiar terminology so we can

22   effectively communicate. I understand that it's an automated

23   process and the computer chugs it out, but I don't know what

24   else to call it except for a message.

25    A. I understand.

Page 30

1    Q. Just so I understand that.

2    But again I do want -- it is helpful when you

3   clarify that this is not necessarily, Fred, go get a file.

4   It's an automated report.

5    A. Sure.

6    Q. And so does that work get distributed in the same

7   way that you described a few minutes ago to the operations

8   clerks as well?

9    A. We have a team collectively, and they are called

10   the automation group, that perform those tasks with respect

11   to actually ordering the collateral files.

12    Q. And who makes up the automation group?

13    A. There are three people that, I think, four. We

14   just added one. They are people that handle that task.

15   There are three loan servicing specialists and a work

16   director.

17    Q. Do they work underneath you also?

18    A. Yes. They report directly to me.

19    Q. Are they housed in the same office space as the

20   operations clerks and supervisors?

21    A. Yes.

22    Q. But they have separate titles?

23    A. Yes.

24    Q. So I assume the loan servicing specialists are the

25   people who perform the work and the work director is

Page 31

1   essentially their supervisor?

2    A. As the title indicates, they truly direct the work

3   flow.

4    Q. And so these loan servicing specialists are the

5   ones that then actually go about determining where the

6   collateral is and how and to whom the request needs to be

7   made; correct?

8    A. Actually our automation program does that.

9    Q. So they are going to get a report?

10    A. A report.

11    Q. That says this loan is with Deutsche Bank?

12    A. Yes.

13    Q. And they know how to contact Deutsche Bank to go

14   get that document; correct?

15    A. Yes.

16    Q. So they send out the request for the collateral

17   file and you described that a little while ago as being

18   either done electronically or by letter depending upon the

19   custodian; correct?

20    A. Not necessarily the custodian. It depends upon the

21   investor.

22    Q. Okay.

23    A. There's some that require a paper request.

24    Q. So that would be determined by the pooling and

25   servicing agreement?

Page 32

1    A. Yes.

2    Q. In your offices then do you have access to the

3   pooling and servicing agreements, or is that simply indicated

4   on the computer information that's available to you?

5    A. It's indicated.

6    Q. So there's going to be an indication on the

7   computer screen?

8    A. Yes.

9    Q. And then is there a time line for them, or a

10   standard time for the collateral file to be obtained?

11    A. Depending the custodian, it could be as little

12   as 24 hours, or as much as ten days.

13    Q. I would assume it probably has to with the location

14   of the custodian.

15    A. Yes.

16    Q. So once that request is made and sent out and the

17   file actually gets -- the collateral file gets delivered to

18   your offices, how does that occur?

19    A. We get it via UPS or Fed Ex.

20    Q. And I assume those probably end up showing up at

21   your offices daily?

22    A. Yes.

23    Q. What happens to them once they come into your

24   office?

25    A. We confirm what they receive based on the shipping

Geline v.                                                                            H. John Kennerty
Northwest Trustee Services, et al                                                    May 20, 2010

---

**Page 33**

1  report, and then we process them in by uploading, once the
2  verification has been completed, uploading the shipping
3  report into the tracking system.
4      Q.  So who performs that task?
5      A.  That's done by the file room team.
6      Q.  Those are the operations clerks?
7      A.  Some are operation clerks and some are loan
8  servicing specialists as well.
9      Q.  So they upload the shipping report you said?
10     A.  Once the verification is completed, yes.
11     Q.  So they actually physically go through each one of
12  the collateral files and make sure the documents that are
13  listed on the shipping report match up with the documents
14  that are in the collateral file?
15     A.  That specific task is actually performed in Eagan,
16  Minnesota.
17     Q.  Okay.  Could you explain it to me?
18     A.  The collateral files are shipped to Eagan.
19     Q.  First.
20     A.  For imaging purposes.  Depending upon if it is a
21  copied state files and once it's imaged, the images are
22  verified that they have been uploaded to our imaging
23  platform, then the files are returned to the custodian.
24         If it's an original document state file, those
25  files are then categorized on a shipping manifest and shipped

**Page 34**

1  to us.
2      Q.  So you're sending out the request to the custodian
3  and it goes first to Eagan, Minnesota, and is that an office
4  of Wells Fargo?
5      A.  Yes.
6      Q.  And documents are imaged and then they are either
7  returned to the custodian or they're forwarded on to your
8  offices in South Carolina; correct?
9      A.  Correct.
10     Q.  But the team in Eagan is responsible for verifying
11  the contents of the collateral file; is that correct?
12     A.  They image it.  And based on those images an
13  electronic data stream is provided to us of what documents
14  are in the file.
15     Q.  And by electronic data stream what do you mean?  Is
16  it something like a checklist on a computer screen or actual
17  images of the documents or both?
18     A.  It truly is a stream of data that comes in that we
19  process.  That gets uploaded to say, okay, we received
20  original note and original recorded mortgage.
21     Q.  Okay.
22     A.  Then of course the images are available as well.
23     Q.  So the data is coming in electronically.  But then
24  once you receive it you can actually see the documents;
25  correct?

**Page 35**

1      A.  The images; correct.
2      Q.  All right.  So once the collateral file is arriving
3  there in South Carolina, there's no additional verification
4  of the contents of those collateral files because it has
5  already been done in Eagan; is that correct?
6      A.  Prior to it being sent to the attorney, we document
7  what is being sent.
8      Q.  Again?
9      A.  Yes.
10     Q.  But when it's being received by your offices that's
11  just uploading of the shipping report, you called it?
12     A.  Correct.
13         MS. HUELSMAN:  Are we doing okay of not
14  talking over each other?  I think we're probably talking over
15  each other.
16         COURT REPORTER:  Just a little.
17  BY MS. HUELSMAN:
18     Q.  We just have to watch talking over each other
19  because she has to take down everything that we both say.
20  It's really common in conversation to do that, but it makes
21  her life hard.  And it's especially hard because I talk
22  really fast, even though actually right now I'm actually slow
23  for me.
24     A.  Sure.
25     Q.  So the file room team then performs its task and

**Page 36**

1  takes the collateral documents.  The collateral file.  I'm
2  sorry.
3         And you say that you actually have a storage unit
4  there in your offices; correct?
5      A.  We have a small file room, yes.
6      Q.  That's where the collateral files are stored until
7  they have to be sent?
8      A.  Either to the attorney or back to the custodian.
9      Q.  And what kind of state is Washington state treated
10  as?
11     A.  It's -- if it's a foreclosure state or foreclosure
12  action it's a copy state.
13     Q.  Washington is considered a copy state?
14     A.  Yes.
15     Q.  And so your offices would never get the collateral
16  file because Washington is a copy state; correct?
17     A.  Unless there's some type of --
18     Q.  Special request or?
19     A.  Yes.
20     Q.  All right.  So the documents in our case that we're
21  dealing with here, the Geline case, those were sent to Eagan,
22  imaged and then sent back to the custodian; correct?
23     A.  Initially, yes.
24         MS. HUELSMAN:  Your attorney has provided me
25  with some documents here so we are going to go through those.

Geline v.
Northwest Trustee Services, et al

H. John Kennerty
May 20, 2010

Page 37

1    MR. YATES: I could use a restroom break.
2    (Off the record.)
3    (Exhibit No. 1 was marked.)
4  BY MS. HUELSMAN:
5    Q.  Before we turn to this document, so what did you do
6  to prepare for your deposition today?
7    A.  Booked a flight, hotel, and rental car.
8    Q.  Did you review any files?
9    A.  Yes.
10   Q.  Can you tell me what you reviewed without
11  disclosing anything that's privileged?
12   A.  The collateral file.
13   Q.  That was it?
14   A.  Yes.
15   Q.  And so you didn't review any of the electronic
16  records?
17   A.  No.
18   Q.  Were you involved at all personally in the Geline
19  file?
20   A.  How?
21   Q.  Did you perform any work in connection with
22  Ms. Geline's foreclosure?
23   A.  No.
24   Q.  But you can describe to me how it came to be in
25  your department; correct?

