UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------|
In Re:                         |
                               |     Case No. 10-20010-rdd
  CYNTHIA CARSSOW FRANKLIN,     |     Chapter 13
                               |     White Plains, NY
                               |     December 3, 2013
                    Debtor.     |
-------------------------------|
```

<u>TRIAL</u>
DEBTOR'S OBJECTION TO PROOF OF CLAIM
BEFORE HON. ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

    FOR TRUSTEE:    *(No appearance)*




    FOR DEBTOR:    LINDA M. TIRELLI, ESQ.
        Garvey, Tirelli & Cushner, Esqs.
        50 Main Street, Third Floor
        White Plains, New York 10606


    FOR CREDITOR:  DAVID DUNN and NICOLE E. SCHIAVO, ESQ.
        Hogan Lovells US LLP
        875 Third Avenue
        New York, New York 10022

*Proceedings electronically recorded.*      *"Official Court Copy of Transcript"*
*Transcript produced by:*

......................................................................................................................................

*American Legal Transcription*
*11 Market Street - Suite 215 - Poughkeepsie, NY 12601*
*Tel. (845) 452-3090 - Fax: (845) 452-6099*
amlegaltrans@aol.com

1                    **Index to Examination**

2    <u>Witnesses</u>:

3    <u>Kyle N. Campbell:</u>    DIR    CR    RD    RC    VD    RB

4      By Mr. Dunn:        --    --    51    --    --    --

5      By Ms. Tirelli:     --     7    --    53    --    --

6

7    <u>Cynthia Carrsow:</u>    DIR    CR    RD    RC    VD    RB

8      By Mr. Dunn:        93    --    --    --    --    --

9      By Ms. Tirelli:     --    --    --    --    --    --

10

11                    **Index to Exhibits**

12   <u>Creditor's Exhibits</u>                              <u>ID</u>    <u>EVD</u>

13     H – WELLS FARGO DOCUMENT                         7      7

14

15

16

17

18

19

20

21

22

23

24                        *  *  *

*Proceedings*                                          3

1

2            THE COURT:  This is In re: Franklin, and the

3    debtor's objection to the Wells Fargo proof of claim.

4            MS. TIRELLI:  Yes.  Good morning, Your Honor.

5    Linda Tirelli on behalf of the debtor, Cynthia Franklin.

6            THE COURT:  Okay.  So I have an agreed exhibit

7    book, as well as a book of disputed exhibits.

8            Do you have any witnesses besides the information

9    that I have already in the exhibit books?

10           MS. TIRELLI:  No, Your Honor.  The debtor does not

11   have any further witnesses.

12           THE COURT:  Okay.  All right.  Does Wells Fargo

13   have any witnesses besides what's in the exhibit books that

14   have been provided to the court including the affidavit?

15           MR. DUNN:  We have the affidavit, Your Honor, and

16   we would submit that, and Mr. Campbell is here --

17           COURT CLERK:  I'm sorry, could you state your name

18   for the record?

19           MR. DUNN:  I'm sorry.  My name is David Dunn.  I'm

20   with Hogan Lovells.  We have the affidavit, Mr. Campbell is

21   here to testify.  I also have a -- have the original of the

22   note, which we would submit and a copy, so that we can have

23   a copy in the record without having the original in the

24   court's records.  But the original is available for the

25   court's inspection and Ms. Tirelli's inspection and we would

*Proceedings*                                                    4

1  | submit the original note, as well, Your Honor.

2  | THE COURT:  Okay.

3  | MS. TIRELLI:  Your Honor, we object to the

4  | affidavit.  And I would like to *voir dire* the witness and

5  | cross-examine him on the affidavit.

6  | THE COURT:  Okay.  All right.  Do you have an

7  | objection to the admission of the note?

8  | MS. TIRELLI:  I'd like to see it first.

9  | MR. DUNN:  Your Honor, I don't know whether you

10 | would prefer the note, this is the original note which I'm

11 | tendering to Ms. Tirelli; there is nothing on the back pages

12 | of the note, except the last page, which has two bar code

13 | notations on it.  I have both the three-page copy, which the

14 | copy -- which is the text and copies of each of the six

15 | pages, front and back.  I'm not sure which would be

16 | preferred in terms of a copy.  Perhaps we should put the six

17 | pages front and back in just so that there's no question.

18 | THE COURT:  That sounds like it's more complete.

19 | MR. DUNN:  Yes, Your Honor.

20 | Linda, here is a copy.

21 | MS. TIRELLI:  If I could just have a moment, Your

22 | Honor.

23 | THE COURT:  Sure.

24 | MS. TIRELLI:  Okay.  Your Honor, we don't have an

25 | objection to the original note that's been presented;

*Proceedings*                                                                    5

1    however, we certainly do object to the endorsements and the

2    offer to see the endorsements, which I believe is the issue

3    presented here today.

4              THE COURT:  Okay.  Why don't you hand up the

5    original, I can look at that, and then I'll give it back to

6    counsel for Wells Fargo and he can give me the copy.

7              Okay.  So this is the second endorsement, the

8    blank endorsement, then is a file stamp?  It's a stamp?

9              MR. DUNN:  I have no personal knowledge, but it

10   appears to be.

11             THE COURT:  Well, it appears to be.  It doesn't

12   look like it's a signature.

13             MR. DUNN:  It appears to be an inked stamp.

14             THE COURT:  Right.

15             MR. DUNN:  The endorsement by ABN AMRO in blank.

16             THE COURT:  Is in ink.  Oh, I'm sorry, the

17   endorsement by ABN AMRO is a file stamp, the endorsement by

18   Mortgage Factory is in ink.

19             MR. DUNN:  In fact, they typed on the original

20   note and signed apparently by the same person who signed for

21   Mortgage Factory.

22             THE COURT:  Right.

23             MR. DUNN:  It appears to be the same signature on

24   the last page.

25             THE COURT:  Right.

*Proceedings*                                                                        6

```
 1           MR. DUNN:  The endorsement in blank by ABN AMRO

 2    does appear to have been applied by a representative.

 3           MS. TIRELLI:  Excuse me.  I'm sorry.  I think you

 4    took my copy.

 5           MR. DUNN:  Oh, I'm sorry.

 6           THE COURT:  By a stamp.

 7           MR. DUNN:  Yes.

 8           THE COURT:  Let me give this back to you and you

 9    can give me the copy.  No one's numbered these exhibits, so

10    why don't we just have this one be Wells Fargo number 1.

11           MR. DUNN:  If I could, that's fine, Your Honor,

12    although, we did number the exhibits to Mr. Campbell's

13    affidavit.

14           THE COURT:  Yes.

15           MR. DUNN:  So I was wondering if we might want to

16    make this H.

17           THE COURT:  Okay.  That's fine too.

18           MR. DUNN:  Since I was using letters, because I

19    was the creditor.

20           THE COURT:  Okay.  That's fine.

21           MR. DUNN:  So why don't we make then Exhibit H.

22           THE COURT:  Okay.  That's admitted as Exhibit H.

23    Did you give that to me or --

24           MR. DUNN:  Oh, I'm sorry.

25           THE COURT:  Okay.  Thanks.  All right.  So that's
```

1    admitted as H.

2

3               (Creditor's Exhibit H – WELLS FARGO DOCUMENT,

4               marked for identification and received into

5               evidence)

6

7               THE COURT:  And so let's put Mr. Campbell on the

8    stand.  You can sit down.  Okay.  Would you raise your right

9    hand, please?

10              Do you swear or affirm to tell the truth, the

11   whole truth, and nothing but the truth, so help you God?

12              THE WITNESS:  Yes.

13              THE COURT:  Would you state and spell your name

14   for the record?

15              THE WITNESS:  Kyle Campbell, K-y-l-e, C-a-m-p-b-e-

16   l-l.

17              THE COURT:  Okay.  So you can go ahead.

18              MS. TIRELLI:  Okay.

19

20                  KYLE N. CAMPBELL,

21         having been first duly sworn in by the court,

22            was examined and testified as follows:

23                      * * * * *

24   CROSS EXAMINATION BY MS. TIRELLI:

25        Q.   Good morning, Mr. Campbell.  Do you recall signing

*TIRELLI-CROSS-CAMPBELL*                                                    8

1   an affidavit pertaining to this case?

2        A.   I did.

3        Q.   And are familiar with that affidavit, as you sit

4   here today?

5        A.   Yes.

6        Q.   Would you like to have a copy to refresh your

7   recollection?

8        A.   That would be appreciated.  Thank you.

9             MS. TIRELLI:  Let the record reflect I'm just

10  going to hand this to Mr. Campbell.

11            THE COURT:  Okay.

12            MS. TIRELLI:  A copy of the affidavit in the

13  exhibit (inaudible).

14            MR. DUNN:  Your Honor, I have -- do you want the

15  original of Mr. Campbell's affidavit, I have it?

16            THE COURT:  No, I have a copy, that's fine.

17       Q.   Okay.  Is that the affidavit that you signed?

18       A.   Yes, it is.

19       Q.   Okay.  Do you also recall being deposed pertaining

20  to this case?

21       A.   I do.

22       Q.   Okay.  And do you recall your deposition

23  testimony?

24       A.   Loosely, yes.

25       Q.   Okay.  Would a copy of the deposition transcript

*TIRELLI-CROSS-CAMPBELL*                                                          9

1    help to refresh your recollection?

2         A.   Yes, to reference.

3              MS. TIRELLI:  I don't have an extra copy of the

4    deposition transcript, I know that we passed those around

5    those, if you want to take a look, the transcripts of these

6    minutes.

7              MR. DUNN:  I'm not sure what the purpose is of

8    giving the witness a copy of his deposition.

9              THE COURT:  You should only give it to him when

10   you ask him to -- when you need it.

11             MS. TIRELLI:  Well, Your Honor, I think we're

12   going to start out --

13             THE COURT:  You can hand it to him now, but you're

14   not referring him to anything in particular in it, right, at

15   this point?

16             MS. TIRELLI:  No, not at this point, Your Honor.

17             THE COURT:  Okay.

18             MS. TIRELLI:  (Inaudible).

19             THE COURT:  All right.

20        Q.   Okay.  Mr. Campbell, in your affidavit you state

21   that you're a vice president of Wells Fargo.  What is your

22   job title at Wells Fargo?

23        A.   I am a loan administration manager.

24        Q.   Okay.  And what exactly is a loan administration

25   manager?

TIRELLI-CROSS-CAMPBELL                                           10

1          A.   I am a -- I'm sorry, are you asking for what my

2    responsibilities and duties are?

3          Q.   Yes.  What are your responsibilities as a loan

4    administration manager?

5          A.   Well, I oversee individuals who work in the

6    system, litigated loans, verify information, confirming

7    accuracy of information to our local counsel and to appear

8    on cases similar to today.  I have been in a similar role

9    for the past three and a half years -- oh, sorry, I've been

10   in a management role for three and a half -- for about a

11   year now, and prior to that, I was in the position that I

12   now oversee for almost three years.

13         Q.   Okay.  So is it fair to say that your job role

14   primarily entails testifying at trials and depositions and

15   contested cases?

16         A.   No, it does not primarily entail that.

17         Q.   Okay.  Well, what percentage of your time is spent

18   testifying in trials and depositions and contested cases?

19         A.   Presently?

20         Q.   Yes.

21         A.   Very minimal.  I oversee individuals who work on

22   loans that are litigated.  I rarely travel and appear on

23   cases like I'm here today.

24         Q.   Okay.  So when you say that you oversee

25   individuals, are those individuals the ones that are

*TIRELLI—CROSS—CAMPBELL*                                                    11

```
1    testifying?

2         A.    Some do, yes.

3         Q.    Okay.  All right.  What are your duties as a vice

4    president at Wells Fargo?

5         A.    I'm a -- it's actually a -- a designation as a

6    signing officer, it's a vice president of loan

7    documentation.  And what that does is that designates me as

8    a signing officer on behalf of the company.

9         Q.    So as a signing officer, do you have any duties as

10   a vice president to the role of an officer of the

11   corporation?

12        A.    No, it is strictly designated for signing

13   authority.

14        Q.    In your affidavit you state that Wells Fargo holds

15   and services the note and mortgage.  For who are they

16   holding it and servicing the loan?

17        A.    Federal Home Loan and Mortgage Corporation.

18        Q.    Okay.  And how do you know that?

19        A.    Per review of our business system of record.

20        Q.    And when did you review the system of record?

21        A.    In review for this affidavit, yesterday, in

22   preparation for the deposition, multiple times.