Page 38

1    A.  Correct.
2    Q.  So from my understanding of what you told me a few
3  minutes ago, your office would have had a report that
4  indicated that the collateral file needed to be requested; is
5  that correct?
6    A.  Correct.
7    Q.  And then that occurred according to the process
8  that you just described to me a few minutes ago; correct?
9    A.  Correct.
10   Q.  Do you know who performed that task in your
11  department?
12   A.  It would have been our automation group.
13   Q.  But you don't know the person within the automation
14  group?
15   A.  No.
16   Q.  Did you review any records to verify that that
17  process occurred before you came here today?
18   A.  I had the file, so --
19   Q.  So there's no other way the documents could have
20  arrived at your offices but through the process you described
21  to me?
22   A.  Correct.
23   Q.  That's what I want to be sure of.
24   So do you know when the collateral file was
25  requested from Ms. Geline's --

Page 39

1    I guess I should say, do you know when Ms. Geline's
2  file was requested initially from the custodian?
3    A.  No.
4    Q.  Would there be electronic records of that in the
5  system, the software system that you described?
6    A.  Yes.
7    Q.  And do you know the custodian that had Ms. Geline's
8  collateral file?
9    A.  If memory serves, I believe it was Wells Fargo
10  document custody.
11   Q.  Where is that located?
12   A.  It is Hennepin, Minnesota. I believe Eagan and
13  Hennepin run together.
14   Q.  Okay.
15   A.  I believe it is considered Hennepin.
16   Q.  One is on one side of the city or border or
17  whatever? I'm sure there is probably a big line between
18  Eagan and Hennepin.
19   A.  Yes.
20   Q.  And then initially would the collateral file have
21  then gone back to the custodian?
22   A.  Once it was imaged; correct.
23   Q.  Right, right, okay.
24   I recognize that you said later on it came back,
25  but initially it would have gone back to the custodian;

Page 40

1  correct?
2    A.  Correct.
3    Q.  Did you review any records that confirmed that that
4  occurred?
5    A.  The comments in the system where the file was
6  ordered.
7    Q.  So you did look at the electronic records?
8    A.  Not -- the second time because it was ordered
9  twice.
10   Q.  But I mean you have looked at the electronic
11  records regarding the file; right?
12   A.  Correct.
13   Q.  You just told me a few minutes ago you hadn't. So
14  I just wanted to make sure.
15   MR. YATES: I'm going to object. It's vague.
16  You might want to clarify the time.
17  BY MS. HUELSMAN:
18   Q.  So at some point have you reviewed the electronic
19  records in the file?
20   A.  Yes.
21   Q.  But you didn't necessarily do it directly before
22  coming here to testify, but you have looked at the electronic
23  records in the past?
24   A.  Yes.
25   Q.  And you're basing your testimony regarding your

Geline v.
Northwest Trustee Services, et al

H. John Kennerty
May 20, 2010

---

Page 41

1  previous viewing of the electronic files?
2     A. Yes.
3     Q. So the collateral file went back and then what
4  happened in your department with the Geline file?
5     A. We received a second request to request or to order
6  the collateral file.
7     Q. Did your department perform any other work in
8  connection with Ms. Geline's foreclosure before that second
9  request for the collateral file?
10    A. I can't specifically say one way or the other
11 because I do not know.
12    MS. HUELSMAN: Okay. Let's mark this as
13 Exhibit 2.
14    (Exhibit No. 2 was marked.)
15 BY MS. HUELSMAN:
16    Q. Have you ever seen this document before?
17    A. No.
18    Q. Is Ms. Hosenfeld, H-O-S-E-N-F-E-L-D, is she one of
19 your employees?
20    A. She was a notary that we had.
21    Q. So she was an employee of Wells Fargo?
22    A. She was a contract worker.
23    Q. So she was a contract employee, but she wasn't an
24 employee of Wells Fargo?
25    A. Yes.

---

Page 42

1     Q. Was she one of the people that you supervised as
2  part of the loan documentation team?
3     A. Yes.
4     Q. I'm assuming, based on your statement, she is no
5  longer there.
6     A. She went to another department.
7     Q. Is Ms. Moua, M-O-U-A -- is that how you pronounce
8  it?
9     A. Yes.
10    Q. Xee Moua.
11    A. Yes.
12    Q. And that's X-E-E. That's the first name. Last
13 name is M-O-U-A.
14    She is one of your employees; correct?
15    A. Yes.
16    Q. And she's still an employee?
17    A. Yes.
18    Q. What is her actual title?
19    A. She is a work director.
20    Q. She is a work director?
21    A. Yes.
22    Q. So she's part of the automation group?
23    A. No. She is part of the executable team.
24    Q. So I thought -- okay. She's part of the executable
25 team.

---

Page 43

1     What does the executable team do?
2     A. They receive documents for execution; various types
3  of documents; affidavits; substitution of trustees; judgment
4  figures.
5     There's requests for power of attorneys, and there
6  are various other types of requests. There are foreclosure
7  related requests.
8     Q. What other, I guess, departments or teams do you
9  manage? We have the automation group and we have the
10 executable team.
11    What else is there?
12    A. Assignment team.
13    Q. What does the assignment team do?
14    A. They execute assignments.
15    Q. I thought the executable team could do that.
16    A. It's separate.
17    Q. So the assignment team does nothing except execute
18 assignments?
19    A. Assignments, yes.
20    Q. That's got to get redundant.
21    Then we have the automation group; executable team;
22 assignment team.
23    Any other teams or groups?
24    A. File room team.
25    Q. What do they do?

---

Page 44

1     A. They process the files in and maintain and manage
2  the file room and then process files out.
3     Q. Any other teams or groups in your department?
4     A. No.
5     Q. All right. So Ms. Moua is a work director of the
6  executable team?
7     A. Yes.
8     Q. And she works under you; correct?
9     A. Correct.
10    Q. So would it be part of her regular job duties and
11 responsibilities to sign documents like Exhibit 2 which is an
12 appointment of successor trustee document?
13    A. Yes.
14    Q. Would your officers create this document or would
15 it be created by a third party?
16    A. It would be created by a third party.
17    Q. So would it be created by an attorney that was
18 going to perform the foreclosure?
19    A. Yes.
20    Q. So I'm trying to clarify this. But so from what I
21 understand already, based upon what we've already talked
22 about, the collateral file that's sent, gets imaged and gets
23 sent back and then the data is streamed to your offices;
24 correct?
25    A. Correct.

---

Geline v.                                                                                                    H. John Kennerty
Northwest Trustee Services, et al                                                                          May 20, 2010

Page 45

1    Q.  And then your offices perform execution of
2    documents that need to be executed so that the foreclosure
3    process can continue on; correct?
4    A.  Correct.
5    Q.  And I understand that you said that the actual work
6    performed by the attorneys and the rest of that process is
7    outside of your realm of knowledge?
8    A.  Correct.
9    Q.  But based upon this, it does appear that there is
10   communication between your department and the foreclosing
11   attorney because you just told me that they create these
12   documents and then Ms. Moua signs them.
13   A.  Yes.
14   Q.  Can you explain to me how that occurs?
15   A.  The communication?
16   Q.  Yes.
17   A.  They would send a Word format document to a
18   specific mailbox and from there, depending upon the type of
19   document and whoever is responsible for that particular
20   mailbox would review it and process it.
21   Q.  Okay.  So if I understand it correctly, the work is
22   getting sent out to the attorney to perform the foreclosure,
23   and the attorney is then creating the paperwork to have it
24   self appointed as the trustee and that is simply sent back to
25   your team for execution; correct?