23        Q.    Okay.  And this -- your affidavit was signed on

24   July 2nd, 2013; is that right?

25        A.    Yes.
```

TIRELLI-CROSS-CAMPBELL                                          12

1        Q.    Okay.  And that's the same date that you testified

2   at deposition; isn't that true?

3        A.    I can't recall the specific date.

4        Q.    If you look at page one.  Actually, every page at

5   the top right-hand corner.

6        A.    Yes.  That's correct.

7        Q.    Okay.  In paragraph one of your affidavit, you

8   state that you make this affidavit based on your personal

9   knowledge.  What is the basis of your personal knowledge?

10       A.    A review of the business system of record.

11       Q.    And what exactly did you review prior to signing

12   this affidavit?

13       A.    The -- in regards to the exhibits attached.

14       Q.    Okay.  Specifically what?

15       A.    Do you want me to go through each exhibit or...

16       Q.    Well, are the exhibits that are attached to your

17   affidavit, is that all you reviewed prior to signing this

18   affidavit?

19       A.    Yes.

20       Q.    Okay.  And in paragraph two, when you say that the

21   loan at issue in this proceeding was transferred to Wells

22   Fargo, who transferred the loan to Wells Fargo?

23       A.    I believe it was Washington Mutual.

24       Q.    And how do you know that?

25       A.    From this servicing transfer letter that is

*TIRELLI-CROSS-CAMPBELL*                                         13

1    referenced as Exhibit A -- nope, sorry, Exhibit B.  I

2    apologize.

3         Q.   And I want to jump ahead over to Exhibit G.

4              THE COURT:  I'm sorry, did you say Exhibit B?

5              THE WITNESS:  Yes.

6              THE COURT:  That's the servicing transfer letter?

7              THE WITNESS:  Yes.

8         Q.   Okay.  I'm sorry.

9              THE COURT:  Okay.

10        Q.   Exhibit B.

11             THE COURT:  To your declaration.  Okay.

12        Q.   Exhibit B, do you know when this letter was

13   written?

14        A.   It's dated February 3rd, 2007.

15        Q.   Okay.  And where did you obtain this letter?

16        A.   From our imaging system.

17        Q.   And when you say our imagining system, what do you

18   mean by that?

19        A.   We have an imagining system that stores and

20   maintains documents that are regularly used in the course of

21   business.  This letter would be one of those documents that

22   is stored there.

23        Q.   Okay.  And so did you personally pull this letter

24   from that system?

25        A.   No, I did not.

*TIRELLI-CROSS-CAMPBELL*                                        14

1          Q.    Okay.  Do you know who did?

2          A.    No.

3          Q.    Then how do you know this is in the imagining

4     system?

5          A.    I reviewed it with the letter in this version that

6     is in our imaging system.

7          Q.    Okay.  So when would this have been put into the

8     imagining system?

9          A.    I don't know.

10         Q.    Okay.  So then how do you -- I'm sorry, I'm not

11    understanding.  How do you know this is in the imaging, this

12    letter, Exhibit B?

13         A.    I looked at it within the imagining system.

14         Q.    When you say the imagining system, could you

15    please look at what's Exhibit G to your affidavit?

16         Could you please explain to me what Exhibit G is, or

17    what it purports to be?

18         A.    This is actually a screen print, screenshot, of

19    our imagining system.  It is a list of documents that are

20    held and maintained within the system, itself.

21         Q.    Okay.  And can you please show me where this

22    letter, which is dated February 3rd, 2007, Exhibit B,

23    appears in that loan image viewer, which is Exhibit G?

24         A.    I can't tell from the face of this, I would

25    actually have to go in and open the document.

TIRELLI-CROSS-CAMPBELL                                          15

1       Q.   Well, what exactly would you open?  This is -- is

2   this a complete exhibit of a screenshot that we have here

3   today as Exhibit G?

4       A.   I'm not sure I understand what you mean by

5   "complete"?

6       Q.   Well, you said that you saw this letter in the

7   loan image viewer system, and I believe that you testified

8   that Exhibit G is a copy of the print of the screenshot of

9   the loan image viewer system?

10      A.   Yes, it's a -- it is a screenshot; that is

11  correct.

12      Q.   Okay.  So is this screenshot complete?  Is this

13  your entire loan image viewer system?

14      A.   It appears to be, yes, with my review.  However,

15  each of these attachments are viewable, which means you

16  would actually have to be able to go into the attachment to

17  confirm what specifically is in that document.  And an

18  example of that would be is, if you look at the items that

19  are labeled lost mitigation package, there are different

20  numbers of pages within each of those documents, therefore,

21  without actually opening it up and viewing it, it would be

22  hard to determine what that would be.

23      Typically, letters that are saved within this are

24  labeled as correspondence and not specific to what the

25  letter may be, so you would actually then have to go in and

TIRELLI-CROSS-CAMPBELL                                            16

1    look at the document to confirm what exactly that was.

2    Without being able to go into the system to review what

3    documents are which, I wouldn't be able to tell you which

4    specific correspondence that is listed on this Exhibit G, is

5    the specific letter that's referenced in Exhibit B.

6         Q.   Okay.  The documents that are identified in

7    Exhibit G, what order are they in?

8         A.   These appear to be chronological.

9         Q.   Okay.  So is that what the newest, at the top, on

10   page one, and the oldest being on page nine, at the bottom

11   of page nine?

12        A.   Yes, that appears accurate.

13        Q.   And is --

14        A.   However, the most recent is obviously March 19th,

15   2013; there may have been additional documents entered after

16   that date.

17        Q.   Well, understood.  When was this screen print

18   printed, do you know?

19        A.   From the bottom right corner of the exhibit, it

20   says June 19th, 2013.

21        Q.   Okay.  And are you the one who printed out this

22   screenshot?

23        A.   I don't believe I did.

24        Q.   Do you know who did?

25        A.   I couldn't say.

TIRELLI-CROSS-CAMPBELL                                         17

1       Q.   Well, who gave it to you?

2       A.   It was reviewed with counsel in preparation for

3  the affidavit.

4       Q.   So, just looking a little closer on Exhibit G and

5  Exhibit B; with Exhibit B, the letter is dated February 3rd,

6  2007, what would be the policy and procedure for imagining

7  of this letter into the loan image viewer?

8       A.   I'm sorry, what would --

9       Q.   Well, are you familiar with the policies and

10 procedures with uploading images into this loan image viewer

11 system?

12      A.   Yes.

13      Q.   Okay.  What would be the standard policy and

14 procedure at Wells Fargo for uploading this letter, which is

15 Exhibit B to your affidavit, into the loan image viewer

16 system?

17      A.   That documents sent are uploaded, are uploaded, at

18 or near the time the document was received or sent, created.

19      Q.   Okay.  Do you see anything dated February 3rd,

20 2007?

21      A.   No.

22      Q.   Do you see anything that might strike you as

23 possibly being this letter anywhere in this document image

24 viewer system?

25      A.   Like I said, I would have to go in and look at the

TIRELLI-CROSS-CAMPBELL                                    18

1    documents listed as correspondence, customer correspondence.

2        Q.   Okay.  But there's none dated the same date as the

3    letter; is that right?

4        A.   That is correct, but near the letter, yes.

5        Q.   Well, I don't understand.  If this letter was

6    dated February 3rd, 2007, was it mailed to the customer?

7        A.   Yes, it was.

8        Q.   How do you know that?

9        A.   Pursuant to our policy and procedures letters that

10   are generated are mailed and sent to the customer.

11       Q.   Did you work for Wells Fargo in February of 2007?

12       A.   I did not.

13       Q.   Okay.  Did you work for Wells Fargo at any time in

14   the year 2007?

15       A.   No.

16       Q.   Or in the year 2006?

17       A.   No.

18       Q.   So, at this time this letter was written, it is

19   fair to say that you would not have any personal knowledge

20   as to whether or not this was actually mailed out?

21       A.   Do I personally know that it was stuff -- I'm

22   sorry, can you rephrase that?

23       Q.   Whether or not this was mailed out?  We're looking

24   at the letter which is Exhibit B?

25       A.   Okay.

TIRELLI-CROSS-CAMPBELL                                      19

1        Q.   Okay.  So do you have any personal knowledge as to

2   whether or not this letter was actually mailed out in 2007?

3        A.   Personal knowledge, I do not personally know that

4   this was mailed.  But pursuant to policies and procedures,

5   letters are generated and mailed and are done within the

6   ordinary course of business pursuant to policies and

7   procedures.

8        Q.   Okay.  Looking to the next letter, which I believe

9   is Exhibit C, it's a letter dated October 15th, 2007.  Are

10  you familiar with that letter?

11       A.   Exhibit C is actually two letters, the same date,

12  two separate addresses.

13       Q.   Okay.  You're absolutely correct.  And where did

14  you get Exhibit C?

15       A.   The -- I was provided these through our counsel.

16       Q.   All right.  So the attorney provided it to you.

17  Did you verify this letter with your system in any way?

18       A.   I did.

19       Q.   Okay.  And what did you look at to verify this

20  with the system?

21       A.   Actually, Exhibit G.  And you will see on page

22  nine there are documents labeled "default correspondence

23  demand letter."  And what you would be able to do is go into

24  those demand letters and confirm this.

25       Q.   Okay.  And looking at the entries for 12/15/2007,

TIRELLI-CROSS-CAMPBELL                                        20

1    you see the time next to that, the 12:00 a.m.?

2         A.   I do.

3         Q.   Okay.  And do you see that column going straight

4    up and down the page of page nine, that every entry seems to

5    be at 12:00 a.m.?

6         A.   Yes.

7         Q.   Okay.  Could you please tell me who maintains the

8    computer system to ensure that the date stamp on here is

9    accurate and that the time stamp on here is accurate?

10        A.   I'm not sure who maintains it.  Can you rephrase

11   that?

12        Q.   Sure.  Is it your testimony that the date that

13   appears on this loan mirror image system, as this Exhibit G,

14   is accurate in terms of when the image was uploaded into the

15   system?

16        A.   Yes.  Actually, I looked into this after the

17   deposition that we had because, as I stated in the

18   deposition, I didn't know specifically what that meant.

19        The images that you're seeing that are stamped at 12:00

20   a.m., are done as an upload into the system, which will all

21   reflect that upload takes place at 12:00 a.m.

22        Q.   And who does the upload?

23        A.   I am -- don't know.

24        Q.   Okay.  Where is the upload done?

25        A.   I don't know.

TIRELLI-CROSS-CAMPBELL                                         21

 1          Q.   What department does the upload?

 2          A.   I am not sure.

 3          Q.   What is the process to ensure the upload is done

 4     accurately?

 5          A.   What do you mean by "done accurately"?

 6          Q.   Well, to make sure that everything that is

 7     uploaded is actually going to appear into this viewer

 8     system?

 9          A.   I am not certain what is done to go back and look

10     into the documents that were uploaded.

11          Q.   Okay.  What is the name of the computer system

12     that maintains the date and time stampings on Exhibit G?

13               MR. DUNN:  Objection.

14               THE COURT:  On what basis?

15               MR. DUNN:  Vagueness.  I don't understand "the

16     name of the system that maintains."  I don't understand the

17     question.

18                THE COURT:  Are you laying a foundation for a

19     subsequent question?

20               MS. TIRELLI:  Well, Your Honor, I am.

21               THE COURT:  Okay.  So overruled.  Do you know the

22     name of the system that does this?

23               THE WITNESS:  Yes.  The name of the system's

24     actually listed on the top left corner of the Exhibit.  It's

25     loan image viewer.  That's the name of the system.

*TIRELLI-CROSS-CAMPBELL*                                        22

1       Q.   Okay.  And loan image viewer, that's the

2   technology that actually puts the date stamp on there?

3       A.   That is the name that -- that everyone I know in

4   the company uses and refers to it as, is loan image viewer.

5       Q.   What knowledge do you have regarding the

6   technology that ensures -- in other words, the technology in

7   the calibration of it -- to ensure that the date and time

8   stamping this loan viewer image system is accurate?

9       A.   I am not a technology person.  I wouldn't be able

10  to answer that, nor do I really understand the question.

11      Q.   Going to now what's marked as I believe Exhibit C,

12  the loan modification transmittal form.

13           MR. DUNN:  C.  No, the C is the October 15th

14  letter, I think.

15      A.   I believe you're referencing D.

16      Q.   I'm sorry, D.  D would be the Wells Fargo home

17  loan modification transmittal form.

18           THE COURT:  Do you need some water or anything?

19           THE WITNESS:  No, I'm just getting over a cold.

20      Q.   Where did you get this copy of the loan

21  modification transmittal form?

22      A.   This was received through counsel.

23      Q.   Okay.  And did you compare this with an original?

24      A.   A copy of this would be in our imaging system,

25  referenced as Exhibit G.

*TIRELLI-CROSS-CAMPBELL*                                                23

1    Q.   Okay.  Have you ever seen an original of this?

2    A.   Not that I can recall.

3    Q.   Did you ever request to see the original of this

4    document?

5    A.   No.

6    Q.   Okay.  And where did you find this in the loan

7    imaging system; if you could just direct me to that in

8    Exhibit G?

9    A.   And this would fall into the category that we

10   discussed earlier, is that with the general use of terms for

11   the documents that are uploaded into the imaging system, you

12   would have to actually go in and verify the document.  So

13   what you'll see in Exhibit G for the date on or around

14   February 11th, 2008, would be items listed as a loss

15   mitigation package and you would actually then need to go in

16   and verify the document by looking at the specific item,

17   itself.

18   Q.   Well, when would Wells Fargo have put this into

19   its loan image viewer system?

20   A.   When?

21   Q.   Yeah, when?

22   A.   On or around the date it was created.

23   Q.   Okay.  So if you just take a look at that Exhibit

24   D and just tell me when was it created?

25   A.   Exhibit G?

*TIRELLI-CROSS-CAMPBELL*                                            24

1     Q.   G.  Not G, the loan modification transmittal form?

2     A.   On the second page of the Exhibit D, which is the

3   loan modification agreement, that is dated February 11th,

4   2008.  If you would then look into the imaging system --

5           THE COURT:  It's February 16th?

6           THE WITNESS:  February 11th, 2008.  Sorry.  And

7   then Exhibit G.  I apologize.

8           THE COURT:  I see.  I'm sorry, I was looking at

9   the --

10          THE WITNESS:  Yes.

11          THE COURT:  -- that's a fax, is the 16th, you're

12  right.  Sorry.

13    A.   And what you would then do is, if you go into the

14  imaging system, they're uploaded on or around the date in

15  which the document was created or received.  So what you

16  would then do is look into the items listed as loss

17  mitigation package and you would be able open and view those

18  documents.

19    Q.   Okay.  Do you see on the third page of that

20  exhibit, there appears to be a copy of a signature, which I

21  cannot authenticate, at the bottom, with the date 12 -- I'm

22  sorry, February 12th, 2008?

23    A.   There are two signatures, correct.

24    Q.   I'm sorry?

25    A.   There appears to be two signatures, correct?

TIRELLI-CROSS-CAMPBELL                                      25

1      Q.   I'm looking at the one with the date next to it?

2      A.   With the date next to it?

3      Q.   2/12/08?

4      A.   Yes.

5      Q.   Okay.  So, if this was signed on 2/1/208, when

6  would it have been imaged into the system?

7      A.   When it -- when it is --

8           MR. DUNN:  Objection.

9      Q.   If you know?

10     A.   When it was received; it could have been mailed

11 in, it could have been faxed in.

12     Q.   Okay.  And where is the original of that document

13 today?

14     A.   I don't know.

15     Q.   And do you see any entry in your loan image viewer

16 that would indicate that this document is actually

17 maintained in the system?

18     A.   Do I see any indication?  Again, I would have to

19 go into the documents listed as the loss mitigation package,

20 which you can see on or around the date of February 12th,

21 2008, from the signature, and then there appears to be a fax

22 confirmation on the top of the page of February 16th.  So

23 that's a time span right there, in and of itself.  You would

24 have to be able to look at the documents around that time.

25     Q.   Well, did you do that prior to signing this

TIRELLI-CROSS-CAMPBELL                                    26

1  affidavit?

2       A.   I believe I did, yes.

3       Q.   Okay.  And so which entry in this loan image

4  viewer did you look at?

5       A.   I don't recall.

6       Q.   Okay.  I mean, I'm not seeing anything that is

7  dated on or around the 12th of February, so maybe you can

8  help me out and tell me which one of these you would have

9  looked at?

10      A.   There --

11      Q.   -- I only see four or five entries for February

12 2008?

13           MR. DUNN:  Your Honor, the time for closing

14 argument is later, I think we should have a question.

15           THE COURT:  She's just asking him to -- if he can

16 clarify his answer --

17      A.   Yeah.

18           THE COURT:  -- by looking at the images.

19      A.   It would be one of the documents in February.

20      Q.   But you don't know which one?

21      A.   Not off the top of my head, no.

22      Q.   Okay.  And you don't recall which one of these you

23 actually looked at when you verified prior to signing your

24 affidavit?

25      A.   I would have looked at multiple items, yes.  I

*TIRELLI-CROSS-CAMPBELL*                                                      27

1   don't know which specific one it was, off the top of my

2   head.

3        Q.   Okay.  Turning next to the letter that's date

4   November 16th, which I believe is Exhibit E -- excuse me,

5   yeah, E.  There's actually two letters and, as you indicated

6   before, they go to two different addresses, part of the same

7   exhibit.  Where did you obtain these letters?

8        A.   Through counsel, but these can also be found in

9   our imaging system as well.

10       Q.   Okay.  And how do you know they're in your imaging

11  system?

12       A.   I -- I actually reviewed these as well.

13       Q.   Okay.  And can you please show me where in the

14  loan viewer image system these are maintained?

15       A.   At actually page nine of ten.  The dates in which

16  they were uploaded are reflecting as December 11, 2008, it

17  will show his demand letter.

18       Q.   So that entry then would have been done almost a

19  month after this letter; is that what you're saying?

20       A.   Near the time that the letters were generated,

21  yes.

22       Q.   Well, the letters were generated, according to the

23  date of the letter, anyway, it's November 16th?

24       A.   Okay.

25       Q.   Okay.  So what is the policy and procedure at

TIRELLI-CROSS-CAMPBELL                                          28

1    Wells Fargo in terms of imaging a letter into the system?

2        A.    That it's uploaded around the time that it was

3    created.

4        Q.    When you say "around the time," what do you mean

5    by "around the time"?

6        A.    Around, near or around the time.  I really

7    couldn't go to the definition of -- I'm not -- I don't know

8    the specific time frame.  I wouldn't be able to give you a

9    specific number of days in which it has to be done, just

10   near the time that it was created.

11       Q.    Okay.  So does Wells Fargo have a stated policy in

12   terms of how many days can lapse before an image is loaded?

13       A.    I'm not -- I'm not sure I understand that.

14       Q.    Well, you've identified entries for December 11th,

15   2008, that you claim were where you found the images of

16   these letters that are dated November 16th, 2008; is that

17   right, I don't want to misquote you?

18       A.    I'm sorry --

19            MR. DUNN:  Objection.

20       A.    Yeah.  You spoke a little too fast for me.

21            THE COURT:  On what basis?

22            MR. DUNN:  It mischaracterizes his testimony.

23            THE COURT:  Well, which -- which entry are you

24   focusing on now on page nine of ten?

25            MS. TIRELLI:  I believe the witness testified --

1           THE COURT:  No, I'm asking --

2           THE WITNESS:  You're asking me?

3           MS. TIRELLI:  Okay.  I'm sorry, Your Honor.

4           THE WITNESS:  Okay.  I'm sorry.  On page nine of

5    ten, if you look at the two -- two items listed as default

6    correspondence/demand letter dated December 11th, 2008,

7    there should be about a dozen --

8           THE COURT:  Wait.

9           THE WITNESS:  -- or so down the page.

10       Q.   Okay.  And who generated this letter, either one,

11   November 16th, 2008?

12       A.   These letters are actually generated off a default

13   within the system.  They are auto-generated by the system

14   itself.

15       Q.   What do you mean "the system"?  What system are

16   you talking about?

17       A.   Our business system of record that maintains and

18   tracks all events and actions that take place within the

19   loan.

20       Q.   Okay.  And where do we have that today?  In your

21   affidavit, where do we have that?

22       A.   What do you mean, where do we have?

23       Q.   What system of record are you talking about?

24       A.   It's our mortgage servicing platform.  It's what

25   we house all the payment applications, customer service and

TIRELLI-CROSS-CAMPBELL                                          30

 1  collection calls, loss mitigation efforts, escrow payments,

 2  tax payments, everything is tracked in the system of record.

 3      Q.   And did you review that prior to signing the

 4  affidavit?

 5      A.   I believe I had reviewed Exhibit A, was from our

 6  business system of record.

 7      Q.   Not Exhibit A, I'm looking at the letters which

 8  are dated November 16th.  What system did you review to take

 9  a look at these letters?  And then when they were generated,

10  who generated them?

11      A.   But -- I'm not sure I understand.  The letters are

12  generated once the loan has hit 45 days, if not, in this

13  case, November 16th, for default purposes.  These are --

14  these are sent and triggered by a default on the loan

15  itself.

16      Q.   So you're saying it's computer generated?

17      A.   The letter, yes.  These are computer generated and

18  what you'll see is that they'll be a tracking number along

19  the top.  I couldn't tell you if that's USPS or certified

20  mail tracking log.  I think that's certified.  But these are

21  generated and then mailed out accordingly.

22      Q.   Okay.  And what system is in place to ensure the

23  accuracy of these letters before they're mailed out?

24      A.   When -- I'm not sure I understand.  Once the loan

25  hits 45 days, these letters are generated and sent to the

TIRELLI-CROSS-CAMPBELL                                      31

1    homeowner informing them of the default.

2         Q.   So is there a system where a human being would

3    actually get involved and take a look at this prior to being

4    mailed out?

5         A.   There may be.  I'm not familiar with it.

6         Q.   You're not familiar with what?

7         A.   With the -- what you just referenced.

8         Q.   You're not familiar with the system of whether or

9    not there's a human being reviewing these letters before

10   they go out?

11        A.   I don't know that process.  I know that these

12   letters are generated once the loans hit 45 days in arrears

13   and mailed to the borrower --

14        Q.   So who --

15        A.   -- to all the addresses on file, which is why

16   you'll see two letters to two separate addresses.

17        Q.   So who oversees the letters being generated on

18   automatically?

19        A.   I don't know.

20        Q.   Well, who's job is it to maintain that record?

21             MR. DUNN:  Objection.  I'm not sure what record

22   she's talking about.

23        A.   Yeah, I am not familiar --

24        Q.   Well, I thought you testified earlier that this is

25   part of your system of records, your business records, so

TIRELLI-CROSS-CAMPBELL                                              32

1   who is the human being that's in charge of overseeing this

2   system of business records?

3        A.   I -- I didn't say that, specifically.  I said that

4   these are stored and maintained in our imaging system, which

5   are documents that are relied upon in the ordinary course of

6   business.  They are generated from our business system of

7   record, which is derived by a default on the loan itself.

8        Q.   But there's no human being overseeing that

9   process?

10       A.   I don't know.

11       Q.   Okay.  Looking at what was attached as Exhibit G,

12   which is a copy of a note.

13            MR. DUNN:  No.  F is the note.

14       Q.   I'm sorry, F.  Okay.  Did you find this image

15   somewhere in your system?

16       A.   I did.

17       Q.   Okay.  And where did you find that?

18       A.   It was December of 2009.  Let me double check that

19   date.  Yes, December 28th, 2009.  It is page six of ten,

20   approximately eight up from the bottom on Exhibit G.

21       Q.   Okay.  And did you print this image of Exhibit F

22   out yourself?

23       A.   I did not.

24       Q.   Okay.  Who did?

25       A.   I don't know.

TIRELLI-CROSS-CAMPBELL                                    33

1       Q.   Well, how did you get it?

2       A.   What do you mean, how did I -- how did I --

3       Q.   It's attached to your affidavit, sir, how did you

4   receive it?

5       A.   I received this through an email from counsel.  I

6   reviewed the original note alongside my actual imaging

7   system and pulled this specific document up.

8       Q.   Okay.  And I'm sorry, could you just pull me back

9   to, you said in December 9th -- I'm sorry, December 2009?

10      A.   December 28th, 2009, page six of ten, in Exhibit

11  G, eight up from the bottom, it's labeled as "note," an

12  eight-page document.

13           THE COURT:  I'm sorry.  I --

14      Q.   Well --

15      A.   Six.  Sorry, six.

16           THE COURT:  Just to clean up.  I don't think you

17  handed me the copy of the note, or did you give it to my

18  clerk?  You did?  Oh, I see it.  I'm sorry.

19           MR. DUNN:  And the copy is --

20           THE COURT:  Got it.  Yeah.  No, I have it.

21           MR. DUNN:  Okay.

22      Q.   Okay.  Looking at the image that you -- or the

23  line indicating that there is an image, there's a column

24  that says image -- "imaging status."  And many of the

25  entries on page six of ten have the word "complete" in that

TIRELLI-CROSS-CAMPBELL                                          34

1    column.  What does that mean?

2         A.    I -- I do not know.

3         Q.    You don't know?

4         A.    I don't.  I do not know.

5         Q.    Okay.  And that column seems to be blank next to

6    the line that you just pointed out where the "select

7    description," it says, "note," and it's got a committal date

8    of 12/28/2008.  Why is that blank?

9         A.    I do not know.

10        Q.    To the right of the columns that reads imaging

11   status, there's a column, "client," and then number 936 next

12   to that entry.  What does 936 indicate?

13        A.    It just indicates investor information on the

14   loan.

15        Q.    Okay.  And who's the investor on the loan?

16        A.    Thorough Home Loan Mortgage Corporation.

17        Q.    And their assigned number is 936; is that right?

18        A.    Not them, specifically, but them, Fannie Mae, as

19   well, FHA loans, government servicing, government entities

20   are generated under this.

21        Q.    So Fannie Mae and Freddie Mac would have the same

22   investor loan number?

23        A.    Yes, I have seen that.  Yes.

24        Q.    I'm saying, investor loan number, what I mean is

25   the client number, which is indicated on this exhibit,

TIRELLI-CROSS-CAMPBELL                                      35

1    right?

2         A.    Yes.

3         Q.    Okay.  Going down just two entries, you have a

4    title policy and then you have client number 708.  Who's

5    client 708?

6         A.    That is also, I've seen Freddie Mac and Fanny Mae

7    mortgages also listed underneath that client ID code.  It's

8    typically just an indicator of which version of the system

9    you can log in to.

10        Q.    Who maintains the system to make sure that the

11   client code is accurate?

12        A.    I do not know.

13        Q.    Okay.  Going to the line that you pointed out, the

14   note, there's a column that says, "page count," and the

15   numeral eight appears in there; what does that mean?

16        A.    I'm not sure if that's a six or an eight.

17        Q.    It appears to be an eight.  I have a magnifying

18   glass, if you need it?

19        A.    No.

20        Q.    Do you want a magnifying glass?

21        A.    No, I'm okay.  I couldn't tell you if that's a six

22   or an eight.

23        Q.    Well, it appears to be an eight.

24             MS. TIRELLI:  Does anybody else need a magnifying

25   glass?

TIRELLI-CROSS-CAMPBELL                                      36

1          MR. DUNN:  I don't need a magnifying glass, but

2    the witness has testified he doesn't know if it's a six or

3    an eight.

4          Q.   Well, if there's a problem seeing it, do you want

5    to maybe take a closer look?

6          A.   No, I don't -- I don't have a problem seeing it.

7    I pulled the document up and verified it with the actual

8    original note, side by side, it was a six-page document when

9    I pulled it up and reviewed it.

10          Q.   But in your loan image viewer system, it says

11    eight pages?

12          MR. DUNN:  Objection.  She's arguing with the

13    witness, Your Honor.

14          THE COURT:  Well, do you have any reason to

15    account for the fact that, as to the number of pages listed

16    here?

17          THE WITNESS:  I -- I -- what I reviewed for the

18    affidavit, itself, the exhibit, and looked at the original

19    note, and this specific document, when I pulled it up, it

20    was a six-page document.  If this is just an error with

21    printing or copying, I need to look at sixes and eights in

22    the loan number column, as well as the client column, we

23    just discussed, and they appear almost identical.  In fact,

24    if I look at the client number on page six of ten, going

25    from the top, they should be 936's, they appear to be eights

TIRELLI-CROSS-CAMPBELL                                    37

1    straight down that column.  We do not have a 938 investor

2    code, client code, which how I know that to be true.  That

3    -- those are sixes, but they appear to be eights.  So where

4    the page count, and this note dated December 28th, 2009,

5    it's a six.  It's more likely a printing error.

6        Q.   Okay.  But you just testified earlier that you

7    can't tell if it's a six or an eight?

8        A.   No, I said I reviewed the document, it was six

9    pages.  I said it -- I did not say that it was a six or

10   eight on this page, itself.  I reviewed personally and it

11   was a six-page document.  I'm stating that the sixes and

12   eights, when printed on the paper, appear to be very

13   similar.

14       Q.   Okay.  And when's the first time that you reviewed

15   the original note in this case?

16       A.   In preparation for the affidavit, as well as

17   deposition.

18       Q.   So that would be July 2013?

19       A.   Around there, yes.

20       Q.   So did you have anything to do with the filing of

21   the proof of claim in 2010?

22       A.   No.

23       Q.   Did you work for Wells Fargo in 2010?

24       A.   I did.

25       Q.   What department did you work in?

TIRELLI-CROSS-CAMPBELL                                           38

1        A.   The same one I am in now.

2        Q.   What's that?

3        A.   Default Servicing Litigation Support.

4             MR. DUNN:  Your Honor, I don't think this is *voir*

5   *dire* on the affidavit.

6             THE COURT:  I'm sorry?

7             MR. DUNN:  I don't think these questions are *voir*

8   *dire* on the affidavit.  If she wants to cross the witness,

9   she's welcome do so, but I thought we were in *void dire* on

10  the affidavit.

11            THE COURT:  That's fine.

12       Q.   Are you a custodian of records?

13       A.   Yes.  I review and maintain them, yes.

14       Q.   Okay.  What do you mean -- what do you mean by

15  that?

16       A.   I review and maintain that they're accurate, yes.

17       Q.   But do you maintain the records?  When you say you

18  maintain them, what do you mean by you maintain the records?

19       A.   I have the ability to access and maintain records.

20  I can upload documents into an imaging system.  Technically,

21  that makes me a custodian.  I can house documents in our

22  imagining system.

23       Q.   Okay.  Is there a custodian department at Wells

24  Fargo?

25       A.   A custodial department?

TIRELLI-CROSS-CAMPBELL                                          39

1        Q.    Yes?

2        A.    Yes, there is.

3        Q.    Do you work in the custodial department?

4        A.    I do not.

5        Q.    Have you ever worked in the custodial department?

6        A.    No.

7        Q.    Who maintains the original documents at Wells

8    Fargo --

9        A.    I do --

10       Q.    -- pertaining to this loan?

11       A.    I do not know.

12       Q.    You don't know where the originals are maintained?

13       A.    No.  I knew where they were, yes.  But you asked

14   me, do I know who did it, no.

15       Q.    Okay.  And where were they?

16       A.    I believe it was in Minneapolis, Minnesota, it may

17   have been Eagan, I know we have a couple offices or sites

18   there.  I'm not sure.

19       Q.    And how do you know that?

20       A.    Per review of our business system of record, which

21   looks very similar to Exhibit A.

22       Q.    Who has -- who else has control to this database

23   that maintains the records?

24            MR. DUNN:  Objection.

25            THE COURT:  On what basis?

TIRELLI-CROSS-CAMPBELL                                    40