Page 46

1    A.  The part about the trustee is outside of my realm.
2    Q.  Well, that's what this document is.
3    A.  Okay.
4    Q.  So that's --
5    A.  Again, the mechanics of it, I can't speak to, but
6    as far as what they send to us, yes.
7    Q.  I know.  I'm just -- your employees are the ones
8    signing the documents appointing the trustees.
9    A.  Yes.
10   Q.  I'm not trying to trick you.  It's the document.
11   A.  Yes.
12   Q.  So Ms. Moua, does she have an obligation to review
13   the document and make sure it's accurate or anything else?
14   Or is she just signing what is sent to her?
15   A.  From a quality standpoint, yes.  There's a -- the
16   requirement to ensure that it's accurate.
17   Q.  And how does she ensure that it's accurate?
18        MR. YATES:  Object, to the extent it falls
19   beyond his notice.  It's another witness.  It's not a person
20   that you're asking about.
21        MS. HUELSMAN:  I understand.  He's also their
22   supervisor.  Go ahead.
23   A.  They look at the information as far as the name to
24   foreclose in.  And there's a verification of process that
25   they complete.

Page 47

1    BY MS. HUELSMAN:
2    Q.  Can you explain to me how that occurs?
3    A.  There's a foreclosure matrix that is maintained
4    with foreclosing entities.  That is these documents are, for
5    lack of a better term, bumped up against for verification
6    purposes.
7    Q.  So if I'm understanding you correctly, there's
8    information on a computer screen that lays out the parties
9    who should be involved in the foreclosure?
10   A.  Yes.
11   Q.  And it's Ms. Moua's responsibility to take a look
12   at that and make sure that the information on the document
13   she signs matches up with what's on the computer screen?
14   A.  Yes.
15   Q.  So Ms. Moua is looking at the document to make
16   certain that the description of the deed of trust that's at
17   issue in this case is correct; is that right?
18   A.  Yes.
19   Q.  And she is going to be looking to make sure that
20   the entity whose name she is signing on behalf of matches up
21   also with the information that's on the computer screen;
22   correct?
23   A.  Yes.
24   Q.  So according to this document, Ms. Moua was signing
25   this document on behalf of Wells Fargo who was acting as the

Page 48

1    attorney for US Bank as a trustee of a pooled trust?
2    A.  Yes.
3    Q.  Am I understanding that correctly?
4    A.  Yes.
5    Q.  So US Bank was the trustee of this pooled trust
6    WFMBS2004-N; is that correct?
7    A.  Correct.
8    Q.  And you think that Wells Fargo was acting as the
9    custodian for this pooled trust; correct?
10   A.  Not as custodian.  Custodian to me -- oh, you mean
11   for the collateral file?
12   Q.  Yes.
13   A.  Yes.
14   Q.  That's what you told me earlier.
15   A.  Yeah, I was --
16   Q.  Yeah.
17   A.  Okay.
18   Q.  US Bank is just the trustee --
19   A.  Right.
20   Q.  -- according to this; right?
21   A.  Right.
22   Q.  All right.  Once Ms. Moua signs this document, what
23   happens to it?
24   A.  The notary notarizes it, and then they are shipped
25   via overnight mail to the applicable attorney.

Geline v.
Northwest Trustee Services, et al

H. John Kennerty
May 20, 2010

Page 49

1    Q.  So the original leaves your office it as goes to
2    the trustee?
3    A.  Yes.
4    Q.  And do Ms. Moua and Ms. Hosenfeld at the time, do
5    they work in the same physical location?
6    A.  Yes.
7    Q.  Let's take a look at Exhibit 1.  We've back tracked
8    a little bit.
9    A.  (Witness complies.)
10    Q.  Can you explain to me what this document is, the
11    certification of loan documents?
12    A.  This is exactly that.  It's a document that we use
13    when we have to make copies of a document or documents and
14    send somewhere for whatever the purpose may be.  This says we
15    have examined.  We have reviewed the original documents and
16    the attached copies are true and accurate.
17    Q.  Okay.
18    A.  They are copies of the originals.
19    Q.  And Ms. Al Hamadi, she is an employee of Wells
20    Fargo?
21    A.  Yes.
22        MS. HUELSMAN: That's A-L, capital
23    H-A-M-A-D-I.  Also, it's on the document.  I know it's easier
24    for you if I just spell it.
25        COURT REPORTER: Thank you.

Page 50

BY MS. HUELSMAN:
2    Q.  So Ms. Al Hamadi is currently an employee of Wells
3    Fargo; correct?
4    A.  Yes.
5    Q.  And she witnessed your signature on this document
6    on May 17th, 2010?
7    A.  Yes.
8    Q.  And for what purpose did you execute this document?
9    A.  To provide copies of the original note from the
10    collateral file to Counsel.
11        MS. HUELSMAN: Mark this as Exhibit 3.
12        (Exhibit No. 3 was marked.)
13    BY MS. HUELSMAN:
14    Q.  Okay.  Exhibit 3, I assume you've seen this
15    document before?
16    A.  Yes.
17    Q.  And can you tell me what this document is?
18    A.  It's an unrecorded assignment of the mortgage.
19    Q.  That's Ms. Geline's Deed of Trust?
20    A.  Yes.
21    Q.  I'm being particular because she actually has a
22    deed of trust instead of a mortgage.  So.  And so it was your
23    testimony on this Exhibit 1 and your testimony here today
24    that Exhibit 3 is a photocopy of the original unrecorded
25    assignment document that you saw --

Page 51

1    A.  It is.
2        MR. YATES: Wait for her to finish the
3    question.
4        MS. HUELSMAN: Yeah.
5    BY MS. HUELSMAN:
6    Q.  That you saw in Fortmill, South Carolina on
7    May 17th, 2010; correct?
8    A.  Correct.
9    Q.  And do you know the reason that this document has
10    never been recorded?
11    A.  No.
12    Q.  Is that usual for original assignments to be
13    unrecorded in collateral files?
14    A.  It's -- I've seen that before.
15    Q.  But it's not the -- it's not normal?
16        MR. YATES: Object to the extent it misstates
17    prior testimony.  You can answer.
18    BY MS. HUELSMAN:
19    Q.  Why don't you give me your best estimation of the
20    percentage of times that you see original assignments sitting
21    in the collateral file unreported.
22    A.  Half the time.  50%.
23    Q.  Do you know why this document was not recorded
24    prior to the foreclosure proceeding?
25    A.  No.

Page 52

1    Q.  And do you know what Wachovia Bank's involvement is
2    as the trustee in this particular loan file?
3    A.  No.
4    Q.  Do you understand why I'm asking you that question?
5    Just because they're on here.
6        MR. YATES: I'm going to object to the extent
7    that the document speaks for itself.
8        MS. HUELSMAN: I understand.  I'm just --
9    BY MS. HUELSMAN:
10    Q.  Have you ever seen Wachovia Bank in the chain of
11    custody for this particular loan file?
12    A.  Have I?  No.
13    Q.  No.  So in other words, your testimony I believe
14    you told me was that your records would show it coming from
15    Wells Fargo Bank, the custodian entity, to Eagan, Minnesota
16    for scanning or imaging you said?
17    A.  Yes.
18    Q.  It goes back to Wells Fargo as the custodian;
19    right?
20    A.  Yes.
21    Q.  And then it since then comes from Wells Fargo, the
22    custodian, back to your offices now because of the
23    litigation?
24    A.  Yes.
25    Q.  Right?

Geline v.
Northwest Trustee Services, et al

H. John Kennerty
May 20, 2010

---

Page 53

1    A.  Yes.
2    Q.  So at no point in that was Wachovia involved;
3    right?
4    A.  Not from my perspective, no.
5    Q.  All right.  Has this document been sent for
6    recording since you saw the original on May 17th?
7    A.  No.
8    Q.  So it's still sitting in your files back in South
9    Carolina?
10   A.  Yes.
11        (Exhibit No. 4 was marked.)
12   BY MS. HUELSMAN:
13   Q.  I assume you have seen this document before?
14   A.  Yes.
15   Q.  This is also you're contending a photocopy of the
16   original promissory note which is in your offices in South
17   Carolina that you have testified to be in possession of on
18   May 17th.  And I assume you're going to tell me that same
19   thing today.
20   A.  Yes.
21   Q.  Turn to the last page of the promissory note.
22   A.  (Witness complies.)
23   Q.  There are two endorsement stamps on the last page.
24       Do you see those?
25   A.  Yes.