```
 1              MR. DUNN:  I don't know what "control" means?

 2              THE COURT:  Can you define that further?

 3              MS. TIRELLI:  Sure.

 4        Q.   Who's in charge of limiting, or perhaps

 5   monitoring, who has access to the system of records at Wells

 6   Fargo?

 7        A.   Which system of records?  Can you be more

 8   specific?

 9        Q.   Well, why don't you tell me how many systems of

10   records you have?

11        A.   We have the mortgaging servicing platform, which

12   is represented in Exhibit A of the affidavit, and the

13   imaging system of record.

14        Q.   Okay.  So let's start with the mortgage system

15   platform; is that what you said?

16        A.   Mortgage servicing platform.

17        Q.   Servicing platform.  So who's in charge of

18   maintaining and monitoring who has access to that system?

19        A.   I -- I don't know.

20        Q.   And with the image viewer system, who's in charge

21   of maintaining control over who has access to that system?

22        A.   I don't know.

23        Q.   Do you know what the policy and procedure is with

24   regards to limiting access to these systems?

25        A.   I'm not a hundred percent sure I -- I am familiar
```

TIRELLI-CROSS-CAMPBELL                                        41

1   with that.  I know it's -- access is granted as needed, so

2   if you have a reason to utilize that resource, then you will

3   have access to see documents in there.

4        Q.   So if you needed access to it, who would you go to

5   seek permission from?

6        A.   Management.

7        Q.   Of what department?

8        A.   Direct manager.  I'm not sure.

9        Q.   You don't know?

10       A.   No.

11       Q.   Okay.  And with regards to recording and logging

12  any changes to the system, who's in charge of that?

13       A.   What do you mean by "changes"?

14       Q.   Well, if there was a -- if there was a mistake

15  made in the record, who would be in charge of logging it and

16  correcting it?

17       A.   I'm not sure I understand.  What do you mean "a

18  mistake"?

19       Q.   Well, I'm trying to ask how these records are

20  maintained.  So who would be in charge of logging in and

21  recording any changes?

22            THE COURT:  Are you focusing on inputs?  Inputs

23  into the system?

24            MS. TIRELLI:  Inputs into the system.  Yes.

25       A.   What -- which system?

TIRELLI-CROSS-CAMPBELL                                    42

1       Q.   Into either system, MSP or the image viewer

2   system?

3       A.   My -- to the best of my understanding and to my

4   knowledge, is that the imaging system, once it's been

5   uploaded, it's there.  There have been instances where I

6   have seen information that had been placed in for the loan

7   that were for a completely different loan and were not

8   removed.

9            From -- in regards to the mortgaging servicing

10  platform that's represented on Exhibit A, I'm not a hundred

11  percent sure if -- the chain to remove information from

12  there, either.

13      Q.   Okay.  And what is the protocol for backing up the

14  system?

15      A.   I don't know.

16      Q.   And are there any auditing procedures for the

17  system?

18      A.   I -- I'm not familiar with those.

19      Q.   Okay.  And do you know anything about the

20  maintenance to ensure that the system's working and

21  functioning properly?

22      A.   I will receive updates if -- if -- emails that

23  updates are being made.  I do not know that process.

24      Q.   Okay.  So you don't know who is actually in charge

25  of maintaining the system then?

TIRELLI-CROSS-CAMPBELL                                        43

1         A.    No.

2         Q.    Okay.  With regard to the accuracy of the dates

3    and the times in your image -- of your system, do you recall

4    testifying that you didn't know whether or not they could be

5    changed?

6         A.    I believe we discussed that, yes.

7         Q.    Okay.  Do you know today whether or not someone

8    can manipulate the date or the time of the entries?

9         A.    I attempted to look into this, actually, after we

10   talked and, to my knowledge, I am not aware of any way to

11   change or remove attachments into the imaging system, like I

12   said earlier.

13             THE COURT:  I'm sorry, you have to speak a little

14   louder.

15             THE WITNESS:  I'm sorry.  I'm not aware of any way

16   to change, manipulate, delete, remove, once a document has

17   been added.

18        Q.    Well, some of the times, if you look at page six

19   of ten, of Exhibit G, some of the times are actually,

20   3:12:15 p.m., for example, 3:09:43 seconds p.m., etcetera,

21   and some of them are 12:00 a.m.  So is that 12:00 a.m. just

22   a default, or how does that work?

23        A.    There are -- and this is another thing I looked

24   into, actually -- there are certain systems that we have

25   that communicate with the mortgage servicing platform that

*TIRELLI-CROSS-CAMPBELL*                                                          44

1  give -- that will add images into Exhibit G here.  So what

2  will happen is when the document is uploaded and into this

3  system it will be ran at midnight, so kind of like a direct

4  deposit for your check, you know the funds are going to be

5  there the Thursday, but they won't hit till the Friday.

6  It's kind of the same -- same scenario, where it's being

7  deposited into this from a different source, I guess, would

8  be a good way to put it, which is why you'll see that at

9  midnight.

10         Now, you'll actually see ones that are directly

11  uploaded simultaneously, which will actually have the exact

12  time, not a 12:00 midnight time.

13     Q.   Okay.  So is it your testimony, though, that the

14  note was uploaded automatically?

15     A.   I'm not sure when it was uploaded.  I did not

16  upload the document.

17     Q.   Well, it says here 12:00 a.m.?

18     A.   Yes.  And it could have been done from an imaging,

19  I'm not sure how it was uploaded.  But, yes, documents are

20  uploaded at midnight because they're being pulled in from a

21  different -- different source.

22     Q.   Well, do you know who put into the system on that

23  date and time?

24     A.   I don't.

25     Q.   Okay.  Well, how would you find that out?

1        A.   I -- I don't know.

2        Q.   Okay.  If you can look at page seven of ten, of

3   Exhibit G.  Earlier we looked at an exhibit which is a loan

4   modification copy, which I believe was Exhibit D.  On page

5   seven of ten, there are two entries for forbearance

6   agreements, one is dated 11/20/2009 -- actually, they're

7   both dated 11/20/2009, one was at 5:57:44 p.m. and the other

8   one was uploaded 5:58:15 p.m.  Have you ever seen a

9   forbearance agreement pertaining to this loan?

10       A.   No, did not look for one.

11       Q.   Okay.  Would you know whether or not that was a

12  false entry into the system?

13       A.   No.

14       Q.   Okay.  But is it possible that it could be a false

15  entry into the system?

16            MR. DUNN:  Objection.

17       A.   I'm not sure.

18            MR. DUNN:  Anything's possible.

19       Q.   Well, I think that you testified --

20            THE COURT:  Well, he's the one who's supposed to

21  know about the system, so it's overruled.

22       A.   I'm not sure what you mean by a "false entry"?

23       Q.   Well, I think that you testified earlier that you

24  saw it where a note for a different case was put into the

25  wrong account?

1        A.   I did not look at that document that you're

2   referencing on Exhibit G.

3             THE COURT:  I'm sorry.  You're going to have to

4   speak up.

5             THE WITNESS:  I did not look at the document

6   that's being referenced on Exhibit G for verification

7   purposes, I would not be able to speak to what it was.

8        Q.   Okay.  But what I'm asking you is, in the past

9   you've testified now that you have seen false entries in the

10  past --

11       A.   No.  No, I did not.

12       Q.   You did not?

13       A.   I didn't.

14       Q.   Okay.  If you want to clarify that testimony then?

15       A.   No, I do not say "false."  You're

16  mischaracterizing my testimony.

17       Q.   Well, what exactly did you say, I don't want to

18  mischaracterize your testimony?

19            MR. DUNN:  Objection.  He said what he said.

20            THE COURT:  Well, I have down in my notes that he

21  had seen incorrect entries in the past.  Is it --

22            THE WITNESS:  I would say -- I wouldn't say

23  incorrect.  I would just say that there could have been,

24  say, a letter, like we see on Exhibit B here, that may have

25  been from a different loan.  Without going in and actually

*TIRELLI-CROSS-CAMPBELL*                                          47

1    looking at what's listed on Exhibit G, I wouldn't be able to

2    speak to if it was accurate, inaccurate, or true or false.

3    I don't know.

4         Q.   Okay.  If you look on page one of ten, about a

5    third of the way down the page, do you see an entry there

6    for "note, certified true copy"?

7         A.   I do.

8         Q.   Did you look at that?

9         A.   I cannot recall specifically.

10        Q.   You don't recall if you did, or --

11        A.   I don't recall if I did, that's correct.

12        Q.   Okay.  A little bit further down there's -- on the

13   date 3/14/2012, there's an entry for a lost note affidavit.

14   Do you see that?

15        A.   I do.

16        Q.   For 3/14/2012, some two years after the proof of

17   claim was filed; do you know who would have uploaded a lost

18   note affidavit into the loan image viewer?

19        A.   I don't.

20        Q.   Do you know why it would have been uploaded into

21   the loan image viewer?

22        A.   No.

23        Q.   Did you look at the eight-page document, lost note

24   affidavit?

25        A.   No.

TIRELLI-CROSS-CAMPBELL                                              48

1        Q.   We did discuss it in your deposition, didn't we?

2        A.   I can't recall.

3        Q.   Okay.  Did you read your deposition before signing

4     it?

5        A.   I did.  But I don't recall, specifically, what

6     you're referring to on the transcript.

7        Q.   Okay.  Is it possible that that's a false entry?

8             MR. DUNN:  Objection.

9        A.   I -- without reviewing it --

10            THE COURT:  Overruled.

11       A.   Yeah, without reviewing the actual document,

12    itself, I wouldn't be able to say it was false.  I don't

13    know what it is.

14            THE COURT:  You weren't interested in this, when

15    you looked at the screen?

16            THE WITNESS:  Well, to be honest with you, what we

17    were looking at was the original note, when I had the

18    original in my possession, I was trying to --

19            THE COURT:  So you weren't interested in why the

20    image that you were saying is a correct reflection of Wells

21    Fargo's business records listed a lost note thereafter?

22            THE WITNESS:  It didn't strike me that it was

23    lost, because I had it in my hand.

24            THE COURT:  Well, the title says "lost note

25    affidavit."  Someone signed an affidavit, according to this

TIRELLI-CROSS-CAMPBELL                                          49

1    designation.

2                THE WITNESS:  And without looking, I really

3    couldn't tell you.

4                THE COURT:  That didn't concern you?

5                THE WITNESS:  No, I had the original in my hand

6    and was reviewing it firsthand.

7                THE COURT:  So why didn't it concern you?

8                THE WITNESS:  Because it wasn't lost.

9                THE COURT:  But did it concern you as to the

10   accuracy of these images?

11               THE WITNESS:  No, it very well --

12               THE COURT:  Why?

13               THE WITNESS:  -- could be a lost note affidavit, I

14   don't know the circumstances behind that document that's

15   there, I haven't looked at that document.

16               THE COURT:  Someone signed an affidavit, right,

17   according to this heading, that the note was lost?

18               THE WITNESS:  I'm not sure, I haven't reviewed it.

19   You're asking me to say --

20               THE COURT:  Anyway, you weren't concerned by it?

21               THE WITNESS:  No.

22               THE COURT:  Okay.  And you didn't look at the

23   other entries for notes?

24               THE WITNESS:  I did review some of them.  I don't

25   recall.  I was -- I was looking for the earliest copy of the

*TIRELLI-CROSS-CAMPBELL*                                                  50

1  note that had all endorsements on it and that took me back

2  to the December 28th of 2009.

3              THE COURT:  Do you know whether these notes have

4  the endorsements on them?

5              THE WITNESS:  Not without --

6              THE COURT:  -- on page one?

7              THE WITNESS:  Not without looking at them, no.

8  Some of the page numbers match up.  I could not -- could not

9  say.

10             THE COURT:  Well, the one, there's one that says

11 seven pages on it.

12             THE WITNESS:  I see that.

13             THE COURT:  Do you have an explanation for that?

14             THE WITNESS:  Not without looking at it, no.

15             THE COURT:  And you didn't look at it?

16             THE WITNESS:  No.

17             THE COURT:  You just left it be?

18             THE WITNESS:  I may have looked at it, I don't

19 recall, specifically.  They could be -- it could be a -- I

20 don't know what the extra page to be, I don't know without

21 looking at it.

22             THE COURT:  I'm sorry, could be a?

23             THE WITNESS:  Without looking at it, I couldn't

24 tell you what the seventh page would be for.

25             THE COURT:  Okay.

*DUNN-REDIRECT-CAMPBELL*                                                      51

1            MS. TIRELLI:  Your Honor, I have nothing further

2    for this witness, at this time.  I'm going, again, just

3    renew my objection.  I do not believe he is competent to

4    testify.  I also do not believe that these business records

5    are accurate or trustworthy and therefore should not be

6    admitted.

7            THE COURT:  Okay.  Do you have any response to

8    that, or do you want to ask any clarifying questions?

9            MR. DUNN:  I do have a couple questions.

10           THE COURT:  Okay.

11

12   REDIRECT EXAMINATION BY MR. DUNN:

13       Q.   With respect to the exhibits to your affidavit,

14   Mr. Campbell, is it correct that you verified the existence

15   of each of them in the system of record?

16       A.   Yes, I did.

17       Q.   And you said, with respect to the note, which is

18   Exhibit F, specifically, that you were looking for something

19   specific when you looked at copies of the note?

20       A.   Yes.

21       Q.   What were you looking for?

22       A.   I was looking for the note with all endorsements

23   that matched up with the original.

24       Q.   And when you say "all endorsements," could you

25   explain exactly what you were focused on?

DUNN-REDIRECT-CAMPBELL                                                52

1        A.    Specifically, the blank endorsement, but the three

2    that are -- well, sorry, the -- the ones that are on the

3    third page -- well, sorry that would be the fifth page of

4    the exhibit, with the blank endorsement by ABN AMRO Mortgage

5    Group.

6        Q.    And the systems that you looked at, the loan

7    viewer system and the mortgage servicing platform, are those

8    systems that you regularly use in the course of your

9    business?

10       A.    Yes, I've used those every day for the past three

11   and a half years.

12       Q.    And do you understand that others at Wells Fargo

13   use those systems?

14       A.    Yes, I do.

15       Q.    For what purposes?

16       A.    For storing documents, for verifying information

17   documents that have been received or sent, basically,

18   they're used in the ordinary course of business.

19       Q.    Are those systems used in connection with

20   communications with borrowers?

21       A.    They are.

22       Q.    Are there any other systems that are used to store

23   communications with borrowers that you're aware of?

24       A.    Outside the imaging system and our mortgage

25   servicing platform system, no.

*TIRELLI-RECROSS-CAMPBELL*                                   53

1          Q.   And did you -- did you actually view each of the

2     documents that are attached to the exhibit in the system

3     yourself?

4          A.   I have.

5          Q.   You were able to locate each and every one of

6     them?

7          A.   I was.

8          Q.   And are they complete copies of the documents in

9     the system?

10         A.   They are.

11         Q.   And with respect to the note, did you actually

12    compare it to the original note that's in evidence as

13    Exhibit H?

14         A.   Yes.  Side by side.

15              MR. DUNN:  Nothing further, Your Honor.

16              MS. TIRELLI:  Okay.  I do have another question,

17    if I may.

18

19    RECROSS EXAMINATION BY MS. TIRELLI:

20         Q.   Next to the entry for 12/28/2009 note, to the

21    right there are several columns, the column that says "loan

22    file indicator," there's a Y put into that column, what does

23    that mean?

24         A.   I don't know.

25         Q.   Under the column "original," it's blank, why is

TIRELLI-RECROSS-CAMPBELL                                    54

1   that?

2       A.   Still trying to find it, sorry.

3       Q.   It's page six of ten in Exhibit G.

4       A.   I do not know.

5       Q.   Under the column "signed," it's also blank, why is

6   that?

7       A.   I do not know.

8       Q.   Under document recorded, I guess it doesn't say N

9   or Y, it's again blank, why is that?

10      A.   I am not sure.

11      Q.   So who was charged with going through these

12  records and making sure that they're maintained accurately?

13      A.   I'm -- I'm -- I stated earlier, I don't know.

14      Q.   You don't know.  Okay.

15          MS. TIRELLI:  Your Honor, I have nothing further

16  at this time.  I just renew my objection to the competency

17  of this witness.

18          THE COURT:  Well, some of this is you're objecting

19  to everything based on the screenshots, right?

20          MS. TIRELLI:  Well, Your Honor, I'm objecting to

21  everything based on his lack of knowledge on how the system

22  was maintained.

23          THE COURT:  No, no.  But I'm just trying to figure

24  out what your objecting to?

25          MS. TIRELLI:  I'm objecting to all of the exhibits

1  being presented.

2         THE COURT:  All right.

3         MS. TIRELLI:  And the affidavit, Your Honor.  His

4  affidavit is loaded with legal conclusions.  There is no

5  basis --

6         THE COURT:  Well, let's just -- let's just break

7  it down.  Are you also objecting to the -- you're not

8  objecting, though, to the admission, because it's already

9  been admitted, of the original note.

10         MS. TIRELLI:  Well, the issue that was left after

11  summary judgment --

12         THE COURT:  You should stand up.  It's okay when

13  you're examining the witness, but when you're talking to me,

14  you should stand up.

15         MS. TIRELLI:  Your Honor, I beg your pardon.

16         THE COURT:  It's all right.

17         MS. TIRELLI:  I didn't mean any disrespect by

18  that.   After the last -- after the summary judgment hearing

19  it was my understanding that Your Honor wanted to focus on

20  today was whether or not Wells Fargo could authenticate and

21  prove that that note was endorsed at the time the first

22  proof of claim was filed and that endorsement did not

23  appear.

24         If this is their witness, Your Honor, he's

25  incompetent to testify to that.  This system is of record is

*PROCEEDINGS*                                                            56

1    not trustworthy and therefore it does not qualify as a

2    business record or an exception to the hearsay rule.

3          THE COURT:  Okay.  And your basis for saying --

4    well, are you saying that it's -- are you focusing on part E

5    of that exception, neither the source of information, nor

6    the method or circumstances or preparation indicate a lack

7    of trustworthiness, or are you focusing on other aspects as

8    well?

9          MS. TIRELLI:  I'm focusing on that, Your Honor.

10   I'm also looking at on the *Vinhnee* case, I hope I'm saying

11   that right, and the Imwinkelried --

12         THE COURT:  That's the Ninth Circuit BAP case?

13         MS. TIRELLI:  Yes, Your Honor.

14         THE COURT:  Right.

15         MS. TIRELLI:   And the eleven steps for

16   authentication and proving trustworthiness of documents.  So

17   based on the case law, it would seem that we would need to

18   have somebody here who is familiar with the system, how it's

19   maintained, and it's accuracy, and also be able to state

20   whether or not they're truthful.  He's already testified

21   that there are incorrect -- there are incorrect entries in

22   other cases.  This record cannot be authenticated.  It

23   cannot be verified as being trustworthy.

24      I also want to point out, Your Honor, that in the -- at

25   the time of deposition, Mr. Campbell said that he was able

PROCEEDINGS                                                    57

1   to pull up on his laptop, as we sat there, and go into each

2   entry with me.  I asked him to do that, and counsel told him

3   he could not do that.  I asked more than once and I was told

4   he was not be able to do that.  So if he can't corroborate

5   his testimony --

6          THE COURT:  Well, have you made... All right,

7   that's a separate issue.  I understand that point.  There's

8   no testimony about entries that are potentially indicated as

9   that this is unreliable.

10     Did you, in addition to that, make a document request

11  of any of these entries?

12         MS. TIRELLI:  I made a document request, Your

13  Honor, at the deposition.

14         THE COURT:  Right.

15         MS. TIRELLI:  And it was denied.  I was told no.

16  I was told no, he cannot pull it up, he will not do it.

17         THE COURT:  No, but did you follow that up in any

18  way to seek these documents?

19         MS. TIRELLI:  No, Your Honor, I did not.

20         THE COURT:  Okay.

21         MS. TIRELLI:  Your Honor put the burden on the

22  bank to verify these records.

23         THE COURT:  Well, at some point, you have to

24  enforce a document request, though.  But let's turn to --

25         MS. TIRELLI:  But there would be no way to

*PROCEEDINGS*                                                        58

1    corroborate, Your Honor.  If he can't pull it up and

2    demonstrate it, how would I ever know that this truly came

3    out of that entry?

4            THE COURT:  Well, they're two different things.  I

5    understand you're asking me to draw an inference that there

6    are entries on here that are suspicious.

7            In addition to that, if, in fact, you made a

8    formal request for the document, and it was denied, then

9    there may be another basis for ruling in your favor, but it

10   doesn't really sound like that was the case.  At least you

11   didn't come to me afterwards and say, I want this, they're

12   not giving it to me.

13           MS. TIRELLI:  Well, Your Honor, at the original

14   12(b)(6) notice of deposition, we did ask for a complete

15   record of the chain of transfers and all documents

16   pertaining to that, so I would say that this would have

17   fallen into that and that would certainly be an open issue

18   for discovery.

19           THE COURT:  All right.  Well --

20           MS. TIRELLI:  It should have been produced.

21           THE COURT:  Well, let's turn to why you say that

22   803(6) isn't satisfied.  What are your grounds for saying

23   that, besides the reliability point?

24           MS. TIRELLI:  Well, I think the reliability is

25   just really a truly key issue.  If the record is not

1    trustworthy, it fails.

2              THE COURT:  Well, are you also saying he is not a

3    qualified witness?  He's clearly not the custodian, but you

4    don't have to be the custodian to introduce a business

5    record, you can be a qualified witness too.  Are you saying

6    he's not a qualified witness?

7              MS. TIRELLI:  I'm saying he's not a qualified

8    witness, Your Honor, because he lacks the familiarity with

9    the system, how it's maintained, what the safeguards are,

10   who has access to it, you know, who monitors that access.

11   He has absolutely no knowledge of this.  You know, he knows

12   what he knows because that's what he's told and that's it.

13             MR. DUNN:  Your Honor, may I be heard?

14             THE COURT:  Yes.

15             MR. DUNN:  In the first instance, he is a regular

16   user.  He is a person who uses these in the ordinary course

17   of his business.  These are -- he knows how they are created

18   or generally when the are created, he knows that they are

19   relied upon in the ordinary course of business and that they

20   are regularly made and maintained.  He doesn't need to know

21   the details of the maintenance.  You don't need to put on

22   the computer specialist or the person who actually is in

23   charge of maintaining the system.  He is a person who

24   regularly uses these.

25             THE COURT:  Well, what is the evidence for his

1   knowledge of the procedure governing the creation and

2   maintenance of these records?

3          MR. DUNN:  The evidence is that he is aware, as a

4   matter of policy, that this is the place where Wells Fargo

5   stores documents and records relating to these loans.  He's

6   aware of the policies and procedures and he's a person who

7   is involved on a regular basis in dealing with those people

8   and using, on a regular basis, these very documents.  These

9   are the documents that are used in dealing with customers.

10      Without regard to whether there is any evidence or

11  issue about some other items that may be on the viewer,

12  there is no issue or question about the validity of the

13  documents that are attached.  He has testified that he has

14  actually compared those documents to the documents in the

15  system.  And, specifically, with respect to the document

16  that matters critically here, which is the copy of the note,

17  he compared the copy of the note and the question -- to the

18  original note, and we have the original note in evidence and

19  we have the copy that he says he compared on the loan viewer

20  and he is competent to testify as to all of those facts.

21  And the date in the system indicates that that note was in

22  the system, was put up in the system, in 2009, not only

23  before the proof of claim was filed, but before a bankruptcy

24  was ever initiated.  So that is really the -- when you strip

25  down to it, the sole critical issue that is relevant here.

PROCEEDINGS                                                          61

1    And there is no evidence that has been offered that any of

2    these documents are inaccurate or incomplete or unreliable.

3    And these documents are sent, indeed, he testified as to the

4    letters, that they were sent as a matter of computer

5    generation based on default within the system, so there

6    wouldn't be a person who could testify to that because the

7    system generated them, and he knows that because his job is

8    to deal with customers concerning those issues, Your Honor.

9            THE COURT:  So this is the system that's used to

10   generate the documents?  All the documents that are

11   generated are put into this system and then they're used

12   afterwards in communications with the borrower, with the

13   court, etcetera?

14           MR. DUNN:  Yes.

15           THE COURT:  Then why does the proof of claim not

16   have this on it, this endorsement?

17           MR. DUNN:  The proof of claim does not -- what?

18           THE COURT:  There are two proofs of claim filed in

19   this case; one of them attaches a note that doesn't have

20   this endorsement?

21           MR. DUNN:  Because there's another copy that's in

22   the system, Your Honor, which is the loan origination copy.

23   When Wells Fargo gets the document, it gets the loan

24   origination file, and there is a copy in the system, an

25   earlier copy, at the time of origination.  And this is

*PROCEEDINGS*                                                    62

1    specifically referenced in paragraph three of the affidavit.

2              So the loan origination documents always reside in

3    the testimony.  As the testified, they don't get deleted.

4    That copy existed and unfortunately was taken in error and

5    attached to the proof of claim.  That was an error, Your

6    Honor.  There is no doubt that that was an error.  I was not

7    counsel, I did not do that, I was not involved in this

8    matter at the time.  It was a mistake.  It was a mistake

9    that was made by counsel in attaching --

10             MS. TIRELLI:  Objection to the extent that counsel

11   is testifying, Your Honor.

12             THE COURT:  Well, all right.

13             MS. TIRELLI:  Okay.  That was -- that was not the

14   testimony.

15             THE COURT:  I kind of opened the door to that.

16             MR. DUNN:  I think you asked me --

17             THE COURT:  That's fine.  So --

18             MR. DUNN:  -- how this happened.

19             THE COURT:  So --

20             MR. DUNN:  The point is in Exhibit --

21             MS. TIRELLI:  You don't know how it happened, you

22   cannot testify to this, sir.

23             MR. DUNN:  Well, I know -- I know that a -- I know

24   that the copy that was attached to the original proof of

25   claim is the same as the copy that existed at origination.

1          MS. TIRELLI:  Well, Your Honor, I'm going to

2     object to this because, again, I asked him to pull this up

3     on the system at deposition, all right, and Mr. Dunn refused

4     to allow that.  This would have been very easy and resolved

5     if it was able to be pulled up in the system and demonstrate

6     for me exactly where these entries were and what was

7     actually in the system.  They refused to do that.

8          MR. DUNN:  There was never a document --

9          MS. TIRELLI:  He had the opportunity, I think

10    that, you know, he's --

11         MR. DUNN:  I thought I -- Your Honor, I thought it

12    was my turn to speak.  I waited while Ms. Tirelli spoke.

13    But if she wants to speak again, I'll sit down until she's

14    finished.

15         THE COURT:  No, go ahead.  Go ahead.

16         MR. DUNN:  Okay.  The loan origination copy

17    continues to reside in the system at all times.  That is the

18    copy that was attached to the original proof of claim.  That

19    copy contained the endorsement by Mortgage Factory to ABN

20    AMRO.  If you look at the note, Your Honor, you will see

21    that Mortgage Factory signor and ABN AMRO signor were the

22    same person.  So if you look at -- if you look at the note,

23    you can see that Rene Wells, who signed as agent/attorney in

24    fact, signed for the Mortgage Factory and signed for

25    Mortgage Factory in transferring the note to ABN AMRO.  The

1   origination copy, of course, did not contain ABN AMRO's

2   endorsement because that copy was the copy that existed at

3   origination.  Someone, I don't know who, pulled that copy

4   and attached it to the original proof of claim.

5            MS. TIRELLI:  Your Honor, objection.  That is --

6   that is not in evidence.  You cannot testify, Mr. Dunn.

7            THE COURT:  Well, his affidavit says that.

8            MR. DUNN:  That's what his affidavit says.

9            THE COURT:  Mr. Campbell's affidavit.

10           MS. TIRELLI:  Mr. Campbell can't possibly testify

11  to that either.  He did not work for Wells Fargo, he's

12  testified that he did not work there at -- I'm sorry, he had

13  nothing to do with the filing of the proof of claim, he

14  can't possibly testify as to what happened at the timing of

15  the proof of claim or the event of proof of claim, Your

16  Honor.

17           MR. DUNN:  What he can testify to is that in the

18  loan image viewer, which he looks at and uses regularly,

19  there is a copy dated March 26th, 2007, and that that is

20  shortly after Wells Fargo came to acquire the loan.  In the

21  system there is a copy of the origination documents and

22  included in that is a copy of the note that contains these

23  endorsements.

24           THE COURT:  Well, let me break this down.  The

25  note is in evidence, right?  This is being offered really

PROCEEDINGS                                                                65

1    only for the proposition that a copy of the note appeared

2    substantially contemporaneously in Wells Fargo's records,

3    which I guess is being offered to support the fact that it

4    wasn't something that was created as a result of this

5    litigation.

6              MS. TIRELLI:  Your Honor, we don't know that.

7    This is hearsay.  This is -- he -- his testimony is related,

8    it is relying on hearsay.

9              THE COURT:  But we have the -- but we have the

10   actual note.

11             MS. TIRELLI:  Well, we have the actual note, Your

12   Honor --

13             THE COURT:  So I don't understand what else, I

14   mean --

15             MS. TIRELLI:  -- we do not know, the task in hand,

16   Your Honor, was to prove that this was actually in hand,

17   received, endorsed in blank, prior to --

18             THE COURT:  Well, I didn't have -- I didn't have

19   the actual note at the summary judgment hearing.

20             MS. TIRELLI:  No, but, Your Honor, you did.

21             MS. SCHIAVO:  Yes.

22             MS. TIRELLI:  Because you actually described --

23             THE COURT:  No, I had --

24             MS. TIRELLI:  Your Honor, you did --

25             THE COURT:  I had a copy.

*PROCEEDINGS*                                                              66

1          MS. TIRELLI:  -- respectfully.  No, Your Honor,

2    you had it because you actually described the rubber stamp

3    as being lightly gray and it appeared to be a rubber stamp

4    to you.  It's in -- I have the transcript.

5          THE COURT:  But --

6          MS. TIRELLI:  We did have the original note.  Ms.

7    Schiavo did bring the original note with her.

8          THE COURT:  But I didn't treat it as their motion

9    for summary judgment.  I said there were enough issues about

10   the bona fides of the note that we'd have to have a trial on

11   it.

12          So now they've offered up the note, and it's been

13   admitted into evidence, so the piece -- the evidence you

14   really want to exclude is just the issue or when this note

15   was created, right?

16          MS. TIRELLI:  Well, Your Honor, the endorsement,

17   you know, it was not on the proof of claim when the proof of

18   claim was filed.

19          THE COURT:  I understand that.  But --

20          MS. TIRELLI:  It's a rubber stamp.  Anybody could

21   have put that there.

22          THE COURT:  -- the issue that you're -- the key

23   issue for the imaging is the timing, right?  The timing in

24   February on or around that the note was dated, February of

25   2009, right?  So that's why you want it out?

*PROCEEDINGS*                                                      67

1          MS. TIRELLI:  Well, Your Honor, I believe that the

2     witness testified --

3          THE COURT:  And it seems to be the one thing that

4     is reasonably reliable of this system is the dating, not

5     necessarily what it records and whether it's accurate or

6     whether someone actually did in fact endorse it, but just

7     the timing of it.

8          MS. TIRELLI:  Well, Your Honor, we don't know that

9     because the witness has no knowledge as to how the dating is

10    calibrated, what happens when there's a leap year, you know,

11    how reliable is this?  Can it be manipulated?  I asked that

12    in deposition and the witness said that he does not know if

13    it can be manipulated or not.  It's on the very last page of

14    his testimony. His answer at line six, page 243, of the

15    deposition transcript, "I do not know that it's possible to

16    change these dates or not possible."  This is not a

17    competent witness to testify as to whether or not the dates

18    can be changed.  He took information that he received,

19    documents that he received, from counsel.  These were not,

20    you know, documents that he retrieved on his own and did his

21    own research to pull this together.

22          MR. DUNN:  I don't see how --

23          MS. TIRELLI:  And did not -- and he also cannot

24    testify as to -- or has not testified -- as to whether or

25    not the loan image viewer record that we see here today

PROCEEDINGS                                                    68

1    mirrors that which existed at the time the proof of claim

2    was filed.  We don't know if these entries were entered

3    after the fact and then backdated.  We don't know.  This is

4    not a competent witness.  This entire record, Your Honor, is

5    all hearsay.  It's all hearsay.  It does not pass the test

6    for the business judgment -- I'm sorry, for the business

7    record exception.

8            MR. DUNN:  Your Honor, the question is not what

9    the loan image viewer looked at the time the proof of claim

10   was filed, the question is whether a copy bearing the

11   complete endorsement is in the file, and there is reliable

12   indication it was in the file prior to the time the proof of

13   claim was filed, prior to the time the original, and in fact

14   prior to the time --

15           THE COURT:  Well, that -- now we're focusing on

16   whether, again, he's a qualified witness.

17           Does he really know the procedure going into the

18   creation and maintenance of this record?

19           MR. DUNN:  He knows how things are uploaded and he

20   knows that they are used and he uses them in the ordinary

21   course, and he does not need to be the person -- we couldn't

22   find the person who uploaded it.

23           THE COURT:  No, no.  You don't -- you don't need

24   the person who actually does it.  I get that.

25           MR. DUNN:  He uses these regularly --

*PROCEEDINGS*                                                      69

```
1            THE COURT:  What is your response to Ms. Tirelli's

2   point, which I think is accurate, that he doesn't know

3   whether the system can be manipulated in any way?

4            MR. DUNN:  He -- I think he testified, and he can

5   testify, he made inquiry into that and determined that it

6   could not, that the dates and the information could not be

7   changed and things could not be removed.  I think he told

8   Ms. Tirelli that he did that in response to her inquiry.  He

9   did not know at the time of the deposition, but he does know

10  now.

11           MS. TIRELLI:  Well, Your Honor, he testified he

12  doesn't know the policy and procedure surrounding that.

13           MR. DUNN:  No.

14           MS. TIRELLI:  So whatever he's relying on is just

15  second-hand hearsay.

16           THE COURT:  Well, any knowledge of a business

17  record is second-hand hearsay.

18           MS. TIRELLI:  Well, Your Honor, but the

19  trustworthiness is --

20           THE COURT:  I mean he reads the procedures, for

21  example.  That if he was actually familiar with all the

22  procedures behind this, that would be based on hearsay, but

23  it stills renders him a competent witness.