---

Page 54

1    Q.  Do you have any idea when those endorsement stamps
2    were affixed to this promissory note?
3    A.  No.
4    Q.  So when it came back to you for the second time
5    from the Wells Fargo custodian facility it had both of these
6    stamps on it?
7    A.  Yes.
8    Q.  And do you know if it had both of these stamps on
9    the original note when it came to your offices the first
10   time?
11   A.  No, I do not know.
12   Q.  Now, according to what you told me, this original
13   note should have been imaged when it went to Eagan the first
14   time it was requested; correct?
15   A.  Correct.
16   Q.  So if the note had these stamps affixed to it at
17   that time it should have been caught in that image system;
18   correct?
19   A.  Yes.
20   Q.  I'm assuming based upon imaging that somebody is
21   sticking it in a machine and the machine is reading it and
22   copying it; correct?
23   A.  Correct.
24   Q.  And you just don't know because you haven't looked
25   at that image; correct?

---

Page 55

1    A.  Correct.
2    Q.  Was the promissory note reimaged when it came back
3    to you the second time?
4    A.  It should have been, yes.
5    Q.  So it should have gone from Wells Fargo the
6    custodian to Eagan to you even on the second trip to you?
7    A.  Yes.
8    Q.  And would it have -- would the reimaging have
9    written over the previous image or would there just be a
10   separate file created such that there would be two images of
11   the collateral file?
12   A.  Separate image.
13   Q.  So on the system there should be two separate
14   images of the collateral file from the different dates at
15   which it was imaged?
16   A.  Yes.
17   Q.  Does Joan Mills work in your department?
18   A.  No.
19   Q.  Do you know if she ever worked in your department?
20   A.  I do not know if she ever did.
21   Q.  Does your department ever -- does your department
22   employees ever sign on endorsements of promissory notes?
23   A.  Yes.
24   Q.  On a regular bases?  Or just under particular
25   circumstances?

---

Page 56

1    A.  Depending upon your definition of regular basis.
2    Q.  Why don't you give me your --
3    A.  In -- part of our process would be to do that when
4    it was necessary or needed.
5    Q.  When would it be necessary?
6    A.  At the request of the foreclosing attorney.
7    Q.  So if the foreclosing attorney provided the
8    instruction to Wells Fargo to endorse the promissory note
9    then your department would be the people who would do that?
10   A.  Yes.
11   Q.  And the instruction would only come from the
12   foreclosing attorney?
13   A.  Yes.
14   Q.  And would the foreclosing attorney also tell you to
15   whom the endorsement should be made payable?
16   A.  Yes.
17   Q.  So in other words, the foreclosing attorney would
18   say either endorsing a blank or endorse it to X, Y, Z
19   corporation?
20   A.  Yes.
21        (Exhibit No. 5 was marked.)
22   BY MS. HUELSMAN:
23   Q.  Have you seen this document before?
24   A.  Yes.
25   Q.  And this is your signature on this document?

---

Geline v.
Northwest Trustee Services, et al

H. John Kennerty
May 20, 2010

Page 57

1    A. Yes.
2    Q. When did you sign this document?
3    A. It would have been August of 2000 -- August 8,
4    2009.
5    Q. You just know that based upon looking at the date
6    on the document?
7    A. Yes.
8    Q. I'm assuming you don't have any specific
9    recollection of signing it?
10   A. No.
11   Q. Have you ever signed one of these documents with an
12   incorrect date on it?
13   A. No.
14   Q. So you're always careful to look at the date when
15   you sign?
16   A. Yes.
17   Q. Can you tell me for what purpose you signed this
18   document?
19   A. It printed as part of the loss mitigation
20   declaration packet when this was referred to foreclosure.
21   Q. So you're referring to the requirement under our
22   State statute that somebody sign off on it for the entity
23   that's foreclosing indicating that loss mitigation has been
24   provided to the borrower; is that correct?
25   A. Yes.

Page 58

1    Q. So this beneficiary declaration is a part of that
2    package?
3    A. Yes.
4    Q. So this declaration was created and sent to your
5    offices by the foreclosing trustee; is that correct?
6    A. No.
7    Q. Who would have created this?
8    A. This is created daily after the referral.
9    Q. Can you explain to me how that happens?
10   A. Sure. Once a loan is referred there is a 24-hour
11   delay before it's uploaded into the system and we get
12   notification that the loan has been referred.
13   Q. From the foreclosing referral group?
14   A. Correct.
15   Q. So that's the report that you were talking about
16   getting daily?
17   A. Oh, the report for pulling collateral documents?
18   Q. I thought -- I'm sorry. I thought you also told me
19   that there was a report that tells you that the matter is
20   potentially being referred to you.
21   Am I wrong?
22   A. Yes.
23   Q. Correct me.
24   A. It goes through -- which part? The report or with
25   respect to --

Page 59

1    Q. Why don't you describe the whole process to me so I
2    understand it.
3    A. The loans are referred by the referral, foreclosure
4    referral group.
5    Q. And I just want to make clear that you told me
6    earlier that that essentially was a message on the automated
7    system.
8    Am I wrong?
9    A. Correct.
10   Q. I'm right, okay.
11   A. Make sure we get our terminology correct.
12   Q. Exactly, and I like to be right as much as
13   possible. Go ahead.
14   A. Once it's referred, our system picks it up the next
15   day.
16   Q. Okay.
17   A. And once it's picked up we -- it pulls in the data
18   for the processing of that loss mitigation declaration as
19   well as the beneficiary declaration.
20   Q. Okay. So the loss mitigation declaration and the
21   beneficiary declaration are documents that are created by
22   Wells Fargo?
23   A. Yes.
24   Q. So the system pops up a message or whatever with
25   that packet of documents for somebody to sign; is that right?

Page 60

1    A. They are actually printed.
2    Q. Wow, what do you know, something's printed, okay.
3    So do you regularly sign these types of documents?
4    A. Yes.
5    Q. Do other members of your various teams also sign
6    these documents?
7    A. Only when they are asked.
8    Q. So the loss mitigation and the beneficiary
9    declaration are types of documents that generally only you
10   sign?
11   A. Correct.
12   Q. What is the reason that you are tasked with signing
13   those documents?
14   A. I was -- when the -- when we implemented the
15   process it was just convenient for me to sign them.
16   Q. And what do you do before you sign the documents?
17   Do you verify any information or are you just signing
18   whatever is printed?
19   MR. YATES: I'm going to object to the extent
20   it has been asked and answered.
21   A. The verification of the date; the foreclosing
22   entity information is pulled in from a, the foreclosure
23   matrix. And then it's -- I sign it.
24   BY MS. HUELSMAN:
25   Q. So I want to be particular about this.

Geline v.                                                                    H. John Kennerty
Northwest Trustee Services, et al                                            May 20, 2010

---

Page 61

1      So you're getting these documents, the loss
2  mitigation declaration, and the beneficiary declaration, and
3  those two documents are printed and presented to you by
4  somebody else for signing; right?
5      A.  Correct.
6      Q.  That's one of your other file clerks or staff
7  people that gives you those documents?
8      A.  Yes.
9      Q.  And those are part of the 50 to 150 documents per
10 day that you sign; correct?
11     A.  Yes.
12     Q.  Somebody comes and brings you those documents and
13 you sit down to sign them.  And you're looking at the
14 documents to make sure that the date is correct and
15 consistent with the date you're signing the document;
16 correct?
17     A.  Yes.
18     Q.  And you're looking on a computer screen at the
19 foreclosure matrix that you described to me to make certain
20 that the name of the foreclosing -- of the beneficiary on the
21 document that you're signing matches with the matrix; is that
22 correct?
23     A.  No.  That's not correct.
24     Q.  Okay.  What are you looking at on the matrix?
25     A.  I'm not looking at the matrix.