24           MS. TIRELLI:  But, Your Honor, he's not a

25  competent witness in this case.  And these records are not
```

 1 | trustworthy.  That's what gets you over the hump of hearsay

 2 | as a business record --

 3 |             MR. DUNN:  These are two separate --

 4 |             MS. TIRELLI:  -- is the trustworthiness.

 5 |             MR. DUNN:  These are two --

 6 |             MS. TIRELLI:  Okay.  We have a lost note affidavit

 7 | sitting there in 2012.  These records are not trustworthy.

 8 | When I asked to have them opened, they said no.

 9 |             MR. DUNN:  Your Honor, at deposition is not a time

10 | to make a request for documents or data.  She didn't make

11 | document requests or data requests that were not complied

12 | with.  She didn't --

13 |             MS. TIRELLI:  Exhibit G was handed to me at the

14 | deposition.

15 |             MR. DUNN:  Please, Your Honor, may I finish, Your

16 | Honor?

17 |             THE COURT:  No, let him finish, please.

18 |             MR. DUNN:  She didn't -- she did not before or

19 | after the deposition make document requests or data

20 | requests.  A deposition's a time --

21 |             THE COURT:  No, I agree with that.  You don't have

22 | to --

23 |             MR. DUNN:  -- to ask that question.

24 |             THE COURT:  You don't have to --

25 |             MR. DUNN:  Okay.

```
 1            THE COURT:  But --

 2            MS. TIRELLI:  I disagree with that, Your Honor,

 3   because I did, in fact, put document request out for a

 4   12(b)(6) and -- I'm sorry, a --

 5            THE COURT:  30(b)(6).

 6            MS. TIRELLI:  30(b)(6), excuse me, Your Honor.

 7   And I was told at the deposition by Mr. Dunn, and it's also

 8   in the record, that this is not a 30(b)(6) witness and he

 9   was here for one purpose and one purpose only and that was

10   to focus at the issue at hand here in this case.

11            THE COURT:  Okay.

12            MS. TIRELLI:  When I asked to see the document --

13   and first of all, Exhibit G was handed to me by Mr. Dunn at

14   the deposition, on July 2nd, if you look at the bottom of

15   Exhibit G, there is a date on it some two weeks earlier --

16            THE COURT:  Right.

17            MS. TIRELLI:  -- June 19th, 2012.  This could have

18   been turned over to me sooner.  It wasn't.

19            THE COURT:  But --

20            MS. TIRELLI:  So when it's handed to me, and I

21   have the witness there, you know, you do the best you can

22   do.

23            THE COURT:  But was there a request that asked for

24   it, anything like this?