---

Page 62

1      Q.  Okay.
2      A.  The matrix is updated daily, and this information
3  is pulled from that matrix.
4      Q.  So you're simply signing the document that's
5  presented to you and you're just making sure that the date is
6  correct?
7      A.  Correct.
8      Q.  So how do you know when you're signing this
9  document that it's true and correct?
10         MR. YATES:  Objection, asked and answered.
11     A.  There are people that are responsible for the --
12 for maintaining that foreclosure matrix.
13 BY MS. HUELSMAN:
14     Q.  So you're relying upon your employees to have the
15 correct information in the matrix system?
16     A.  Not my employees.
17     Q.  Okay.
18     A.  Fellow Wells Fargo team members.
19     Q.  Who puts the information into the matrix?
20     A.  It's generated from our foreclosure departments.
21 Specifically I don't know who.
22     Q.  That's coming from the foreclosure referral;
23 correct?
24     A.  No.  It's coming from the foreclosure department.
25     Q.  And that's separate from the foreclosure referral

---

Page 63

1  group?
2      A.  Yes.
3      Q.  And again, just generally I know you don't work
4  there.
5          What does the foreclosure department do?
6      A.  They -- they are the liaison, conduit, if you will,
7  between Wells Fargo and the foreclosing attorney.
8      Q.  And that's separate from the foreclosure referral
9  group?
10     A.  Yes.
11     Q.  All right.  So someone at the foreclosure
12 department makes sure that the information on the matrix is
13 correct.
14         That's your understanding?
15     A.  Correct.  That is my understanding.
16     Q.  You told me that your department is the one that
17 actually has the collateral documents in your possession.
18         If it's in the original file state in your
19 department that's also going to have a copy on the imaging
20 system if it's a copy file state; right?
21     A.  Correct.
22     Q.  Does the foreclosure department also have access to
23 the imaging system?
24     A.  Yes.
25     Q.  So it is from the imaging system that you're

---

Page 64

1  surmising that the foreclosure department gets the
2  information to put into the matrix?
3      A.  I can't answer that.
4      Q.  You just know it's the foreclosure department's
5  responsibility to put the information in the matrix; right?
6      A.  Correct.
7      Q.  And then the matrix is -- the information from the
8  matrix is inserted into this document, the beneficiary
9  declaration and that's presented to you for signature?
10     A.  As part of our daily, morning processing.
11     Q.  Right.
12     A.  It's updated, with any updates and then it gets
13 pushed out to the various processors.
14     Q.  And so when you sign this beneficiary declaration
15 and any other beneficiary declaration, you don't have any
16 independent knowledge about whether or not the information is
17 truthful, you're relying on the other people in the process
18 to make sure that the information is correct on the document
19 that you're signing?
20     A.  Yes.
21         MR. YATES:  Let her get the question out so
22 she can take it down.
23         WITNESS:  Okay.
24 BY MS. HUELSMAN:
25     Q.  And do you know the difference between whether or

---

Geline v.                                                      H. John Kennerty
Northwest Trustee Services, et al                             May 20, 2010

Page 65

1  not an entity has a -- is the actual holder of the promissory
2  note or the requisite authority under RCW 62A.3-301 to
3  enforce the obligation?
4            MR. YATES: Objection to the extent it calls
5  for a legal conclusion.
6    A.  Could you read the question again?
7            (Requested testimony was read.)
8            MR. YATES: Same objection.
9    A.  No.
10           MS. HUELSMAN: I'm going to take another break
11 because I forgot to bring a document.
12           (Off the record.)
13           (Exhibit No. 6 was marked.)
14 BY MS. HUELSMAN:
15   Q.  Have you ever seen this document before?
16   A.  No.
17   Q.  You said you had looked at the collateral file in
18 this case; correct?
19   A.  Correct.
20   Q.  And I believe you told me that it should contain
21 all of the original promissory note recorded deed of trust
22 assignments, things like that; correct?
23           MR. YATES: Object to the extent it misstates
24 prior testimony.
25   A.  Depending upon the custodian.

Page 66

1  BY MS. HUELSMAN:
2    Q.  Sure.  But it should have all the original
3  documents related to ownership of the loan?
4            MR. YATES: Same objection.
5  BY MS. HUELSMAN:
6    Q.  Correct?
7    A.  One would think, yes.
8    Q.  So this assignment which as you can see by the top
9  is recorded in the records of King County in September of
10 2005.
11       Do you see that at the top?  The big stamp there
12 says 9/22/05.
13   A.  I see the stamp, yes.  The bar code.
14   Q.  And it was recorded, and then the return address is
15 Wells Fargo Home Mortgage.  Final documents they are in
16 Eagan, Minnesota.
17       Do you see that in kind of the upper left-hand
18 corner?
19   A.  Yes.
20   Q.  So the original of this document should have been
21 mailed back by the county to Wells Fargo there on Eagan.
22       Do you know why it wouldn't have been put in the
23 collateral file?
24   A.  No.
25   Q.  Should it have been?

Page 67

1    A.  I can't really answer that because I don't know
2  what their process is.
3    Q.  Right.  But normally when you -- you deal with a
4  lot of collateral files; right?
5    A.  Yes.
6    Q.  I'm sure you've looked at a lot of them; right?
7    A.  Yes.
8    Q.  Is it normal when an assignment is returned by the
9  recorder's office for that assignment to be put into the
10 collateral file?
11   A.  It should be, yes.
12   Q.  So that's what should happen?
13   A.  It should, but.
14   Q.  Yeah.
15   A.  Again, I don't know their process.
16   Q.  I understand.  But when you get collateral files
17 they're supposed to have original assignments returned by the
18 recorder's office; right?
19   A.  I would think so, yes.
20   Q.  Let's take a look at Exhibit 3.
21       Can you explain to me why there are two different
22 assignments of the same loan?
23   A.  No.
24   Q.  Can you explain to me why they were -- the loan was
25 assigned to different entities?

Page 68

1    A.  No.
2    Q.  Do you know who Georgiana Rice is?
3    A.  No.
4    Q.  Looks like she is probably in Minnesota, but I
5  thought you might know who she was.
6    A.  It looks like she's with Linear Financial.
7    Q.  But certainly based upon your testimony today and
8  this certification of the loan document, you executed this
9  assignment, Exhibit 6, the deed of trust is not presently in
10 the collateral file?
11   A.  Correct.
12   Q.  Do you know if it was in the imaged file?
13   A.  No.
14   Q.  You testified a few minutes ago about signing
15 declarations regarding loss mitigation; do you recall that?
16   A.  Yes.
17   Q.  In connection with foreclosures in Washington
18 state.
19   A.  Yes.
20   Q.  You said you signed one in this case and I just
21 didn't bother to bring it in.
22       Do you have any knowledge about whether or not the
23 loss mitigation has been offered to the borrower when you
24 sign that document as well?
25   A.  It would not -- it would not have been referred if

Geline v.
Northwest Trustee Services, et al

H. John Kennerty
May 20, 2010

Page 69

1  the due diligence hadn't been completed.
2      Q.  Right.  But again you don't have any personal
3  knowledge when you sign any of those declarations; correct?
4          MR. YATES: Object to the form.  It misstates
5  prior testimony.  You can answer.
6      A.  Personal knowledge that I sat there and watched
7  somebody do it, no, I did not.
8  BY MS. HUELSMAN:
9      Q.  So again, you're just relying upon the rest of the
10  employees at Wells Fargo to have made certain that the task
11  that needed to be performed was performed and you're just
12  signing the document; correct?
13      A.  Yes.
14      Q.  Do you know what part of Wells Fargo provides the
15  loss mitigation service?
16      A.  It would be collections department and then the
17  foreclosure referral department does a confirmation.
18          (Exhibit No. 7 was marked.)
19  BY MS. HUELSMAN:
20      Q.  Have you ever seen Ms. Brodish's declaration
21  before?
22      A.  No.
23      Q.  That's B-R-O-D-I-S-H.
24          Do you know Ms. Brodish?
25      A.  Only from speaking to her on the phone.