25            MS. TIRELLI:  Well, I asked for all -- I asked for
```

1   all the records pertaining to the note and pertaining to the

2   custody and whatnot.  It's taken them three years to come up

3   with the witness.  We had a 30(b)(6) witness who had no

4   knowledge of it.  Is she not familiar with the same system?

5   Doesn't her system have the same dates and times?  It

6   apparently doesn't.

7            MR. DUNN:  That's the --

8            MS. TIRELLI:  Why was Mary Ellen Frost not be able

9   to testify to the same thing?

10           MR. DUNN:  She did testify.  I mean, this is --

11  she testified to those images, she testified to documents

12  that came off the loan image viewer.  This witness was not

13  the 30(b)(6) witness.  There was a prior 30(b)(6)

14  deposition.  There was no motion practice and there was no

15  complaint even among counsel, or conference among counsel,

16  with respect to deficiencies in the 30(b)(6) deposition.

17  This is just grasping at straws, Your Honor, and it's really

18  not --

19           MS. TIRELLI:  Well, Your Honor found the 30(b)(6)

20  to be incompetent at summary judgment.

21           MR. DUNN:  Please may I finish, Your Honor?  Your

22  Honor --

23           MS. TIRELLI:  You found her to be incompetent,

24  Your Honor.

25           THE COURT:  You should stop interrupting him.

1    Okay.  Go ahead.

2              MR. DUNN:  Mr. Campbell's deposition was noticed,

3    specifically, he was not the 30(b)(6) witness, there had

4    been a prior 30(b)(6) witness, even to the extent Ms.

5    Tirelli believed the 30(b)(6) witness was insufficient or

6    she had complaints about the testimony, or the documents

7    that had been produced, there are procedures for following

8    up on that and not coming to court and then challenging an

9    affidavit on the basis that she didn't make -- did or did

10   not make document requests.  I have not memorized the

11   document requests, but I don't believe she made document

12   requests that would call for the information that she's

13   talking about now.  But, in any event, she certainly hasn't

14   complained about the failure to provide that information,

15   she hasn't met and conferred about it, and she hasn't made

16   any motion seeking to have additional documents produces or

17   data produces, Your Honor.

18             THE COURT:  Okay.  Is there any other evidence you

19   want to point me to, as to whether the source of the

20   information in this image file, or the method or

21   circumstances of its preparation, indicate a lack of

22   trustworthiness?

23             MS. TIRELLI:  Well, the witness is unable to tell

24   us who uploaded, when it's uploaded, he has no information.

25             THE COURT:  No, but that's --that's not a

PROCEEDINGS                                                    74

1    requirement.

2              MS. TIRELLI:  In terms of a source, Your Honor --

3              THE COURT:  Right.

4              MS. TIRELLI:  -- there is no source, it's only

5    what they've provided.  Your Honor's already determined that

6    the 30(b)(6) witness lacks credibility.  That was your -- in

7    the --

8              THE COURT:  No, that was the -- I'm talking about

9    his --

10             MS. TIRELLI:  -- summary judgment.  This witness

11   here, Your Honor, has no information.  He lacks competence.

12   He can't testify to that.  He simply can't.

13             THE COURT:  Well, I mean --

14             MS. TIRELLI:  He doesn't know what department

15   uploads these documents.

16             THE COURT:  The impression I have, from looking at

17   this document and from his testimony, is the document's from

18   sources within Wells Fargo -- and it's not clear from what

19   sources or whether the documents are comprehensive -- but

20   documents from sources at Wells Fargo are uploaded into the

21   imaging system and that that uploading is done on a

22   chronological basis.  It is quite possible that those

23   documents, themselves, are self contradictory or not

24   accurate.  But as far as the system, itself, it appears to

25   me, unless I can hear something else, that it actually does

1    track whatever is put into it.  I don't have any evidence,

2    for example, that there are changes to the system that you

3    can go back into it and edit what's on the screen.

4              MS. TIRELLI:  Your Honor, the witness testified

5    that he does know whether or not that -- whether or not you

6    can.

7              THE COURT:  I understand that, but I -- but I'm

8    now focusing --

9              MS. TIRELLI:  It's a computer system.

10             THE COURT:  -- on E, and I don't see anything to

11   indicate that that actually happened, either.

12             MS. TIRELLI:  Well, no, but, Your Honor, it's a

13   computer system, it's a computer record.

14             THE COURT:  Right.

15             MS. TIRELLI:  It can be manipulated.  How can it

16   not be manipulated?  Who has the ability to do that?  It's

17   taken them three years to come up with this?  We could have

18   saved a lot of time if this was presented to us back in

19   2010.  I find it highly suspicious that this is what they

20   produce in 2013, the day of the deposition, despite having

21   it in their office for two weeks.

22             Your Honor, if you could just please take a look

23   at page nine of ten of Exhibit G?  Oh, wait, I'm sorry, Your

24   Honor.

25             THE COURT:  Go ahead.

1          MS. TIRELLI:  No, never mind.  This...

2          THE COURT:  Again, we have the note, right?  So

3    what is it about the -- what in addition does the -- do

4    these exhibits add to that?

5          MS. TIRELLI:  Your Honor, the purpose of today is,

6    as I understood it, was that there was credibility issues

7    that Wells Fargo all along the way in this case and that we

8    had overcome the presumption of authenticity of that

9    endorsement and that it was up to them to come in and prove

10   the authenticity and when that endorsement was placed in the

11   note.

12         THE COURT:  Right.

13         MS. TIRELLI:  I don't see it.

14         MR. DUNN:  Well, I don't think that's quite --

15         MS. TIRELLI:  Your Honor, I think that they had

16   failed to meet the burden at this point.  They've failed to

17   meet it.

18         THE COURT:  Well, what are you offering the

19   screenshots for?

20         MR. DUNN:  I'm offering the screenshots to show --

21   well, first of all, the question, the critical question, I

22   think, is whether Wells Fargo was entitled to file the proof

23   of claim and whether, when it filed the amended proof of

24   claim in which it attached the note endorsed in blank, which

25   I think everybody agrees makes it a holder and entitled to

1    enforce the mortgage, whether in fact it was in possession

2    of an endorsed note, note endorsed into it or in blank, at

3    the time the proof of claim was filed.  And I would point

4    out to Your Honor the amended proof of claim was filed

5    before the bar date, so it's really the amended proof of

6    claim date we're talking about.  What I'm offering it for is

7    to rebut the allegation or inference of recent manufacture

8    because what we see is a dated copy and that dated copy

9    contains the blank endorsement and predates not only the

10   bankruptcy proof of claim, but the bankruptcy filing, and

11   indeed, the foreclosure that, when Ms. Franklin testifies,

12   you'll learn triggered the bankruptcy filing in order to get

13   the protection of the automatic stay.

14          So the only purpose for which we're offering this

15   is to show that Wells Fargo's system shows that it had a

16   copy of the fully endorsed note at the time somebody, and I

17   don't know who, erroneously filed an incomplete copy.  And

18   also for the purpose of showing that that incomplete copy,

19   like all other copies of the note, stays in the record

20   forever so somebody can print the earlier copy out and that

21   -- and that is a copy of what was attached to the first

22   proof of claim.  So that this was not a fraud, this was not

23   a recent manufacture, this was not any of those things, this

24   was an error.

25          THE COURT:  So timing is important, that's why

PROCEEDINGS                                                      78

1   you're doing this?

2                  MR. DUNN:  Yes.

3                  THE COURT:  -- the timing point?

4                  MR. DUNN:  Yes.  The point is to show that it --

5                  THE COURT:  So why doesn't this fall into the *Vee*

6   *Vinhnee* case, where timing was important also, as far as the

7   maintenance and potential for manipulation of the...

8                  MR. DUNN:  Because I don't think there's been any

9   showing that the dates are not reliable, the dates are

10  computer generated, this is a chronological system, as Your

11  Honor has pointed out.

12                 THE COURT:  Well, but *Vee Vinhnee* addresses all

13  that.

14                 There are two cases that seemingly take opposite

15  views, but I don't believe they actually do.  The first is

16  the Ninth Circuit BAP case of *Vee Vinhnee,* 336 BR 437 (9th

17  Cir. BAP 2005), where the court focuses at length on the

18  importance of audit procedures when you deal with electronic

19  documents and how electronic systems actually work, as

20  opposed to other types of record-keeping systems, and in

21  particular access to the system and the ability to affect

22  it, the data that's in it.

23                 And then there's *In re: Lo Sia*, 2013, Bankruptcy

24  Lexis 3559, Bankruptcy D, New Jersey, August 27, 2013, where

25  there was an objection to a witness like Mr. Campbell, who

1    was not the records custodian, which frankly is kind of an

2    outdated or outmoded term, it really was created in the days

3    of people who had file rooms, but the court there properly

4    found that the witness was qualified because she had

5    knowledge of the procedure going in the creation and

6    maintenance of the records sought to be admitted.  And she

7    says, if determination of the pending summary judgment

8    motion's turned on the adequacy of Bank of America's

9    computer records, the court might be inclined to agree that

10   more foundation is required regarding the computer equipment

11   and programs used.  In the matter at hand, the central

12   question is what parties entitled to enforce the note, in

13   that regard Ms. Hardy's critical testimony is that she

14   received and inspected the physical copies of the note and

15   mortgage obtained from Wells Fargo by BANA'S agent and that

16   the note and mortgage are in the possession of defendant's

17   counsel.

18            In that case, there wasn't any issue at to when

19   the endorsement was created, it was just whether there was a

20   note.

21            Can you address the other concerns I have about

22   this exhibit, as well, Exhibit C -- I'm sorry, Exhibit D to

23   Mr. Campbell's declaration is a loan modification

24   transmittal form and loan modification agreement, that's

25   actually signed, or purported to be signed, by the debtor,

1    as well as Wells Fargo?

2              MR. DUNN:  Yes, Your Honor.

3              THE COURT:  I don't see any document with a

4    corresponding title in Exhibit G for that time frame.  I see

5    something, or a series of things, for February of 2008, that

6    say, "loss mitigation package," which really doesn't

7    correspond to a loan modification agreement.  This is on

8    page nine and this is what Mr. Campbell testified to he

9    thought might be covered.

10             MR. DUNN:  Yeah.  I think -- I think there are two

11   things.  I think the procedure here -- and we didn't get

12   into this because he wasn't asked -- but the procedure, as I

13   understand it is, and we can ask Mr. Campbell if he knows,

14   this document was signed by the debtor and then returned to

15   Wells Fargo and sometime after it would be signed by Wells

16   Fargo, so what we would have is a loss mitigation package,

17   and there's a three-page document, I believe, which is loss

18   mitigation package dated February 27, 2008, that's a three-

19   page document, so the document would have come back to Wells

20   Fargo and then would, at sometime later, have been signed by

21   Wells Fargo.  And I think, if you go, there is workout

22   executed modification on what appears to be June 22nd, 2009,

23   I don't -- the second signature is not dated and I don't

24   know how long it took to sign this, but I don't understand

25   there to be any dispute, Your Honor, and indeed I do intend

*PROCEEDINGS*                                                                    81

1   to call Ms. Franklin and have her testify and she did

2   testify at her deposition, that there was an agreement to

3   modify the loan, that agreement was made between her and

4   Wells Fargo, and this is the time at which that agreement

5   was made and that there was a subsequent default on the

6   modified terms.  So I -- I don't think there is any dispute,

7   but that there was, in fact, a loan modification that was

8   entered --

9          THE COURT:  I'm just focusing on the reliability

10  of this imaging.

11         MS. TIRELLI:  Your Honor, I'm just going to

12  reserve an objection, because there is no original.  I

13  understand we're looking at the --

14         THE COURT:  Well, no, but leave that aside.

15         MS. TIRELLI:  -- entry.

16         THE COURT:  I'm not focusing on that.  I'm

17  focusing on the fact that there's a pretty significant

18  document here, which is a loan modification agreement, which

19  is two pages.  It's doesn't --

20         MR. DUNN:  Well, it's three pages.

21         THE COURT:  Well, no, it's two.

22         MR. DUNN:  The transmittal form is the third page,

23  Your Honor.  It's front and back.

24         THE COURT:  Okay.  All right.  So, but it doesn't

25  appear, as far as I can see.

*PROCEEDINGS*                                                                    82

1              MR. DUNN:  Well, as I -- as I said, it does appear

2    to me, a three-page document, that was a loss mitigation --

3    described as a loss mitigation package, on February 27th,

4    and this is a document that relates to loss mitigation and

5    it is a three-page document, Your Honor.

6              THE COURT:  Well, there are many other documents

7    listed here, listed as loss mitigation documents, but isn't

8    this a loan modification agreement?

9              MR. DUNN:  A loan modification document is a loss

10   mitigation document, Your Honor.

11             THE COURT:  How do we know that?

12             THE WITNESS:  They are.

13             THE COURT:  How do you know that?

14             THE WITNESS:  I -- past jobs, I've created,

15   implemented loss mitigation procedures for Capitol and Chevy

16   Chase.  Loss mitigation is the workout option in regards to

17   loss mitigation and is housed --

18             THE COURT:  Well, have you --

19             THE WITNESS:  -- such under that department.

20             THE COURT:  -- have you sent loan modifications or

21   caused them to be uploaded into the servicing platform?

22             THE WITNESS:  Have I, personally, no, but at the

23   time they're --

24             THE COURT:  Well, do people do that?

25             THE WITNESS:  Yes, it's a general --

*PROCEEDINGS*                                                        83

1          THE COURT:  And is there a heading to put them

2     under?

3          THE WITNESS:  No, and that's -- that's why I said

4     earlier that you'd actually have to go in and physically

5     look at each of the documents, loss mitigation is very

6     broad.

7          THE COURT:  No, but there's a column in the loan

8     image viewer, select a description, and it has things like

9     pay stub, check, borrower correspondence, miscellaneous --

10          MS. TIRELLI:  Forbearance agreement.

11          THE COURT:  -- forbearance agreement, why would

12     this -- you're saying, are you familiar with the

13     descriptions?

14          THE WITNESS:  Yes.  And they're -- they were set

15     to be very general, so --

16          THE COURT:  Well --

17          THE WITNESS:  -- where you will have some that are

18     more specific.

19          THE COURT:  Forbearance agreement seems pretty

20     specific.

21          THE WITNESS:  Understood, but the person could be

22     very -- it could be a routine received loss mitigation

23     package, click drop-down, that's what it is, it's a loss

24     mitigation workout.  It is a loss mitigation package.

25          THE COURT:  So this system, if you wanted to find

1    an actual loan modification, you would have to look through

2    every entry that listed loss mitigation package?

3              THE WITNESS:  They're -- they're multiple, yes,

4    but you -- yes.  There could be an executed modification

5    that you see on page eight, I believe it was, but there's

6    multiple names, which is why looking at the face of the

7    document, you ultimately have to go into it and verify it.

8              THE COURT:  Do you have any explanation why the

9    pages for the notes are different?

10             THE WITNESS:  Such as like the six and the seven,

11   without looking at the actual document --

12             THE COURT:  Six, seven, eight and five?

13             THE WITNESS:  Well, again, I think the eight and

14   the six are the same, that's just from looking at the

15   numbers on this sheet, there's a big mix up on these.  But

16   without looking at the documents, themselves, there could be

17   a tracking sheet attached to it that was sent to counsel.

18   I'm not sure.  I -- without looking at the document, it's

19   all speculative.

20             THE COURT:  Okay.  I'm going to have to think

21   about this and I invite the parties to brief it.

22             MR. DUNN:  Okay.

23             THE COURT:  Two contradictory cases, frankly.

24             MR. DUNN:  What I'd like --

25             THE COURT:  But I think here the timing point is

1   critical.  I think we should go on, it's a judge trial, I

2   can, you know, I can...  Let us continue on the record.  If

3   I admitted it, I would still, I believe have concerns about

4   its credibility and I'll tell you that front out, based on

5   the other entries that I've noted in the screenshot, but I

6   don't know if that would sufficient to overcome the

7   presumption under Texas law.

8           MR. DUNN:  We would like the opportunity to brief

9   that, as well, Your Honor.

10          THE COURT:  Well, no, but I'm just saying I --

11          MR. DUNN:  I understand what Your Honor is saying.

12          THE COURT:  I'm just saying, if there's any more

13   evidence you want to introduce besides these disputed

14   amount, or if you want to examine Mr. Campbell now on cross,

15   as opposed to on *voir dire*, although it was a lengthy *voir*

16   *dire*.

17          MR. DUNN:  I thought we basically had cross,

18   but...

19          MS. TIRELLI:  I think that we pretty much covered,

20   you know --

21          THE COURT:  All right.

22          MS. TIRELLI:  -- everything at this point, Your

23   Honor.

24          THE COURT:  Okay.  So do you want to present your

25   evidence?

*PROCEEDINGS*                                                          86

1              MR. DUNN:  Well, my understanding of Your Honor's

2    rules --

3              THE COURT:  I -- I'm sorry.  Go ahead.

4              MR. DUNN:  -- was that the affidavit would be the

5    direct testimony.

6              THE COURT:  But I thought you said you wanted to

7    cross-examine Ms. --

8              MR. DUNN:  I do want to examine Ms. Franklin, yes.

9              MS. TIRELLI:  Well, Your Honor, she didn't -- I'm

10   sorry, Ms. Franklin did not present any direct testimony,

11   she had nothing to add to this conversation.

12             THE COURT:  No, but you --

13             MR. DUNN:  I want to call her.

14             THE COURT:  -- but he's entitled to call her.  I

15   mean, he's obviously not going to be able to her

16   declaration, because she's an adverse witness, so he's

17   entitled to call her as a witness.

18             MS. TIRELLI:  Okay.  And that's fine.  But, again,

19   I thought today's limited issue was regarding the timing of

20   the endorsement.  And I know what she has to add to that.

21             THE COURT:  Well, I don't know, you want to call

22   her for the proposition that she's acknowledged that Wells

23   Fargo has an interest in this note, right?

24             MR. DUNN:  Yes.

25             THE COURT:  Okay.  Is that -- is there any dispute

1    about that?

2              MS. TIRELLI:  Well, Your Honor, we're not -- Wells

3    Fargo continues to say that they're servicing this loan for

4    Freddie Mac, which Your Honor has already found is not --

5    that Freddie Mac has nothing to do with this case.  I don't

6    know that my client has any knowledge.

7              THE COURT:  Well, let me put it this way:  Is

8    there any dispute that Ms. Franklin signed a loan

9    modification agreement, that I've already referred to, that

10   lays out the modified terms of the loan and has, it says

11   it's a Wells Fargo loan?

12             MS. TIRELLI:  Well, it actually says, "servicer,"

13   at the top of it, Your Honor.  And it's not disclosed to

14   her.

15             THE COURT:  Well, okay, but is there any dispute