Page 70

1      Q.  Is she somebody with whom you work regularly in
2  your job?
3      A.  I wouldn't say regularly.  Periodically.
4      Q.  And for what reason are you required to speak to
5  Ms. Brodish?
6      A.  She is in our litigation department and they
7  periodically request that we order collateral files.
8      Q.  So that's usually the context in which you're
9  speaking to her?
10      A.  Yes.
11      Q.  Do you know if the collateral file has ever been
12  provided to Ms. Brodish?
13      A.  Yes.
14      Q.  And when did that occur?
15      A.  I believe it was April 2009, if memory serves.
16      Q.  Okay.
17      A.  It -- it -- actually that might have been April of
18  this year.  I -- April is standing out, but I don't
19  specifically recall the year.
20      Q.  Okay.  So it was either April of this year or April
21  of last year?
22      A.  Yes.
23      Q.  Do you know for what reason the collateral file was
24  sent to Ms. Brodish?
25      A.  She would have requested it.

Page 71

1      Q.  So I'm surmising from what you're saying is it's
2  normal if the litigation part of Wells Fargo contacts your
3  office asking for a collateral file that you send it?
4      A.  Yes.
5      Q.  Again that's by Federal Express or UPS?
6      A.  Yes.
7      Q.  Did Ms. Brodish return the collateral file to your
8  location?
9      A.  Yes, she did.
10      Q.  Do you recall when that occurred?
11      A.  That might have been the April of this year when it
12  was returned to us.
13      Q.  And is there any record kept of what was in the
14  collateral file when it gets sent to Ms. Brodish?
15      A.  It would have been the documentation from when it
16  was processed in.
17      Q.  That's the shipping report, I think you called it?
18      A.  Yes.
19      Q.  But there's no additional imaging that's occurred
20  at your offices; correct?
21      A.  Once it comes back to us, no.  We don't reimage it
22  again.
23      Q.  Is it reimaged before it's sent to Ms. Brodish?
24      A.  Yes.
25      Q.  In other words, it has been imaged at Eagan the two

Page 72

1  times we have talked about?
2      A.  Yes.
3      Q.  And then it has come back to your offices and you
4  sent it to Ms. Brodish and she sent it back to you.  But
5  there has been no additional imaging during those two
6  transfers?
7      A.  Not to my knowledge.
8      Q.  Nobody has independently verified the contents of
9  the collateral file during those two shipments, they are just
10  relying on the shipping record?
11          MR. YATES: Object to the form.
12      A.  Could you repeat that, please?
13          (Requested testimony was read.)
14      A.  Correct.
15  BY MS. HUELSMAN:
16      Q.  I was wondering if we could look at anything that
17  would show whether or not this assignment went missing during
18  this process?
19      A.  Nothing that I'm aware of, no.
20      Q.  All right.  Does Wells Fargo handle all of its own
21  foreclosures?
22          It's not a well phrased question, let me try again.
23          When Wells Fargo services a loan, does your
24  department handle all of the collateral, the documentation
25  for all of the -- all of Wells Fargo servicing when loans go

Geline v.                                                                                          H. John Kennerty
Northwest Trustee Services, et al                                                                  May 20, 2010

---

Page 73

1  to foreclosure?
2      A.  To my knowledge, yes.
3      Q.  So Wells is not using third parties like lenders
4  processing services or other companies?
5      A.  Not for collateral files.
6      Q.  And that includes assignments and things like that,
7  that's what you mean by involving collateral files?
8      A.  Correct.
9      Q.  So I just want to make certain that if an
10 assignment needs to be done on behalf -- regarding a loan
11 that Wells Fargo is servicing it be should be coming through
12 your department, right?
13     A.  For the most part, yes.
14     Q.  Okay.
15     A.  The one exception would be any MERS-related
16 assignments in which the foreclosing attorney has
17 authorization and power of attorney to execute.
18     Q.  And so if it's a loan that has been registered on
19 the MERS system then it doesn't have to come back to your
20 offices for assignment, the foreclosing attorney could simply
21 do it themselves?
22     A.  Correct.  If they have the authorization.
23     Q.  Right.
24     A.  And the power of attorney.
25     Q.  So it's still essentially the collateral file is

---

Page 74

1  coming through your office, it just doesn't have to come back
2  to your department for actual signing of assignments?
3      A.  Correct.
4          MS. HUELSMAN: Let me just review my notes for
5  just a second, okay.
6          WITNESS: Sure.
7  BY MS. HUELSMAN:
8      Q.  When we started out this morning we were kind of
9  going through the flow through Wells Fargo department that a
10 foreclosure goes through, but I just want to make sure I
11 understand that correctly.
12         It starts at collections when somebody gets
13 delinquent?
14     A.  Yes.
15     Q.  It goes to the foreclosure referral group?
16     A.  Yes.
17     Q.  And it goes to loan documentation, your department?
18 I'm sorry.  It goes to -- I'm sorry.  It goes from
19 collections to loan documentation and foreclosure referral
20 group concurrently; right?
21     A.  Yes.
22     Q.  Right?
23     A.  Yes.
24     Q.  And then you guys do what you do, foreclosure group
25 does what it does and then do you know, does it then go to

---

Page 75

1  the foreclosure department?
2      A.  Once it's referred, it goes to the for -- it goes
3  to the foreclosure department.
4      Q.  So when it's coming from collections is it going to
5  foreclosure referral group, loan documentation and the
6  foreclosure department kind of all at the same time?
7      A.  That I don't know.
8      Q.  Okay.
9      A.  If it's concurrent with the referral aspect and
10 loan documentation and then going to foreclosure, I don't
11 know if that's taking place.
12     Q.  I'm just trying to figure out how the foreclosure
13 department gets the information in the foreclosure matrix
14 that you're relying upon when you sign documents.
15     A.  I can't answer that.  I do not know.
16     Q.  But certainly they have to fill it in before it
17 gets to you, otherwise you wouldn't have a document to sign;
18 correct?
19     A.  Correct.
20     Q.  Do people from the foreclosure department have
21 access to the collateral files that you're holding in your
22 offices?
23     A.  They have access to the images.
24     Q.  So they don't come down to your file room to go
25 look at the collateral file?

---

Page 76

1      A.  No.
2      Q.  They are just relying on the imaging?
3      A.  Correct.
4          MS. HUELSMAN: I think that's it.  Thank you.
5          MR. YATES: Thank you.
6          MS. HUELSMAN: Are you reserving signature?
7          MR. YATES: Yes.
8          (The deposition of H. John Kennerty was
9  concluded at 11:40 a.m.)
10         (Signature was reserved.)

---

Geline v.
Northwest Trustee Services, et al

H. John Kennerty
May 20, 2010

Page 0

```
 1                    C E R T I F I C A T E

 2

 3   STATE OF WASHINGTON )

 4   COUNTY OF KING       )        ss.

 5

 6         I, Judith A. Robinson, Certified Court Reporter and

 7   an officer of the Court under my commission as a Notary

 8   Public, in and for the State of Washington, do hereby certify

 9   that the foregoing deposition was transcribed under my

10   direction; that the transcript of the deposition is a full,

11   true and correct transcript to the best of my ability; that I

12   am neither attorney for, nor a relative or employee of any of

13   the parties to the action or any attorney or Counsel employed

14   by the parties hereto, nor financially interested in its

15   outcome.

16         IN WITNESS WHEREOF, I have hereunto set my hand

17   and affixed my official seal this_____day of

18   _____, 2010.

19

20                    _____

21

22                    Judith A. Robinson, Notary Public
                      in and for the State of Washington
                          residing at Seattle.
23                    My Commission expires November 4,
                      2012.
24                    CCR License #2171

25
```

EXHIBIT

5/20/10   1

KENNERTY

## CERTIFICATION OF LOAN DOCUMENTS

Loan No: 0041179441

Trustee Sale NO:
Owner:
Property Address:

I certify that the attached documents are true and correct copies of the original documents in my possession.