16   that she signed that agreement?

17             MS. TIRELLI:  Well, Your Honor, I haven't seen the

18   original agreement.

19             THE COURT:  Okay.

20             MS. TIRELLI:  And that would be the best evidence

21   rule, and I don't know if they have it with them today.

22             THE COURT:  Well, you don't need the original

23   agreement for this -- for that.  You just don't.

24             MS. TIRELLI:  Your Honor, this is redacted.  If

25   you look at --

*PROCEEDINGS*                                                                88

1              MR. DUNN:  It's redacted to --

2              THE COURT:  It's redacted just as far as her

3    personal information, right?

4              MS. TIRELLI:  Well, I don't know that, Your Honor.

5    I can't read through the black lines.  And now I think if

6    they're going to try to submit this into evidence --

7              THE COURT:  All right.  Well, then I think you

8    should --

9              MS. TIRELLI:  -- it's got to be original.

10             THE COURT:  -- I think he's entitled to call Ms.

11   Franklin then.

12             MS. TIRELLI:  That would be fine.  I'm just

13   objecting to this exhibit to the extent that it's not an

14   original.

15             THE COURT:  That's just ---

16             MS. TIRELLI:  I don't know if they have it or not.

17             THE COURT:  I was trying to cut it short, thinking

18   that, perhaps, that there was an agreement that she signed

19   it, but, if not, then she should take the stand.

20             So you can step down, sir.

21

22                  (Witness excused)

23

24             MR. DUNN:  I think I'll be less than 15 minutes.

25             THE COURT:  Okay.

*PROCEEDINGS*                                                            89

1              THE WITNESS:  Can I use the restroom?

2              THE COURT:  Yes.  There's one back there.  Just

3      through that door there and to the right.

4              MR. DUNN:  While Ms. Franklin is out, could I just

5      make a comment on what -- the colloquy you just had with Ms.

6      Tirelli about the loan modification agreement.  I don't

7      think the terms, specific terms, of the loan modification

8      agreement matter for the purposes we have today, I think

9      what does matter is that she, in fact, dealt with Wells

10     Fargo, negotiated with Wells Fargo, entered into a loan

11     modification agreement with Wells Fargo and has treated

12     Wells Fargo as the lender on her loan for a period of four

13     years prior to this time and no one else has made any claim

14     of right or interest with respect to this loan and that she

15     doesn't deny, and I assume she will testify, that she took

16     the loan and understood there was a mortgage and she didn't

17     make the payments.

18             MS. TIRELLI:  Your Honor, there's several issues

19     with that.  After Your Honor determined that Wells Fargo --

20     that there was in fact no contract between Wells Fargo and

21     Freddie Mac, I sent a letter to Ms. Schiavo, which is an

22     exhibit to Mr. Campbell's deposition testimony, asking if my

23     client would be considered for a loan modification under the

24     National Mortgage Settlement Agreement and the response to

25     that is no, because it is still owed by Freddie Mac.  So if

PROCEEDINGS                                                    90

1   they were, in fact, modifying the loan, acting as a servicer

2   for Freddie Mac, then that was deception, you know, on their

3   part towards my client because that was never disclosed to

4   her.

5              THE COURT:  But you're not --

6              MS. TIRELLI:  And they still can't prove it, so...

7              THE COURT:  But you're not saying you're the owner

8   of the loan, right?

9              MR. DUNN:  I'm not saying I'm the owner of the

10  loan, I'm saying I'm the holder of the note.

11             THE COURT:  Of the note.  Well, to that extent,

12  isn't her testimony irrelevant?

13             MR. DUNN:  No, I think it's not, Your Honor.  This

14  is -- this is a court of equity and the question is, is it

15  equitable or not equitable to allow Wells Fargo to enforce

16  its claim and its rights as the holder.  And the fact that

17  for an extended period of time she --

18             THE COURT:  Well, no, no, it --

19             MR. DUNN:  -- the fact that she treated Wells

20  Fargo as the lender --

21             THE COURT:  -- if it is the hold -- the holder --

22  holder -- the status as holder of a note is prescribed in

23  the UCC, it's a straight legal statutory function, so you're

24  either a holder or you're not.  How does equity enter into

25  it?

*PROCEEDINGS*                                                                   91

1          MR. DUNN:  I think it enters into it, because the

2     question of whether and to what extent she -- she

3     acknowledged and recognized and treated Wells Fargo as

4     lender is relevant, Your Honor.

5          THE COURT:  Why?

6          MR. DUNN:  Because she dealt with --

7          THE COURT:  Do you have any case that says that?

8          MR. DUNN:  I haven't looked for cases, Your Honor.

9          THE COURT:  I mean, I -- my reading of the case

10    law is just the opposite, that you have to be a holder or

11    the owner, one or the other.  It's not that they thought,

12    you know, you were.  You have to be.

13         MR. DUNN:  Well, you can also be a transferee in

14    possession, Your Honor.

15         THE COURT:  Not under Texas law.  You have to be a

16    holder.

17         MR. DUNN:  You have to be a holder, but if you

18    have the note, you were entitled to --

19         THE COURT:  Even if it's endorsed to someone else?

20         MR. DUNN:  It's not endorsed to someone else, and

21    there's no argument that it was.

22         THE COURT:  No, I -- I -- that's what I'm saying.

23    I think your whole case -- and that's fine, I don't have any

24    problem with your presenting it that way -- rests on it

25    being endorsed in blank.  But if it isn't, if I conclude for

*PROCEEDINGS*                                                         92

 1   some reason that it isn't, and that it's really, it's just

 2   the one endorsement, then I don't know of any case law that

 3   says that how the parties dealt with each other changes the

 4   fact that you don't fit into 3301, because you --

 5            MR. DUNN:  I -- I think --

 6            THE COURT:  -- you're neither the named endorsee

 7   and you don't hold it in blank.

 8            MR. DUNN:  But the question here is, we're not in

 9   the Texas court, we're not --

10            THE COURT:  But Texas law governs.

11            MR. DUNN:  I understand, Your Honor.  But we're

12   not here on the foreclosure question, we're here on the

13   proof of claim question.

14            THE COURT:  Right.

15            MR. DUNN:  And that always invokes the court's

16   equity as to whether the creditor's claim should be allowed

17   or an objection to the claim should be sustained and equity

18   always, always is invoked in that determination by this

19   court.  And, therefore, the question of how the --

20            THE COURT:  Frankly, I don't agree with that.

21            MR. DUNN:  Okay.

22            THE COURT:  The case law -- I mean, look, we might

23   as well get it out on the record, but I don't think that's

24   right.  So you could cross-examine her, but I may exclude it

25   at the end on the basis that it's totally irrelevant.

*DUNN—DIRECT—CARSSOW FRANKLIN*                                          93

1          MS. TIRELLI:  Okay.  And Your Honor, I'm objecting

2    based on relevance, but my client's here to take the stand.

3          THE COURT:  Okay.  So could you sit up there,

4    please?

5          MS. TIRELLI:  Yes.  Your Honor, if I could just

6    remove the exhibits from the witness stand?

7          THE COURT:  Sure.  Okay, you can take a seat.

8          Would you raise your right hand, please?

9          Do you swear or affirm to tell the truth, the

10   whole truth, and nothing but the truth, so help you God?

11         THE WITNESS:   Absolutely.

12         THE COURT:  And, could you spell our name for the

13   record?

14         THE WITNESS:  Cynthia, C-y-n-t-h-i-a, Carssow, C-

15   a-r-s-s-o-w.

16         THE COURT:  Okay.  You can go ahead.

17

18              CYNTHIA CARSSOW FRANKLIN,

19         having been first duly sworn in by the court,

20            was examined and testified as follows:

21                    *  *  *  *  *

22

23   DIRECT EXAMINATION BY MR. DUNN:

24      Q.  I'm sorry, ma'am --

25         THE COURT:  Yes.

DUNN-DIRECT-CARSSOW FRANKLIN                                    94

1        Q.   -- you are not using Franklin as your name

2    anymore?

3        A.   No, I use the whole name.  Cynthia Carssow

4    Franklin, F-r-a-n-k-l-i-n, same as my son's.  It's kind of

5    like the way the Spanish do it, but I use my name Carssow

6    professionally.

7        Q.   Okay.  Well, do you want to be addressed as Ms.

8    Carssow or Ms. Franklin?

9        A.   The whole thing.

10       Q.   I'm sorry?

11       A.   Whatever you want.

12       Q.   Okay.  Ms. Carssow, since that's how you've --

13       A.   Um-hmm.

14       Q.   -- stated your name.

15            COURT CLERK:  I'm sorry, could you spell your last

16   name?

17            THE WITNESS:   C-a-r-s-s-o-w.

18       Q.   Ms. Carssow, you filed this bankruptcy proceeding

19   in 2010; is that right?

20       A.   Right.

21       Q.   And you filed this bankruptcy proceeding

22   specifically to stop a foreclosure on property you owned; is

23   that right?

24       A.   That's correct.

25       Q.   And that property is in Round Rock, Texas; is that

DUNN–DIRECT–CARSSOW FRANKLIN                                           95

1    right?

2         A.    That's correct.

3         Q.    Okay.  And that was suggested to you by someone

4    who called you on the telephone, that you should do that?

5         A.    Yes, a woman named Denise.

6               THE COURT:  You've got to speak up a little

7    louder.

8               THE WITNESS:  Yes, she did.

9         Q.    And the property, is the property on Crenshaw, in

10   Round Rock, Texas; is that right?

11        A.    That is correct.

12        Q.    And the address is 2523 Crenshaw Drive; is that

13   right?

14        A.    That's right.

15        Q.    And before the filing, you had communications with

16   attorneys in Texas, actually in Dallas, about your failure

17   to make payments on a loan you had taken that related to the

18   property; is that right?

19        A.    Yes.

20        Q.    And that loan was taken in 2000; is that correct?

21        A.    The loan --

22        Q.    The loan was taken in 2000?

23        A.    Oh, yes, November the 2nd, 2000, with Mortgage

24   Factory.

25        Q.    And you signed and mortgage in connection with

DUNN-DIRECT-CARSSOW FRANKLIN                                96

1    that loan?

2         A.   November the 2nd, 2000.

3         Q.   Did you sign a note and mortgage?

4         A.   Yes.  A contract or --

5         Q.   I'm sorry?

6         A.   A contract, whatever they presented.

7         Q.   "They" being the Mortgage Factory; what they gave

8    you, you signed?

9         A.   That group of people I was working with, as I had

10   mentioned in my deposition.

11        Q.   And before filing bankruptcy, you had

12   communications with attorneys in Dallas about failing to

13   make payments on your loan; is that right?

14        A.   I would call them three times a day.

15        Q.   The attorneys?

16        A.   Yes.

17        Q.   And who did you understand those attorneys were

18   representing?

19        A.   Wells Fargo.

20        Q.   And you also had, from time to time, had

21   communication directly with Wells Fargo about the fact that

22   you had failed to make payments that were called for under

23   the loan; is that right?

24        A.   Yes.  And I was calling them three or four times a

25   day, as well.  And I have all the phone records downloaded,

DUNN-DIRECT-CARSSOW FRANKLIN                                  97

1    as I had mentioned.

2         Q.   Okay.  So you were talking both to Wells Fargo and

3    to the attorneys representing Wells Fargo?

4         A.   That's correct.

5         Q.   And when you missed payments, before you started

6    these conversations, did you receive notices of default from

7    Wells Fargo?

8         A.   Yes.

9         Q.   Now, the bankruptcy was filed in 2010; in 2008,

10   two years earlier --

11        A.   Right.

12        Q.   -- had you entered into a loan modification

13   agreement concerning the loan on your Crenshaw property?

14        A.   Yes.  And I made the payments on that.

15        Q.   Who did you enter into that agreement with?

16        A.   I'm not sure.

17        Q.   Do you know whether that was with Wells Fargo?

18        A.   I'm not sure.

19        Q.   Do you know when Wells Fargo -- when you started

20   making payments to Wells Fargo?

21             MS. TIRELLI:  I'm going to object.  Are you

22   looking for dates?

23        A.   I don't have all the dates.  I would have to have

24   my notes in front of me on that.

25             THE COURT:  Okay.

DUNN-DIRECT-CARSSOW FRANKLIN                                    98

1          A.   That would have probably eight, nine.

2          Q.   And you entered into a single modification of the

3    loan; isn't that right?

4          A.   Right.

5          Q.   And that was with Wells Fargo, was it not?

6          A.   That's correct.  And everything was fine.

7          Q.   And was with Wells Fargo?

8          A.   Um-hmm.  That's what they said.

9          Q.   And you received correspondence from Wells Fargo

10   in connection with that modification?

11         A.   Well, they would tell me to send in packets and I

12   would do that --

13         Q.   And did you receive a document --

14         A.   -- as they requested.

15         Q.   And did you receive a document that constituted

16   the loan modification?

17         A.   Well, a contract.

18         Q.   You did?

19         A.   Go back and forth.

20         Q.   Okay.  What do you mean "go back and forth"?

21         A.   Well, they give you a list of things to send in

22   and I'm doing that.

23         Q.   And the loan modification agreement came about

24   because, before that time, you had failed to make payments

25   on the loan; is that right?

*DUNN—DIRECT—CARSSOW FRANKLIN*                                              99

1          A.   I got behind a couple of payments.  They said,

2      don't worry, you have so much equity in the house, over 50

3      percent, that it will not be a problem, we can just add it

4      to the end.  So that's what I did.

5          Q.   And they extended the term of the loan; is that

6      right?

7          A.   I'm not exactly clear on the terminology.

8          Q.   And the entity you were communicating with about

9      this was Wells Fargo, right?

10         A.   Yes.

11         Q.   And the only entity you had contact with

12     concerning the proposed modification was Wells Fargo, right?

13         A.   Yes.

14         Q.   And then, before the filing of the bankruptcy, you

15     again failed to make payments under the modified agreement;

16     is that right?

17         A.   No.

18              MS. TIRELLI:  Objection to the term "again."

19         A.   No.

20              MS. TIRELLI:  I don't know what you mean by

21     "again."

22         Q.   Did you fail to make payments in 2009 or 2010 that

23     were called for under our loan?

24         A.   I made those initial modification payments and got

25     a modification and then things started becoming bad again.

DUNN-DIRECT-CARSSOW FRANKLIN                                    100

1    And, as I had said, my apartment was sold, so I had to move

2    and so I moved back to Austin and had to get my house ready

3    to rent.  It usually rents very fast and I rented it.  And

4    then, I mean, I had completed my MFA and what -- I was doing

5    a book, so I moved back to Bronxville, and the problems

6    began around that time.

7         Q.   Problems in terms of failing to make --

8         A.   Well, I sustained a very large storm, my house was

9    hit by tornado-like winds, that was another problem that

10   came up.  There were a number of things.  And I told them

11   that.  I called them three times a day and they should have

12   that in the records, I do.

13        Q.   My only question is:  Did you fail to make

14   payments that were called for on the loan after the

15   modification and before bankruptcy?

16        A.   It would have been after the modification.

17        Q.   And before the bankruptcy?

18        A.   Right.

19        Q.   And you had lots of communications with Wells

20   Fargo about that, right?

21        A.   And the attorneys in Dallas.

22        Q.   And the attorneys in Dallas?

23        A.   Yep.

24        Q.   And the only people you talked to about that were

25   Wells Fargo or the attorneys representing Wells Fargo; is

*DUNN-DIRECT-CARSSOW FRANKLIN*                                          101

1    that right?

2         A.   Right.

3         Q.   And at no time since Wells Fargo was involved in

4    this loan has anybody else claimed to be entitled to obtain

5    payments from you on the loan, have they?

6         A.   At the very end, when I told them that I was going

7    to have to file bankruptcy, because they kept saying, oh,

8    we're missing this document, oh, we're missing this

9    document, I would send it in, and then I realized at the

10   end, they never planned to do a modification.

11             MR. DUNN:  Move to strike.  Not responsive.

12             THE COURT:  Well, the question was:  Had anyone

13   else, besides Wells Fargo, indicate to you at any time after

14   you started dealing with Wells Fargo, that they were

15   entitled to payments on the loan?

16             THE WITNESS:  No one said that they were entitled

17   to payments, but the girl, at the end, did say that Wells

18   Fargo did not own the loan, that Freddie Mac did.

19             THE COURT:  When was that?

20             THE WITNESS:  That was like -- I have their names

21   -- and that was like about a day before the bankruptcy and

22   they said they were trying to call North Carolina and they

23   were going to try to see if they could get to stop it again,

24   that my concern of Memorial Day, and it was up for auction

25   again, this kept happening over and over.  And at the end, I

*DUNN-DIRECT-CARSSOW FRANKLIN*                                         102

1    thought -- oh, I'm not going to get into that part -- but,

2    in the end, at the last minute, I filed an emergency

3    bankruptcy to stop this.

4         Q.   My only question, Ms. Carssow, is:  Did anybody

5    other than Wells Fargo, in 2008, 2009, or 2010, make any

6    claim that they were entitled to receive payments on the

7    loan from you for the Crenshaw property?

8              MS. TIRELLI:  I'm going say objection.  Asked and

9    answered.

10             MR. DUNN:  No, asked, but not answered, Your

11   Honor.

12             MS. TIRELLI:  I believe she said that someone at

13   Wells Fargo --

14             MR. DUNN:  No, no, I don't --

15             MS. TIRELLI:  -- told her that the --

16             THE COURT:  Well, did anyone, other than --

17             MS. TIRELLI:  -- loan was owned by Freddie Mac.

18             THE COURT:  -- the Wells Fargo person saying,

19   roughly a day or so before the bankruptcy, that Freddie Mac

20   owned the loan, did anyone else say that someone other than

21   Wells Fargo owned the loan, or that you should pay someone

22   other than Wells Fargo?

23             THE WITNESS:  No one said to pay Wells -- to pay

24   Freddie Mac, they said that Wells Fargo was the servicer,

25   Freddie Mac was the investor, at the end.  I didn't know who

DUNN-DIRECT-CARSSOW FRANKLIN                                    103

1    to believe at that point, but I do have their names.

2                    THE COURT:  Okay.

3        Q.   Did you ever pay anybody else, other than Wells

4    Fargo, on the loan?

5                    MS. TIRELLI:  Wait.  I'm sorry.  Objection.

6    During what time frame?

7        Q.   From 2007, forward?

8        A.   I'm not exactly sure of the transition time.

9        Q.   Okay.  From 2008, forward, did you pay anybody

10   other than Wells Fargo, from the time --

11       A.   We had -- no, I didn't pay -- I didn't give a

12   check to Freddie Mac.

13       Q.   You never had any communications with Freddie Mac,

14   did you?

15       A.   Not personally, but they were really desperately

16   trying to reach them and they were all on vacation.

17       Q.   I'm sorry.  Did you ever have any communications

18   with anyone at Freddie Mac?

19       A.   I told them I would fly out there and I would --

20   they said, do not come.

21       Q.   My question is:  Did you ever hear from, did

22   anybody from Freddie Mac ever make any demand of you?

23       A.   No, they didn't call me.

24       Q.   And you never spoke to anything at Freddie Mac?

25       A.   Couldn't find the phone number, no.

*DUNN-DIRECT-CARSSOW FRANKLIN*                                      104

1        Q.   And Freddie Mac never asked you to make payments

2   to Freddie Mac, right?