( ) Deed of trust
(X ) Note
( X ) Assignment - unrecorded
( ) Title Policy _____
( ) _____

By: _____
     John Kennerty, VP of Loan Documentation

3476 Stateview Blvd
Fort Mill, SC 29715
     (Address)

State of South Carolina
County of York

Signed and sworn to (or affirmed) before me on 5/7/10 ·
by Wendy Albertson Al-Hammadi

_____
(Signature of notarial official)

My commission expires: _____

OFFICIAL SEAL
Notary Public
State of South Carolina
WENDY ALBERTSON AL-HAMMADI
My Commission Expires March 10, 2018



**EXHIBIT**
5/20/10 **2**
KENNERTY

**Electronically Recorded**
**20090916000478**

SIMPLIFILE                                    AST  14.00
Page 001 of 001
09/16/2009 11:13
King County, WA

After Recording Return to:
Kathy Taggart
Northwest Trustee Services, Inc.
P.O. Box 997
Bellevue, WA 98009-0997

## Appointment of Successor Trustee

LYDIA K. GELINE and ROBERT M. GELINE, wife and husband is/are the grantor(s), Chicago Title Insurance Company is the trustee and Linear Financial, LP DBA QUADARANT HOME LOANS is the beneficiary under that certain deed of trust dated 05/10/04 and recorded on 05/14/04 under King County, Washington Auditor's File No. 20040514002817.

The present beneficiary under said deed of trust appoints Northwest Trustee Services, Inc., a Washington corporation, whose address is P.O. Box 997, Bellevue, WA 98009-0997, as successor trustee under the deed of trust with all powers of the original trustee.

The undersigned present beneficiary warrants and represents that, as of the date this Appointment of Successor Trustee has been executed and acknowledged, it is the owner and holder of the obligation secured by the subject deed of trust and is not holding the same as security for a different obligation.

4189193
1ST AM  0/14

Wells Fargo Bank NA, Attorney in fact for  US Bank National Association, as Trustee for WFMBS 2004-N

By
Xee Moua, VP of Loan Doc

STATE OF _____South Carolina_____ )
                                                                  )ss
COUNTY OF ____ ·____York _ )

I certify that I know or have satisfactory evidence that ____Xee Moua_____ is the person who appeared before me, and said person acknowledged that (he/she) signed this instrument, on oath stated that (he/she) was authorized to execute the instrument and acknowledged it as the _____VP of Loan Doc _____ of _____Wells Fargo Bank NA, Attorney in fact _____to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

Dated: ____08/31/2009

AMANDA ELIZABETH HOSENFELD
Notary Public, South Carolina
My Commission Expires
April 27, 2017

Notary Public in and for the State of ____South Carolina____
Residing at_____Fort Mill
My appointment expires _____

NORTHWEST TRUSTEE SERVICES, INC.            Client:  «ClientName»
P.O. BOX 997                                                  Borrower: «MatterName»
BELLEVUE, WA 98009-0997
425-586-1900 . FAX 425-586-1997

SERVING WASHINGTON, OREGON, IDAHO & ALASKA

Exhibit _____C_____
PAGE_____ OF __1__

**RETURN TO:**
Wells Fargo Bank, N.A.
Attention: Final Documents
MAC X4701-02B
3601 Minnesota Drive Suite 200
Bloomington, MN 55435

Loan      0041179441
Service   0041179441
Chan      RTL

## ASSIGNMENT OF MORTGAGE/DEED OF TRUST

For value received, Wells Fargo Bank, N.A., successor by merger to Wells Fargo Home Mortgage, Inc. 7001 Westown Parkway, West Des Moines, IA 50266  hereby sells, assigns, and transfers to:

WACHOVIA BANK, N.A., AS TRUSTEE

4527 METROPOLITAN COURT  SUITE C

FREDERICK, MD 21704

Its successors and assigns, all its rights, title, and interest in a certain Mortgage/Deed of Trust executed by
Execution Date : 05/10/2004
Legal Name : LYDIA K GELINE

Beneficiary :
Recorded in   KING              County, State of, WA
in the Book                     Page                    Document #
on the date
Signed        July 26, 2004
Legal:

WELLS FARGO BANK, N.A.

Jo Lennox                        Greg Ceneviva
Vice President                   Vice President
Loan Documentation               Loan Documentation

Chianh Pham                      Dayna Crim
Witnessed by                     Witnessed by

STATE OF MARYLAND ( SS           Property Address: 910 5TH STREET
COUNTY OF FREDERICK)                              KIRKLAND, WA 98033

On this 26th day of   July, 2004  before me, the undersigned a Notary Public of the state of Maryland, personally appeared Jo Lennox and Greg Ceneviva, respectively to me personally known, who being duly sworn, did say that they are the Vice President(s) of Loan Documentation respectively, of Wells Fargo Bank, N.A., successor by merger to Wells Fargo Home Mortgage, Inc., and that the seal affixed to the foregoing instrument is the corporate seal of said corporation by authority of its Board of Directors and the said, Jo Lennox and Greg Ceneviva acknowledged the execution of said instrument to be the voluntary act and deed of Wells Fargo Bank, N.A., successor by merger to Wells Fargo Home Mortgage, Inc., by it voluntary done and executed.  Witnessed  by my hand and notarial seal the day and last year above written.

THIS INSTRUMENT PREPARED BY:
Wells Fargo Bank, N.A.
7495 New Horizon Way
Frederick, Maryland 21703
Prepared by:
                                          NOTARY PUBLIC
Jim Mangel

Erica L. Whipp
Notary Public
Washington County, MD
My Commission Expires 05/05/2007

True and Certified Copy

0041179441



# FIXED/ADJUSTABLE RATE NOTE

**(One-Year Treasury Index - Rate Caps)**

**THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

MAY 10, 2004                    BELLEVUE                    WASHINGTON
[Date]                          [City]                      [State]

910 5TH STREET, KIRKLAND, WA  98033

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ *****605,000.00 (this amount is called "Principal"), plus interest, to the order of Lender. Lender is LINEAR FINANCIAL, LP DBA QUADRANT HOME LOANS

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 4.375 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on JULY 01, 2004 I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on JUNE 01, 2034 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at WELLS FARGO HOME MORTGAGE, P.O. BOX 10304, DES MOINES, IA  503060304 or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ *3,020.68 . This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of JUNE, 2009 , and the adjustable interest rate I will pay may change on that day every 12th month thereafter.

MULTISTATE FIXED/ADJUSTABLE RATE NOTE - ONE-YEAR TREASURY INDEX - Single Family - Fannie Mae UNIFORM INSTRUMENT



True and Certified Copy

The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND THREE-QUARTERS percentage points ( 2.750 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 9.375 % or less than 2.750 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 9.375 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.



True and Certified Copy

7.   **BORROWER'S FAILURE TO PAY AS REQUIRED**

   **(A) Late Charges for Overdue Payments**

   If the Note Holder has not received the full amount of any monthly payment by the end of 15        calendar days
after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be   5.000        %
of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

   **(B) Default**

   If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

   **(C) Notice of Default**

   If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by
a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and
all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to
me or delivered by other means.

   **(D) No Waiver By Note Holder**

   Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described
above, the Note Holder will still have the right to do so if I am in default at a later time.

   **(E) Payment of Note Holder's Costs and Expenses**

   If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right
to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.
Those expenses include, for example, reasonable attorneys' fees.

8.   **GIVING OF NOTICES**

   Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by
delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the
Note Holder a notice of my different address.

   Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note
will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different
address if I am given a notice of that different address.

9.   **OBLIGATIONS OF PERSONS UNDER THIS NOTE**

   If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made
in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this
Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a
guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder
may enforce its rights under this Note against each person individually or against all of us together. This means that any one
of us may be required to pay all of the amounts owed under this Note.

10.  **WAIVERS**

   I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor.
"Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means
the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

11.  **UNIFORM SECURED NOTE**

   This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to
the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same
date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in
this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment
in full of all amounts I owe under this Note. Some of those conditions read as follows:

   (A) Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above,
Uniform Covenant 18 of the Security Instrument shall read as follows:

> **True and Certified Copy**



**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

True and Certified Copy

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

*Lydia K. Geline* _____ (Seal)
LYDIA K. GELINE                  -Borrower

*Robert M. Geline* _____ (Seal)
ROBERT M. GELINE                  -Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

WITHOUT RECOURSE
PAY TO THE ORDER OF
WELLS FARGO BANK, N.A.
BY *Joan M. Mills* 
Joan M. Mills, Vice President

_____ (Seal)
-Borrower

*[Sign Original Only]*

PAY TO THE ORDER OF
WELLS FARGO BANK, N.A.
WITHOUT RECOURSE
LINEAR FINANCIAL, LP

*Lynette Hanson*
LYNETTE HANSON, VICE PRESIDENT

True and Certified Copy

BENEFICIARY DECLARATION
(NOTE HOLDER)
(Attorney in Fact for Beneficiary)



Loan No. 0041179441

The undersigned, under penalty of perjury, declares as follows:

US Bank National Association, as Trustee for WFMBS 2004-N is the actual holder of the promissory note or other obligation evidencing the above-referenced loan or has requisite authority under RCW 62A.3-301 to enforce said obligation.