3             MS. TIRELLI:  Well, objection.  I think she said

4   that Wells Fargo said they were a servicer for Freddie Mac,

5   which would make them an agent, asking for payment.

6             THE COURT:  No, that's a -- the question's just,

7   did anyone specifically from Freddie Mac say payments?

8             THE WITNESS:  Give them a check?

9             THE COURT:  Right.

10            THE WITNESS:  No.

11            THE COURT:  Okay.

12       Q.   So as far as you were aware, from whenever the

13   transition was in 2007 or 2008, forward, the only entity you

14   dealt with on your loan was Wells Fargo; is that right?

15       A.   From 2008 on, that is correct.

16       Q.   And nobody else from that period on has ever made

17   any demand to you with respect to your loan; is that

18   correct?

19       A.   Well, demands --

20       Q.   Other than the lawyers representing Wells Fargo?

21       A.   -- I would get packets from Steven J. Baum, and I

22   would get packets from the Dallas, so those people.

23       Q.   And those were lawyers you understood to be

24   representing Wells Fargo, right?

25       A.   It appeared so.

1      MR. DUNN:  Nothing further.

2      THE COURT:  Okay.  Any cross?

3      MS. TIRELLI:  No, Your Honor.  I don't see the

4   relevance of this entire line of questioning.

5      THE COURT:  Okay.  You can step down now.

6

7                (Witness excused)

8

9      THE COURT:  Okay.  Is there anymore evidence --

10     MR. DUNN:  No.

11     THE COURT:  -- that anyone wants to get in?

12     MR. DUNN:  No, Your Honor.

13     THE COURT:  Okay.  So I'll hear a brief oral

14   argument.

15     MR. DUNN:  Do you want written submissions on

16   these issues, Your Honor?

17     THE COURT:  I'll hear a brief oral argument first,

18   though.  And, in particular, I guess what I'd like you to

19   do, and I think Ms. Tirelli should go first, is point out to

20   me anything you think in the record, including the exhibits,

21   including the depositions, that indicates that the note that

22   was admitted as Exhibit H today is not bonafide.

23     MS. TIRELLI:  Well, Your Honor, again, not bona

24   fide because it was not attached to the proof of claim

25   initially.  I did take the deposition of John Kennerty,

1    which was submitted to the court, and John Kennerty

2    testified.

3              MR. DUNN:  Your Honor, we object to any reference

4    to John Kennerty's testimony and we object to the submission

5    of John Kennerty's testimony.

6              MS. TIRELLI:  That was a joint exhibit, Your

7    Honor.

8              THE COURT:  It was a joint exhibit.

9              MS. SCHIAVO:  Your Honor, we were not asked to

10   stipulate to the admissibility of any (inaudible) --

11             MR. DUNN:  And we do not stipulate to the

12   admissibility of Mr. Kennerty's deposition.

13             MS. TIRELLI:  Your Honor, that was a joint

14   exhibit.

15             THE COURT:  Well, did anyone indicate that it

16   wasn't?  I mean, my -- there's very clear with the parties,

17   I expected an agreed joint exhibit book and the parties to

18   identify exhibits that weren't and I was given what I

19   thought was a joint exhibit book.

20             MR. DUNN:  There's no dispute that it is what it

21   is, but we object to the relevance of it, Your Honor.

22             THE COURT:  All right.  Well --

23             MS. TIRELLI:  Well, Your Honor, this is the first

24   I'm hearing of it.  Your Honor, I did send Ms. Schiavo and

25   email and I told her what I wanted to put in as an exhibit,

PROCEEDINGS                                                        107

1   I wanted to put in the two depositions, I did not hear

2   anything by way of saying that that should be put in as a

3   disputed exhibit.

4          MR. DUNN:  It's not a -- there's no dispute as to

5   what it is, but it relevance is disputed.

6          THE COURT:  Okay.  Well, let me hear what you're

7   offering it for?

8          MS. TIRELLI:  Well, what I'm offering it for, Your

9   Honor, is that John Kennerty testified that, at the time he

10  was vice president of loan documentation at Wells Fargo,

11  there was an assignment team, and there was also something

12  called an endorsement team, where, my understanding, and

13  this testimony will certainly speak for itself, was that if

14  an attorney determined that there needed to be an

15  endorsement, they would send it down to the endorsement team

16  and an endorsement would be placed on it and returned back

17  to the attorney.  That was my understanding of his

18  testimony.

19         At the time the first proof of claim was filed, I

20  sent a letter to the Baum firm questioning the fact that

21  there was no endorsement and sometime after my letter, and

22  before I had objected to the claim, that they had actually

23  went ahead and amended the claim thereafter with the new,

24  what I like to call, a "ta-da" endorsement, as in "ta-da,

25  here it is,"  a rubber stamped endorsement.

1           As far as the testimony today, again, I --

2           THE COURT:  So, but let me be clear, there's

3   nothing in the Kennerty deposition that says that they did

4   the ta-da endorsement?

5           MS. TIRELLI:  Well, that was --

6           THE COURT:  It's just an inference you want me to

7   draw?

8           MS. TIRELLI:  Well, Your Honor, that that was a

9   procedure that was in place at the time the proof of claim

10  was filed.

11          THE COURT:  Right.

12          MS. TIRELLI:  Okay.

13          THE COURT:  And then did you ask him, did you

14  follow that procedure with this claim?

15          MS. TIRELLI:  He did -- he was not able to recall

16  this claim.  Most of his testimony was, I don't recall.  But

17  that was, in fact, a procedure.  And when I asked Mr.

18  Campbell about an endorsement team during his deposition, he

19  had never heard of an endorsement team and he was not

20  familiar with the procedures of filing a proof of claim or

21  the assignment teams or anything of that nature, and would

22  not testify as to anything to do with John Kennerty.

23          When I asked about John Kennerty and his

24  involvement to the 30(b)(6) witness, Ms. Mary Ellen Frost,

25  she told me I needed to go and ask John Kennerty if I wanted

1    to know something about his role in this case.  So the only

2    testimony I have, Your Honor, is that of John Kennerty.

3                    THE COURT:  Okay.

4                    MS. TIRELLI:  Okay.  The fundamental problem with

5    the Campbell affidavit is that he never provides a

6    foundation as to how or under what circumstances Campbell

7    secured sufficient personal knowledge to provide any

8    information that he attempts to provide in his affidavit.

9    All we know is that he claims to be the vice president,

10   which, as he testified today, he's not actually a vice

11   president, it's a designation for signature only, and that

12   he recites final conclusions from the Rules of Evidence to

13   accept his business records.  He does not have sufficient

14   knowledge.  I'm going to reiterate that more than once, and

15   I'll be briefing that.

16                    As far as the testimony today, that Exhibit G to

17   the affidavit, does not anywhere indicate that there is a

18   note endorsed in blank prior to proof of claim.  That

19   inference is being drawn only by the testimony of Mr.

20   Campbell, and, again, their opportunity to demonstrate that

21   and corroborate that was at the deposition, and it was very

22   clear on the record of the deposition that Mr. Campbell

23   said, I have my computer, I could pull this up, and it was

24   cut short because Mr. Dunn refused to allow it.  And I think

25   that any attempt to try to corroborate that now should just

1    simply be dismissed by the court and just disallowed.

2              THE COURT:  Well, he's not offering to pull

3    anything up further.

4              MS. TIRELLI:  No, Your Honor, they're not offering

5    to pull anything up.

6              THE COURT:  Except what he's testified to, he did

7    pull up, and which is what is attached as his -- as exhibits

8    to his declaration.

9              MS. TIRELLI:  Well, that's correct, Your Honor,

10   but again, many of those exhibits were not able to be found,

11   were not found in the loan image viewer screenshots.  You

12   know, so, again, I just very strongly oppose the affidavit

13   of Mr. Campbell, if he's not -- perhaps a very nice man --

14   but he is not a competent witness in this case, he does not

15   have any personal knowledge with regard to this case.

16             THE COURT:  Is there any evidence in the record

17   about who Margaret A. Bezy is?

18             MS. TIRELLI:  No, Your Honor, there's not.  It's a

19   rubber stamp, I don't know who Margaret Bezy is.

20             THE COURT:  And is there any evidence in the

21   record about the -- and I guess this would be from Kennerty,

22   the separate assignment of the mortgage or the assignment of

23   the deed of trust?

24             MS. TIRELLI:  Mr. Kennerty testified that there

25   was a procedure where they would have to -- his department

1    would have to look and verify whether it was a mortgage or

2    whether it was a deed of trust being assigned, and he was

3    taken a little bit off guard in certainly his testimony when

4    he realized he had signed a mortgage, when in fact it was a

5    deed of trust.

6              Is that -- I hope I answered Your Honor's

7    question?

8              THE COURT:  Well, I mean, for example, regarding

9    his authority to sign on behalf of the transferor as opposed

10   to the transferee?

11             MS. TIRELLI:  Well, Your Honor, I asked about that

12   and he does not recall having any conversations with

13   Washington Mutual Bank in 2010, at the time that he signed

14   it, to verify his authority to sign it.

15             THE COURT:  Well, was there any information as to

16   whether he was authorized to sign it by WaMu, or are there

17   any documents showing his authorization to sign it?

18             MS. TIRELLI:  I believe that Your Honor determined

19   that the document, the assignment of mortgage, was in fact a

20   fraudulent document, that was the language Your Honor used,

21   because Washington Mutual Bank did not exist in 2010 --

22             THE COURT:  And so there's no additional --

23             MS. TIRELLI:  -- at the time of the assignment.

24             THE COURT:  -- evidence, besides what was --

25             MS. TIRELLI:  No, there was not additional

1    evidence, Your Honor.  No.

2              THE COURT:  -- presented with the documents?

3    Okay.

4              MS. TIRELLI:  Other than the judicial notice that

5    Washington Mutual did not exist at that time.

6              THE COURT:  So what...  Let me just turn to

7    something...  So under 3308(a) of the Texas UCC, if the

8    validity of a signature is denied in the pleadings --

9              Which you're denying, right?  You're denying the

10   validity of --

11             MS. TIRELLI:  Yes.

12             THE COURT:  -- Ms. Bezy's, the endorsement on the

13   blank endorsement signature?

14             -- the burden of establishing validity is on the

15   person claiming validity, but the signature is presumed to

16   be authentic unless the action is to enforce the liability

17   against someone who doesn't fit the characteristics of the

18   debtor.

19             And under the definition of presumed, in 1206, the

20   trier of fact must find the existence of the fact, unless

21   and until evidence is introduced that supports a finding of

22   it's nonexistence.

23             So is there any additional evidence, besides what

24   you've given me, that proves that this endorsement is not

25   valid?

*PROCEEDINGS*                                                       113

1              MS. TIRELLI:  Well, Your Honor, I just want to go

2     back to the summary judgment transcript, at which time Your

3     Honor determined that we had overcome that presumption,

4     so --

5              THE COURT:  For the purpose of summary judgment

6     only.

7              MS. TIRELLI:  Okay.

8              THE COURT:  I mean, we still have to have a trial.

9              MS. TIRELLI:  Okay.  But I thought Your Honor had

10    already made that determination, so we've --

11             THE COURT:  Okay.  But there's nothing additional

12    that you're offering up, besides --

13             MS. TIRELLI:  No, there's --

14             THE COURT:  -- what you told me?

15             MS. TIRELLI:  -- nothing additional, Your Honor,

16    you know, and just other than the record of having the false

17    assignment of mortgage, the, you know, "ta-da endorsement,"

18    as I like to call them --

19             THE COURT:  Right.

20             MS. TIRELLI:  -- you know, proof of claim filed,

21    another one filed, with the endorsement on it, no

22    explanation for three years, you know, until now, and then

23    we have a record that, you know, that is supposedly produced

24    by Wells Fargo that, you know, is complete hearsay.

25             THE COURT:  Okay.  Okay.  So what is your

1   response?  How do you establish that this is valid, besides

2   the screenshot?

3         MR. DUNN:  Well, I think the critical issue is the

4   note is in evidence, the note contains a facially and

5   presumptively valid endorsement, the question is whether the

6   note in that form was in the possession of Wells Fargo prior

7   to the time the amended proof of claim, or the original

8   proof of claim, was filed, so the screenshot and the fact

9   that it does appear and the witness was able to view it and

10  verify it as an entry on the date identified back in 2009 is

11  an indicator that it was, in fact, so endorsed.  And, of

12  course, Wells Fargo did not ever deal with ABN AMRO.  Wells

13  Fargo acquired these assets from WaMu when WaMu ceased to

14  exist and Washington -- and so it never had any dealings

15  with ABN AMRO and the note was held and serviced by

16  Washington Mutual prior to that time and would have been

17  endorsed by ABN AMRO in the ordinary course at the time it

18  was transferred from ABN AMRO to Washington Mutual, because

19  it couldn't have been held by Washington Mutual without an

20  endorsement by ABN AMRO.

21        MS. TIRELLI:  But, Your Honor, I'm going to just

22  object just to the extent that he is arguing facts that are

23  not in evidence.  I'm going to be objecting.

24        MR. DUNN:  There's no question --

25        THE COURT:  He's asking to draw inferences all

PROCEEDINGS                                                    115

1   from the fact that it appears in 2008.

2             MR. DUNN:  Well, it appears -- it appears -- it

3   appears when the witness was able to verify that it appears

4   in the records.  And that is prior to any bankruptcy or any

5   foreclosure being filed.  We also understand --

6             THE COURT:  Then -- and it's contrary to the

7   inference that Ms. Tirelli wants me to draw from Mr.

8   Kennerty's testimony about an endorsement team procedure and

9   a ta-da endorsement and that sort of thing.

10            MR. DUNN:  Well, "ta-da endorsement" is her

11  rhetoric, Your Honor.

12            THE COURT:  Right.  No, I understand, but --

13            MR. DUNN:  The endorsements --

14            THE COURT:  -- you're rebutting that by saying

15  this was done back in 2008, before the bankruptcy, so there

16  was no ta-da even conceivable.

17            MR. DUNN:  And the endorsement team relates to

18  endorsements by Wells Fargo.  Wells Fargo owns and holds

19  hundreds of thousands of notes.  Wells Fargo does not, there

20  is not absolutely not a shred of evidence and Mr. Kennerty

21  did not testify, that Wells Fargo was in the business of

22  manufacturing endorsements for others.  There is absolutely

23  no support.  It is frankly irresponsible to make -- to ask

24  the court to draw such an inference.  Wells Fargo owns

25  hundreds, in fact, millions, probably, across the country,

1    of loans for which it is actually the owner and/or the

2    holder and its endorsement team, to the extent he referred

3    to an endorsement team, endorses those notes in blank or

4    transfers them to people all of the time.

5            THE COURT:  Where is -- where is -- now you are

6    arguing facts that aren't in evidence, right?

7            MR. DUNN:  No, it is.  It doesn't say, it doesn't

8    say anything about what the endorsement team is endorsing,

9    Your Honor.  These -- these -- this is pure speculation by

10   Ms. Tirelli.  Mr. Kennerty didn't have anything to do with

11   the endorsement of this note.  There's no evidence Mr.

12   Kennerty ever saw this note.  There's no evidence Mr.

13   Kennerty knows anything whatsoever about --

14           THE COURT:  Didn't he sign the assignment of

15   the mortgage?

16           MR. DUNN:  He signed an assignment of mortgage.

17           MS. TIRELLI:  Your Honor, mortgage and note.

18           MR. DUNN:  Your Honor, he signed an assignment of

19   mortgage, that's all he did.  He did not endorse the note.

20   He was not involved in the endorsement of the note.

21           THE COURT:  Well, he was the person responsible

22   for this loan at that time, wasn't he?

23           MR. DUNN:  No, he was a signor of the endorsement,

24   that's all he was.  He was not the person responsible for

25   the loan.  All he did was sign the note -- the assignment of

1    mortgage.  That's all he did.  There's no evidence that he

2    had any other involvement in this loan whatsoever.

3                  With respect to --

4                  THE COURT:  What was he doing signing the mortgage

5    assignment?

6                  MR. DUNN:  He was -- the mortgage had been

7    previously transferred to MERS, and he was a designated

8    officer of MERS, who had been designated appropriately by

9    MERS and therefore was authorized to sign.  The assignment

10   of mortgage does not --

11                 THE COURT:  Then MERS was holding it on behalf of

12   WaMu, right?

13                 MR. DUNN:  And WaMu's successors, because the

14   right to enforce the mortgage transfers with the note.  If

15   the note was properly transferred, as we allege then --

16                 THE COURT:  Right.

17                 MR. DUNN:  -- then the right to enforce the

18   mortgage did not reside with (inaudible) --

19                 THE COURT:  So wouldn't have had to have known

20   that the note had been properly transferred for him to have

21   authority to assign it on behalf of MERS, assign the

22   mortgage?

23                 MR. DUNN:  He was an -- he was an officer of MERS,

24   yes, so --

25                 THE COURT:  So he would have had to have known

1    that the note had been properly transferred out of WaMu in

2    order to be able to sign on behalf of MERS, as

3    representative of WaMu, the transfer --

4              MR. DUNN:  All of WaMu --

5              THE COURT:  -- of the mortgage.

6              MR. DUNN:  These WaMu's assets were acquired at

7    the termination of WaMu by Wells Fargo, Your Honor.

8              THE COURT:  Where is that in the mortgage -- in

9    the evidence?

10             MR. DUNN:  Well, I don't know that that is in the

11   evidence --

12             THE COURT:  Okay.

13             MR. DUNN:  -- but I don't know if that -- that any

14   of this is relevant to the issue of whether the note was

15   properly endorsed at the time of the proof of claim, which

16   is the only issue here.  I think we're getting a little bit

17   far afield.

18             THE COURT:  Well, not really.  One of the things

19   that really concern me here was that it appeared that an

20   officer of Wells Fargo transferred, acting as an agent for

21   the transferor, WaMu, through MERS, to itself, a mortgage

22   and note.  That wasn't right.  You're telling me that that

23   didn't need to be done anyway because WaMu had already

24   transferred everything to Wells Fargo?

25             MR. DUNN:  That was done only for the purpose of

1   recording the mortgage assignment, Your Honor, that's

2   correct, as a matter of law --

3              THE COURT:  Please.  And that doesn't count?  The

4   document doesn't count?

5              MR. DUNN:  I didn't say it didn't count.

6              THE COURT:  Well --

7              MR. DUNN:  I said it was not legally effective and

8   you were not relying upon that document because MERS, Mr.

9   Kennerty was acting as an authorized agent of MERS and MERS

10  does not have, and did not have, authority to transfer the

11  note.  The note would have been transferred by --

12             THE COURT:  He must have been thinking, right, to

13  do it, because MERS was not Wells Fargo's agent, it was

14  WaMu's agent.  That's the capacity in which MERS was acting

15  as the holder of the mortgage, right?  As WaMu's agent?

16             MR. DUNN:  I believe --

17             THE COURT:  That's how it's appointed.  It's not

18  just some sort of universal holder of whoever says they own

19  the documents.

20             MR. DUNN:  It is -- it is the agent for all of its

21  members, as I understand the way MERS operates.

22             THE COURT:  But in the particular transaction it's

23  the agent for the holder of the mortgage that appoints them

24  as its representative --

25             MR. DUNN:  And its --

*PROCEEDINGS*                                                          120