The trustee may rely upon the truth and accuracy of the averments made in this declaration.

Dated this 8th day of August, 2009, in Fort Mill, SOUTH CAROLINA.

US Bank National Association, as Trustee for WFMBS 2004-N, beneficiary
Wells Fargo Bank, N.A., its Attorney in Fact

By: Herman John Kennerty
Its: Vice President of Loan Documentation

NWTS #:7023.05235
Matter name: GELINE, LYDIA K. and ROBERT M.

Exhibit  D
PAGE  1  OF  1





20050922002268
WELLS FARGO HO ADT
PAGE001 OF 001    12.00
09/22/2005 15:17
KING COUNTY, WA

This document prepared by and
When recorded, return to:

Wells Fargo Home Mortgage - Final Documents
1000 Blue Gentian Rd
Eagan, MN 55121
Attention: MAC # X9999-01M

Loan Number: 0041179444

MIN #: 1000133000588748657
MERS Phone: 1-888-679-6377

**Assignment of Deed of Trust**

For Value received,

Linear Financial, LP dba Quadrant Home Loans
P.O. BOX 10304
DES MOINES, IA 50306030

Hereby sells, assigns and transfers to:

Wells Fargo Bank, N.A., successor by merger to Wells Fargo Home Mortgage, Inc.
1000 Blue Gentian Rd - X9999-01M
Eagan, MN 55121

Its successors and assigns all of its right, title, and interest to a certain Deed of Trust as follows:

Execution Date 5/14/2004

Legal Name:    LYDIA K GELINE and ROBERT M GELINE, Trustor

Beneficiary:    Linear Financial, LP dba Quadrant Home Loans

| | | |
|---|---|---|
| County: | King | KIRKLAND, WA 98033 |
| State: | WA | Address:    910 5TH STREET |
| Recording Date: | 5/14/2004 | LoanAmount:    $605,000.00 |
| Document Number: 2004051400281 | | Book:    Page: |
| Pin/Tax Number:    124500-3500-02  Folio # | | Certificate #: |
| | Section: | |

LEGAL DESCRIPTION AS SHOWN AND/OR ATTACHED TO THE DEED OF TRUST REFERRED
TO HEREIN.

Linear Financial, LP dba Quadrant Home Loans

_____                                    _____
GEORGIANA RICE                                                      SEBLE MOLLA
Vice President Loan Documentation, Linear                    Witnessed by
Financial, LP dba Quadrant Home Loans

                                                                              _____
                                                                              TIM FALCK
                                                                              Witnessed by

State of Minnesota    } ss.
County of Dakota

On This Thursday, July 28, 2005 before me the undersigned a Notary Public of the state of Minnesota
personally appeared GEORGIANA RICE, respectively to me personally known, who being duly Sworn, did say
that they are a(n) Vice President Loan Documentation respectively, of Linear Financial, LP dba Quadrant Home
Loans and that the seal affixed to the foregoing instrument is the seal of said national association by authority of
its Board of Directors and the said GEORGIANA RICE acknowledged the execution of said instrument to be the
voluntary act and deed of Linear Financial, LP dba Quadrant Home Loans, by it voluntary done and executed.
Witnessed by my hand and notarial seal the day an last year above written.

                                                                              _____
                                                                              Christina A. Burrell

Prepared By:    SEBLE MOLLA



CHRISTINA A. BURRELL
Notary Public
Minnesota
My Commission Expires January 31, 2007



1

2

3

4

5

6

7

8 **SUPERIOR COURT OF THE STATE OF WASHINGTON**
**IN AND FOR KING COUNTY**

9 LYDIA GELINE,                           )
                                          )
10                        Plaintiffs,      )   No.  09-2-46576-2 SEA
                                          )
11              v.                         )   **DECLARATION OF AMY BRODISH**
                                          )   **IN SUPPORT OF DEFENDANT'S**
12 NORTHWEST TRUSTEE SERVICES, INC;   )    **RESPONSE**
   WELLS FARGO BANK, NA dba WELLS      )
13 FARGO HOME MORTGAGE; LINEAR         )
   HOME, L.P. dba QUADRANT HOME        )
14 LOANS; U.S. BANK, N.A., as Trustee for )
   WFMBS 2004-N and doe Defendants 1 through )
15 20, inclusive,                       )
                                          )
16                                        )
                        Defendants.       )
17

18              **DECLARATION OF AMY BRODISH**

19      I, Amy Brodish, hereby declare:

20      1.      I am a Litigation Specialist for Wells Fargo Home Mortgage.  This declaration is

21 made in support of Wells Fargo Bank's, N.A. as Attorney in Fact for U.S. Bank, N.A., as Trustee

22 for WFMBS 2004-N ("Wells Fargo") Response to Plaintiff's Motion for Preliminary Injunction

23

24 to Further Restrain Trustee's Sale. I make the following declaration based upon my own personal

25 knowledge and if called to testify in this action I could and would competently testify thereto.

26

---

BUMGARDNER DECLARATION IN SUPPORT OF
MOTION FOR ORDER OF DEFAULT AND DEFAULT
JUDGMENT 1 of 3

**ROUTH CRABTREE OLSEN, P.S.**
*A Law Firm and Professional Services Corporation*
3535 Factoria Boulevard SE, Suite 200
Bellevue, Washington 98006
Telephone (425) 586-1952
Facsimile (425) 283-5952



2.      I have personal knowledge of the procedures governing the creation and maintenance of Wells Fargo's loss mitigation and default records and am familiar with the record keeping procedures of Wells Fargo as to those records that pertain to the attempts to modify Lydia Geline's loan that is the subject of this lawsuit.

3.      I have reviewed the records that pertain to the Geline file and as to the following facts, I know them to be true of my own knowledge or I have gained knowledge of them from the business records of Wells Fargo on behalf of Wells Fargo, which records were made at or about the time of the events recorded, and are maintained in the ordinary course of Wells Fargo's business at or near the time of the acts, conditions or events to which they relate. Any such document was prepared in the ordinary course of business of Wells Fargo by a person who had personal knowledge of the event being recorded and had or has a business duty to record accurately such event. As to Wells Fargo's business records that consist of documents created by third parties, Wells Fargo relies on the accuracy of such records in conducting its business of servicing and collecting loans.

4.      A loan workout was cancelled by Lydia Geline in June 2009.

5.      A second loan workout was denied by Wells Fargo in August 2009 because Wells Fargo received "no response from the borrower."

6.      A third loan workout was denied in September 2009 because a workout was "outside of the investor guidelines," in that the loan was twelve months delinquent and the investor requires that the loan be less than twelve months delinquent for a workout.

//

//

//

**ROUTH CRABTREE OLSEN, P.S.**
*A Law Firm and Professional Services Corporation*
3535 Factoria Boulevard SE, Suite 200
Bellevue, Washington 98006
Telephone (425) 586-1952
Facsimile (425) 283-5952

1

2          I declare under penalty of perjury under the laws of the State of Washington that the

3    foregoing is true and correct.  This declaration was executed this 20th day of January 2010 at

4    Frederick, MD.

5

6

7          _____
            Amy Brodish, Declarant

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

BUMGARDNER DECLARATION IN SUPPORT OF
MOTION FOR ORDER OF DEFAULT AND DEFAULT
JUDGMENT 3 of 3

ROUTH CRABTREE OLSEN, P.S.
A Law Firm and Professional Services Corporation
3535 Factoria Boulevard SE, Suite 200
Bellevue, Washington 98006
Telephone (425) 586-1952
Facsimile (425) 283-5952