```
 1                    THE COURT:  -- the lender.

 2                    MR. DUNN:  And its successors and assigns.

 3                    THE COURT:  Right.  Okay.  So --

 4                    MR. DUNN:  And --

 5                    THE COURT:  -- I would have thought Mr. Kennerty

 6      would have known about the endorsement and would have known

 7      about the note in order to be effectively act on behalf of

 8      MERS as the successor and assign of WaMu, but you told me he

 9      knew nothing about the note.

10                    MR. DUNN:  I don't know what he knew.

11                    THE COURT:  Okay.  All right.

12                    MR. DUNN:  I don't know what Mr. Kennerty and Mr.

13      Kennerty didn't know what he knew about this transaction at

14      the time he signed.  He was not able to testify about that.

15      I have no knowledge of what Mr. Kennerty knew.

16                    I think the critical issue here is whether there

17      was an endorsed note at the time and whether this

18      endorsement was in the possession of Wells Fargo before

19      there was any reason for --

20                    THE COURT:  I think that's right.  So really the

21      only issue really is whether the screenshots in or out,

22      because that's your only proof that it was there at the

23      time, other than the date on it, right?

24                    MR. DUNN:  And the fact that the amended proof of

25      claim had it attached and the fact that it does --
```

1            THE COURT:  Well, but that --

2            MR. DUNN:  -- appear on the note today.

3            THE COURT:  Right.

4            MR. DUNN:  The amended proof of claim is before

5     the bar date.

6            THE COURT:  Yes.  As is the first claim, which

7     doesn't have it.

8            MR. DUNN:  And we -- and there is also an

9     explanation for where that came from and why --

10           THE COURT:  And what is that in the record?

11           MR. DUNN:  The fact that that is a copy of the

12    note as it existed on -- at origination and the fact that

13    the origination copy continues to reside in the record even

14    today.  So it is not like, where could they have gotten this

15    copy from?  We have a source for that information.  Even

16    today, you could pull up and print a copy of the note --

17           THE COURT:  Right.

18           MR. DUNN:  -- without the ABN AMRO endorsement.

19           THE COURT:  So you want me to draw the inference

20    that was done in error and that they just ignored the later

21    note?

22           MR. DUNN:  As is reflected by the fact that they

23    promptly filed an amended proof of claim.

24           THE COURT:  Well --

25           MR. DUNN:  I think that -- I think that inference

*PROCEEDINGS*                                                            122

1   is not only drawn from the fact that it exists, it's also --

2            THE COURT:  They promptly filed it after Ms.

3   Tirelli brought it to their attention, right?  They didn't

4   actually do the due diligence and look at the note and

5   realize it wasn't endorsed to them.

6            MR. DUNN:  I understand, Your Honor.  I was not

7   that counsel, I didn't file that proof of claim.  And I

8   can't inquire about because --

9            THE COURT:  Well --

10            MR. DUNN:  -- they're out of business.

11            THE COURT:  -- is it -- I guess we don't have any

12   evidence of this, do counsel have access to the image?

13            MR. DUNN:  I believe the Baum office had access.

14            THE COURT:  But there's no evidence of that,

15   right?

16            MR. DUNN:  I don't know, Your Honor.  The Baum

17   office is out of business.  I couldn't inquire of them.

18   There's no witness to testify.

19            THE COURT:  Well, did counsel generally have

20   access?  There's no evidence of counsel generally having

21   access, right?  So, someone at, I would assume someone at

22   Wells Fargo printed it out for --

23            MR. DUNN:  I don't know who made the error.  The

24   error may well have been made by somebody at Wells Fargo,

25   Your Honor, yes, that's correct.

PROCEEDINGS                                                          123

```
 1           THE COURT:  Okay.

 2           MS. TIRELLI:  Your Honor --

 3           MR. DUNN:  It's not a question -- the Baum office

 4   filed a proof of claim with an incompletely endorsed note on

 5   it, that was the point I was making.  I was not attempting

 6   to attribute whether the error was made by the Baum office

 7   or by Wells Fargo personnel who provided the incorrect copy

 8   of the note to the Baum office, there's no --

 9           MS. TIRELLI:  Your Honor --

10           MR. DUNN:  Can I finish?

11           THE COURT:  Okay.  He's not finished yet.

12           MR. DUNN:  There's no question, Your Honor, that

13   the note that was filed attached to the original proof of

14   claim was not the correct copy of the note, but that copy

15   exists.  My point is, that copy existed and continues to

16   exist in the system, and therefore, we have an explanation

17   for how it could--

18           THE COURT:  Right.  Like the lost note affidavit

19   apparently does.

20           MR. DUNN:  I don't know what's in the lost note

21   affidavit, Your Honor.

22           THE COURT:  No one looked.  So I just go by the

23   heading.  And the two words in that --

24           MR. DUNN:  The note at the time --

25           THE COURT:  -- heading that are incongruence with
```

PROCEEDINGS                                                124

1    your case --

2                    MR. DUNN:  I do not --

3                    THE COURT:  -- the word "lost" and the word

4    "affidavit."

5                    MR. DUNN:  No.

6                    THE COURT:  Someone signed an affidavit,

7    apparently, saying it was lost.

8                    MR. DUNN:  At that time of the lost note

9    affidavit, I do have knowledge that the note was in my

10   office, not in Wells Fargo's records, Your Honor.  We've had

11   the note during that period of time.

12                   THE COURT:  Well, that wouldn't lead someone to

13   doing a loss note affidavit.

14                   MR. DUNN:  It might if they looked for the note

15   and couldn't find it and didn't know that it had been given

16   to counsel.  You would not necessarily have known, by

17   looking, that we were holding the note.  And we were holding

18   the note, that I do know, because this proceeding had

19   already raised these issues.

20                   MS. TIRELLI:  Your Honor?

21                   THE COURT:  Just a second.  Do you have any

22   explanation for why there would be an entry, "note, dash,

23   certified true copy"?  Who would certify it and why?

24                   MR. DUNN:  I do not.  I do not know why there was

25   a -- you're referring to the entry in 2011, Your Honor?

1              THE COURT:  No, there's one a couple months after

2      the lost note affidavit, in May of 2012.

3              MR. DUNN:  I do not.  I do not know what that is

4      in reference to, Your Honor.

5              THE COURT:  Or why there would be a note listed

6      just as "note, seven pages, September 30, 2011"?  You hadn't

7      taken the note, at that point, had you?

8              MR. DUNN:  Yes, I believe that's about the time --

9              THE COURT:  2011?

10             MR. DUNN:  -- we did take it.

11             MS. SCHIAVO:  2010.

12             MR. DUNN:  2010, I'm told, we took it.

13             THE COURT:  So why would there be a note in 2011?

14             MR. DUNN:  Because I think the note was -- was

15     imaged, could have been imaged, at that time, into the

16     system, Your Honor.

17             THE COURT:  It's already imaged.  Imaged back in

18     2009.

19             MR. DUNN:  I don't know why another copy of the

20     note was put into the record.

21             THE COURT:  It doesn't even say "copy," it just

22     says "note."  The other one says "copy."

23             MR. DUNN:  I don't know.  I haven't looked at that

24     document, Your Honor, so I don't know what that document

25     says.  But all -- but I do know that all of this was after

1   the original note containing the ABN AMRO endorsement was in

2   our possession and after it, of course, had been copied to

3   the amended proof of claim.  And we do know that we can

4   compare the note attached to the amended proof of claim with

5   Exhibit H, and it's in evidence, and we do know that they're

6   identical.  So we know that the note, the copy of the note,

7   that was attached to the amended proof of claim, which was

8   before the bar date, is the same as the --

9           THE COURT:  Right.

10          MR. DUNN:  -- note that exists right now.

11          THE COURT:  So am I right for both of you that the

12  dispute really comes down to whether the note that was

13  attached to the amended proof of claim was entered in a

14  backdated way into the image, the screen image?

15          MS. TIRELLI:  Entered in a backdated way, Your

16  Honor, but also who endorsed it.  Because it was endorsed in

17  2010 with a rubber stamp by somebody at Wells Fargo on their

18  team, perhaps, then it's --

19          THE COURT:  Well, no, it's --

20          MS. TIRELLI:  -- a false endorsement.

21          THE COURT:  -- it's not -- that's why I asked who

22  this Ms. Bezy is, but it's not endorsed by someone from

23  Wells Fargo, she's not a -- she doesn't purport to be a

24  Wells Fargo officer.

25          MS. TIRELLI:  Your Honor, I don't know who she is.

1    I mean, for $9.95, I can get a rubber stamp calling myself

2    the vice president of Wells Fargo.

3            THE COURT:  Right.  But no one -- Ms. Bezy has not

4    been identified as any sort of employee of Wells Fargo?

5            MS. TIRELLI:  Your Honor, I don't know who she is,

6    okay, and I don't know that she's given anyone authority to

7    use her name on a rubber stamp.

8            THE COURT:  But that's --

9            MS. TIRELLI:  Or who rubber stamped it, I have --

10   Your Honor, I have we don't know this.  I sent a letter to

11   Steven Baum's office and this is what came back.

12           THE COURT:  But --

13           MS. TIRELLI:  How could it have been endorsed in

14   2010?  It doesn't...

15           THE COURT:  Well, what is your evidence to say

16   that it was endorsed in 2010?

17           MS. TIRELLI:  Well, because the first proof of

18   claim filed in 2010 --

19           THE COURT:  But that -- but that just goes to the

20   backdating point, right?  You don't have any specific -- you

21   don't have any specific evidence to show that it was

22   endorsed in 2010?

23           MS. TIRELLI:  Other than the proof of claims that

24   were filed under oath, where one got it --

25           THE COURT:  With the other --

*PROCEEDINGS*                                                                128

 1              MS. TIRELLI:  -- and one does not.

 2              THE COURT:  Right.  Right.  Okay.

 3              MS. TIRELLI:  And I don't -- and, again, this

 4    record of the image viewing, we can't see what these images

 5    are.  And I just want to point out that I found another one

 6    here about child support verification.  My client, the whole

 7    time I've known her, her kid, her only son is in medical

 8    school.  You know, there is --

 9              THE WITNESS:  He's a resident doctor.

10              MS. TIRELLI:  -- so there's documents here that

11    simply don't make any sense, but which we will brief and,

12    you know, we'll go on.  But this system is just wholly

13    unreliable.

14              I did want to bring up that Your Honor asked a

15    question about whether or not attorneys have access to the

16    Wells Fargo system, and I can unequivocally answer that yes.

17    Because Mr. Dunn and I attended a deposition of a Mr. Paul

18    Brown, who words at Wells Fargo in an unrelated case, there

19    is no protective order on that deposition and I think that

20    it might be worth while taking a look at.  He testified that

21    while he worked for a foreclosure law firm, he was sent down

22    to Wells Fargo to be trained on their computer systems, so

23    that he could access them from the law firm that he worked

24    at.  He later went on to switch jobs, left the law firm, and

25    then went on to work for Wells Fargo.  So I do think that

1    there is testimony by somebody who I have no reason to doubt

2    him.  I don't have that transcript yet, I think the

3    deposition was just taken a week and a half ago, but I do

4    believe that people outside of Wells Fargo have access to

5    this system, which again goes to the integrity of the

6    system.  I don't know who can manipulate this, how it's

7    manipulated, and the witness here was not able to testify to

8    any of that.

9              MR. DUNN:  There is no evidence, Your Honor, that

10   anybody could manipulate the system or that the dates were

11   altered, or that there is any ability to alter any dates.

12             THE COURT:  That's fair.  I guess what I took

13   away, although, I'll read the transcript carefully, is that

14   the witness doesn't know whether it could be done or not.

15             MR. DUNN:  No.  I don't think that -- I don't

16   think the witness said that he didn't know that it could be

17   done.

18             THE COURT:  Well, I'll read his testimony

19   carefully on that one.  I'm not sure he knew whether it

20   could or not.

21             MR. DUNN:  I think the witness testified that once

22   a document went into the system, the document was in the

23   system, and couldn't be removed or changed.

24             MS. TIRELLI:  I'd like to know what the basis of

25   that knowledge is.

1          THE COURT:  Well, I don't think he gave a basis.

2          MR. DUNN:  I don't think he was asked.

3          THE COURT:  Okay.  So this is what I would like,

4    unless you all have anything else to say, I think the only

5    issue that I need to have briefed is whether the screen

6    image and the documents attached as exhibits to Mr.

7    Campbell's declaration, which he testifies he got off of the

8    screen image, are admissible under the business records

9    exception in 803(6).  And I think the focus there should be,

10   first, whether Mr. Campbell, based on his testimony,

11   including his declaration, is a qualified witness for

12   purposes of that rule, and, in particular, focusing on the

13   creation and maintenance and manipulability of this record.

14        And then, secondly, so that would be 803(6),

15   generally and then 803(6)(e) -- I'm sorry, so that -- the

16   first question would be under 803(6)(d), and the second one

17   will be 803(6)(e), which is neither the source of the

18   information or the method of or circumstances of its

19   preparation indicate a lack of trustworthiness.  I don't

20   think there's any issue that A through C are satisfied.

21        So I'd like that to be simultaneous and I don't

22   invite any reply.  I think people should reply, and only

23   reply briefly, if there's something in there that you think

24   is just a clear misstatement of either the trial record or

25   the law, you know, a very clear misstatement or mis-

*PROCEEDINGS*                                                         131

1    citation.

2              So how's -- how's -- can you do that within a

3    month?  Because we have the holidays here, but, let's see,

4    it's the third today, when do you think you can get that in?

5              MS. TIRELLI:  Your Honor, I'd like to have till at

6    least mid February, because I have two trials between now

7    and the beginning of January.

8              THE COURT:  Okay.  Is that okay, mid February?

9              MR. DUNN:  I guess so, I was going to ask for mid

10   January.

11             MS. SCHIAVO:  I think January seems more

12   reasonable.

13             THE COURT:  Well, you're on trial, you say?

14             MS. TIRELLI:  Your Honor, I am.  I have a trial

15   actually next week and then one coming up, I think it's

16   first week of January, and end of December.

17             THE COURT:  Let's make it February 15th.

18             MS. TIRELLI:  Thank you.

19             THE COURT:  And I'd like you to email those to

20   chambers.  Normally, I don't like that, but when it's a

21   post-hearing, a post-trial brief, I need that because

22   otherwise it won't be triggered on my calendar.

23             MR. DUNN:  Do you want to tell us off the record,

24   I don't know how you go off the record here --

25             THE COURT:  It's okay.

PROCEEDINGS                                                    132

1            MR. DUNN:  -- where to email it?

2            MS. SCHIAVO:  I have the (inaudible).

3            MR. DUNN:  You have the address.  Okay.

4            THE COURT:  Yeah.  So that's what I'll...

5            Oh, I'm sorry, there is one other issue, and I

6    think I'd like this from -- I don't really need this, except

7    from Wells Fargo, and it's the issue of whether the equities

8    apply here at all on the claim.  My understanding reading

9    the Texas cases, including Bankruptcy cases, it's a straight

10   UCC issue and you either are a holder or you're not.  So if

11   you have any cases to give me, I'd appreciate that too.

12           MR. DUNN:  Okay.

13           THE COURT:  And, you know, there's whole separate

14   point, and I've raised this with the parties before in

15   trying to encourage them to settle this, even if Ms.

16   Franklin wins, there's still going to be a mortgage on her

17   house.  She won't be able to sell it without dealing with

18   that, so there is some incentive here to resolve it.  And,

19   frankly, even if I were to consider the equities, that's a

20   pretty significant equitable fact, she's stuck with a

21   mortgage.

22           MR. DUNN:  Well, she borrowed the money.

23           THE COURT:  I understand.  And she's --

24           MR. DUNN:  And failed --

25           THE COURT:  -- stuck with a mortgage, so --

1              MR. DUNN:  And failed to pay.

2              THE COURT:  -- it's not like she's walking away

3    with a free house.  If she wins, she's going to have a

4    mortgage on it.  She's going to have to -- she won't be able

5    to sell it unless she deals with that mortgage --

6              MR. DUNN:  That's true.

7              THE COURT:  -- somehow.  So, anyway, it's just

8    another thing you might want to think about in both the

9    brief context as well as the settlement context.

10             And lastly, as far as the settlement is concerned,

11   I understand that the debtor had previously, before her

12   bankruptcy, entered into a loan modification that was not --

13   which was defaulted.  I understand also, from looking at the

14   exhibit, that Wells Fargo took the view that it could not

15   act under the National Mortgage Settlement, because Fanny

16   Mae owned the loan --

17             MR. DUNN:  Freddie Mac.

18             THE COURT:  I mean, I'm sorry, Freddie Mac.

19        -- obviously, the proof of claim doesn't say that, even

20   now, and knowing what I know about the National Mortgage

21   Settlement, there is room there to make a deal, and

22   certainly, given what has happened in this case, including

23   the proof of claim that was originally filed, as well as the

24   mortgage assignment, it kind of fits.  So it's another thing

25   to keep in mind.

1          MR. DUNN:  For those purposes, without their -- we

2     are in an anomalousness situation, Your Honor, because as I

3     understand it, Your Honor has, in effect, ruled that for

4     purposes of the proof of claim there is no evidence that

5     Freddie Mac has an interest in the loan.  But the fact of

6     the matter is, Freddie Mac thinks Freddie Mac has an

7     interest in the loan and Wells Fargo is constrained in its

8     dealings with respect to this loan by the fact that Freddie

9     Mac's view is that Freddie Mac is the guarantor of and the

10    investor in the loan.

11         THE COURT:  Other servicers don't take that view,

12    as far as the National Mortgage Settlement is concerned,

13    based on my understanding of it, including from the monitor

14    of the settlement in California, so it may be worth talking

15    to her about it.

16         MR. DUNN:  Okay.  The monitor on the National

17    Mortgage Settlement I think is in North Carolina.

18         THE COURT:  They're different ones.

19         MR. DUNN:  Right.

20         THE COURT:  There's one appointed by the state of

21    California too.

22         MR. DUNN:  Right.  But I think this would be under

23    the settlement with the state of Texas.

24         THE COURT:  I understand, but if you want to get a

25    point of view of what servicers believe they can and cannot

*PROCEEDINGS*                                                    135

1    do under that settlement, which is largely based on, or not

2    perhaps entirely based on, servicing problems, I think most

3    of them view that they can do it.

4              MR. DUNN:  I will make inquiry, Your Honor.

5              THE COURT:  The facts of this case, in particular,

6    it would kind of jump out.

7              MR. DUNN:  I hear what Your Honor's saying.

8              THE COURT:  Okay.

9              MR. DUNN:  Okay.

10             MS. TIRELLI:  Thank you very much, Your Honor.

11             MS. SCHIAVO:  Thank you, Your Honor.

12

13                      (Proceeding adjourned)

14

15

16

17

18

19

20

21

22

23

24

25                          -o0o-

*PROCEEDINGS*                                                                   136

1

2          CERTIFICATION

3

4          I, DEBRA S. NIEVES, certify that the foregoing

5          transcript is a true and accurate record of the

6          proceeding.

7

8

9

10

11

12          Debra S. Nieves

13          AMERICAN LEGAL TRANSCRIPTION

14          11 Market Street, Suite 215

15          Poughkeepsie, New York 12601

16          Date:  January 29, 2014

17

18

19

20

21

22

23

24

25                              -oOo-