UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re:

                                          Chapter 13

Cynthia Carrsow-Franklin,                     Case No. 10-20010 (RDD)

                Debtor.
-------------------------------------------------------------x

**MEMORANDUM OF DECISION ON DEBTOR'S OBJECTION TO CLAIM OF WELLS FARGO BANK, NA**

APPEARANCES: Garvey, Tirelli & Cushner, Ltd., by Linda M. Tirelli, for the debtor

                  Hogan Lovells US LLP, by David Dunn and Nocole E. Schiavo, for Wells Fargo Bank, NA

HON. ROBERT D. DRAIN, UNITED STATES BANKRUPTCY JUDGE

       The debtor herein (the "Debtor") has objected to a claim filed in this case by Wells Fargo Bank, NA ("Wells Fargo"), Claim No. 1-2, dated September 29, 2010 (amending Claim No. 1-1), on the basis that Wells Fargo is not the holder or owner of the note and beneficiary of the deed of trust upon which the claim is based and therefore lacks standing to assert the claim.[1] This Memorandum of Decision states the Court's reasons, based on the record of the trial held on December 3, 2013 and the parties' pre- and post-trial submissions, for granting the Claim Objection.

**Jurisdiction**

       The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b). Under 28 U.S.C. § 157(b)(2)(B) this is a core proceeding which the Court may determine by final order.

**Background**

       On July 15, 2010, Wells Fargo filed its first proof of claim in this case, Claim No. 1-1, asserting indebtedness of $170,072.60, including prepetition arrears of $38,163.16. The proof of claim attached a

---

[1] *See* Objection to Proof of Claim #1-1 As Amended Claim #1-2 Filed by Wells Fargo Bank, NA and Request for Accounting and Conditional Motion for Damages and Fees, dated October 4, 2010 (the "Claim Objection").

copy of a 30-year note, dated October 30, 2000, payable to Mortgage Factory Inc. in the amount of

$145,850 (the "Note"), which was signed by the Debtor.  The version of the Note attached to Claim No.

1-1 bears a specific indorsement by Mortgage Factory Inc. to ABN Amro Mortgage Group, Inc. ("ABN

Amro") and no other indorsements.

Claim No. 1-1 also attached a Deed of Trust made out to Malcom D. Gibson, as trustee, and an

Assignment of Rents, both dated October 30, 2000, which secure the Note with the Debtor's interest in

the real property located at 2523 Crenshaw Drive, Round Rock Texas 78664 and the other collateral

described therein (the "Property").  There is no real dispute that the Deed of Trust and related security

documents were properly filed and recorded under Texas law; they bear the November 16, 2000 file

stamp of the County Clerk of Williamson County, Texas.[2]  Claim No. 1-1 also attached an Assignment of

Lien, dated October 30, 2000, pursuant to which Mortgage Factory, Inc. assigned its rights under the

Note and related liens to ABN Amro; it, too, bears the County Clerk's file stamp, dated November 16,

2000.

Also attached to Claim No. 1-1 was an Assignment of Deed of Trust by ABN Amro, dated June 20,

2002, pursuant to which ABN AMRO assigned "all beneficial interest in" the Deed of Trust securing the

Note, together with the Note, to Mortgage Electronic Registration System ("MERS") "as nominee for

Washington Mutual Bank, FA," which bears the Williamson County Clerk's June 28, 2002 file stamp.

Claim No. 1-1 also attached (a) a Loan Modification Transmittal Form, (b) a Loan Modification

Agreement signed by the Debtor and an officer of Wells Fargo, dated February 12, 2008, and (c) an

unsigned form, with the heading "Freddie Mac," addressed to an officer of Wells Fargo, which states

that Freddie Mac has approved Wells Fargo's request to consider a loan modification pertaining to the

Debtor on certain conditions.

---

[2] Texas law applies to the merits of the Claim Objection.  It is the parties' choice of law under ¶ 16 of the Deed of
Trust and would apply in any event because the Note and Deed of Trust were entered into by the parties in Texas
and pertain to real property located in Texas.

Finally, Claim No. 1-1 attached an Assignment of Mortgage pursuant to which MERS assigned to Wells Fargo "a mortgage" (neither rights under the Deed of Trust, nor the Note) made by the Debtor pertaining to the Note.  This Assignment of Mortgage is dated July 12, 2010, which is three days before the date of Claim No. 1-1, and is executed on behalf of MERS "as nominee for Washington Mutual Bank, FA" by John Kennerty, Assistant Secretary, presumably of MERS.

In the Claim Objection, the Debtor's counsel has represented without dispute that after reviewing Claim No. 1-1 she contacted Wells Fargo's then counsel, who had signed Claim No. 1-1 on Wells Fargo's behalf, with questions regarding Wells Fargo's standing to assert the claim and followed up on July 26, 2010 with a qualified written request under RESPA, 12 U.S.C. § 2605, and a borrower's request under TILA, 15 U.S.C. §§ 1601, *et seq.*   Wells Fargo responded to these requests in a letter, dated August 18, 2010, in which it stated that Freddie Mac owned the Note, which Freddie Mac had already represented to the Debtor's counsel in a July 27, 2010 email.  *See* Exhibits N and O, respectively, to the Claim Objection.

Neither the email from Freddie Mac, the letter from Wells Fargo, nor anything else offered by Wells Fargo's then counsel dealt with the two key issues raised by Claim No. 1-1, however:  (i) how could Wells Fargo or Freddie Mac assert a claim under the Note when the Note was neither specifically indorsed to either of them nor indorsed in blank (and <u>was</u> specifically indorsed to ABN Amro, although ABN Amro had subsequently assigned its interest therein to MERS as nominee for Washington Mutual Bank, FA), and (ii) how could Wells Fargo properly assert any rights under the July 12, 2010 Assignment of Mortgage when the person who signed the Assignment of Mortgage from MERS in its capacity "as nominee for Washington Mutual Bank, FA" to Wells Fargo <u>was an employee of Wells Fargo</u> (as well as of MERS),[3] and there was no evidence that Washington Mutual Bank, FA authorized MERS to assign its

---

[3] It is undisputed that when he executed the Assignment of Mortgage John Kennerty was an employee of Wells Fargo, not of Washington Mutual Bank, FA, as well as of MERS.  *See generally In re Smith*, 509 B.R. 260, 263 n. 1 (Bankr. N.D. Cal. 2014) ("MERS acts as mortgagee of record for mortgage loans that are registered in MERS'

interest in the Property to Wells Fargo?  Wells Fargo and Freddie Mac's responses to the Debtor's

counsel's questions raised another question, though:  if Freddie Mac was the owner of the loan, as both

Wells Fargo and Freddie Mac contended, why was Claim No. 1-1 filed by Wells Fargo not as Freddie

Mac's agent or servicer, but, rather, in its own name? (The ownership/agency issue had practical as well

as possible legal consequences because counsel for Wells Fargo contended that Freddie Mac guidelines

precluded Wells Fargo from considering loan modification proposals for the Debtor.)

Before the expiration of the bar date in this case, though, Wells Fargo filed another proof of

claim, amended Claim No. 1-2, dated September 23, 2010, which was the same as Claim No. 1-1 in all

respects except one:  the copy of the Note attached to Claim No 1-2 had a second indorsement.   In

addition to the specific, or special indorsement from Mortgage Factory Inc. to ABN Amro, it also had a

blank indorsement, signed by Margaret A. Bezy, Vice President, for ABN Amro.

Presumably, Claim No. 1-2 was intended to satisfy the Debtor's questions about Wells Fargo's

standing to assert a claim:  as discussed below, under Texas law a person in possession of a note

indorsed in blank may enforce the note and a related deed of trust or mortgage even if the noteholder

does not have a valid assignment of the mortgage or deed of trust.  Nevertheless, the Debtor filed the

Claim Objection, asserting several reasons why Claim No. 1-2 should be disallowed under 11 U.S.C. § 502

and Fed. R. Bankr. P. 3007, although since that time she actively pursued only two.[4]

First, the Debtor contended that Wells Fargo lacked standing to assert the claim because it

admittedly did not own the loan upon which it was based yet filed the claim on its own behalf, not as

---

system.  Mortgage lenders subscribe to the MERS system and pay annual fees for the electronic processing and
tracking of ownership and transfers of mortgages.  Members (lenders and servicers) contractually agree to appoint
MERS to act as their common agent on all mortgages the member registers in the MERS system.  To facilitate the
execution of assignments from MERS, MERS regularly designates 'certifying officers,' who are typically employees
of MERS member firms.  MERS authorizes these employees through formal corporate resolutions to execute
assignments on its behalf.").

[4] The Debtor's objection to the amount of Claim No. 1-2 also continues, as does the Debtor's request for the
imposition of sanctions, including under 28 U.S.C. § 1927.

agent or servicer for Freddie Mac.  *See In re Unioil, Inc.*, 962 F.2d 988, 992 (10th Cir. 1992) (proof of

claim "which did not even indicate [claimant's] representational capacity much less disclose the identity

of the true creditor, was defective" under Fed. R. Bankr. P. 3001(b)); [5] *cf. In re Manville Forest Products

Corp.*, 89 B.R. 358, 376-77 (Bankr. S.D.N.Y. 1988), *aff'd*, 99 B.R. 542 (S.D.N.Y. 1989), *aff'd*, 896 F.2d 1384

(2d Cir. 1990) (applying Fed. R. Bankr. P. 3003(c), which pertains to cases under chapters 9 and 11 of the

Bankruptcy Code, to preclude filing of proof of claim in unauthorized capacity).

Second, the Debtor contended that the blank indorsement that appeared for the first time on

the form of Note attached to Claim No. 1-2 was as improper as the purported July 12, 2010 Assignment

of Mortgage to Wells Fargo executed on behalf of the assignor/nominee by an employee of Wells Fargo.

As alleged by the Claim Objection, the blank indorsement was forged in response to problems with the

documentation of Wells Fargo's right to enforce the Note, just, as the Debtor contended, the July 12,

2010 Assignment of Mortgage was manufactured three days before Claim No. 1-1 was filed in order to

falsely lead the Debtor and the Court to think that Wells Fargo had an independent right to enforce a

mortgage on the Property.

Wells Fargo retained new counsel,[6] and the parties engaged in discovery disputes that resulted

in an order compelling the deposition of John Kennerty, who by then no longer worked for Wells Fargo,

*see Kennerty v. Carrsow-Franklin* (*In re Carrsow-Franklin*),  456 B.R. 753 (Bankr. D. S.C. 2011), and Wells

Fargo's production of a woefully unqualified initial Rule 30(b)(6) witness.  With discovery still far from

complete, however, the Debtor moved for summary judgment under Fed. R. Bankr. P. 7056, primarily on

---

[5] Fed. R. Bankr. P. 3001(b) states that "A proof of claim shall be executed by the creditor or the creditor's authorized agent [except where permitted under the Bankruptcy Rules to be filed by the debtor or bankruptcy trustee or by a guarantor, surety, indorser or other co-debtor]."

[6] Stephen J. Baum, P.C., which had filed Claim Nos. 1-1 and 1-2 on Wells Fargo's behalf, ceased doing business on December 31, 2011.  In March, 2012 the firm entered into a $4 million settlement with the State of New York over its handling of foreclosure actions and documents, in which It did not admit to any wrongdoing. Press Release of Attorney General Eric T. Schneiderman, dated March 22, 2012:  "A.G. Schneiderman Announces $4 Million Settlement with New York Foreclosure Law Firm Steven J. Baum P.C. and Pillar Processing LLC."

the basis that Wells Fargo concededly did not own the loan yet had not filed Claim No. 1-2 in a

representative capacity.  Wells Fargo responded that it did not need to be the owner of the loan in order

to enforce the Note and a secured claim for amounts owing under it.  Instead, Wells Fargo relied, under

Texas' version of Article 3 of the Uniform Commercial Code (the "U.C.C."), solely on being the "holder"

of the Note indorsed in blank by ABN Amro that appeared for the first time as an attachment to Claim

No. 1-2.[7]

      In a bench ruling on March 1, 2012, memorialized by an order dated May 21, 2012, the Court

agreed with Wells Fargo, concluding that, under Texas law, if Wells Fargo were indeed the holder of the

Note properly indorsed in blank by ABN Amro, Wells Fargo could enforce the Note and the Deed of Trust

even if it was not the owner or investor on the Note or properly assigned of Deed of Trust,[8] citing *SMS*

*Fin., Ltd. Liab. Co. v. ABCO Homes, Inc.*, 167 F.3d 235, 238 (5th Cir. 1999) (under Texas law, "[t]o recover

on a promissory note, the plaintiff must prove:  (1) the existence of the note in question; (2) that the

party sued signed the note; (3) that the plaintiff is the owner <u>or</u> holder of the note; and (4) that a certain

balance is due and owing on the note") (emphasis added), and *In re Pastran*, 2010 Bankr. LEXIS 2237, at

---

[7] Perhaps wary of relying on an assignment by the assignee to itself without authorization by the purported assignor, Wells Fargo has waived reliance on the July 12, 2010 Assignment of Mortgage to establish its right to assert Claim No. 1-2, looking only to its status as a holder of the Note.  It indeed appears that Mr. Kennerty's signature on the Assignment of Mortgage was improper in either of his capacities, as an officer of Wells Fargo or as an officer of MERS, without further authorization from Washington Mutual Bank, FA, because ABN Amro assigned MERS the Deed of Trust solely in MERS' capacity as nominee for Washington Mutual Bank, FA, without the power of foreclosure and sale in its own right and not for its own successors and assigns as well as Washington Mutual Bank, FA's; and MERS (through Mr. Kennerty) executed the Assignment of Mortgage solely as nominee for Washington Mutual Bank, FA.  Compare *Kramer v. Fannie Mae*, 540 Fed. Appx. 319, 320 (5th Cir.  2013), *cert. denied*, 134 S. Ct. 1310, 188 L. Ed. 2d 305 (2014) (MERS could assign deed of trust made out to it that specifically granted MERS the power to foreclose and assign its rights); *Silver Gryphon, L.L.C. v. Bank of Am. NA*, 2013 U.S. Dist. LEXIS 168950, at *11-12 (S.D. Tex. Nov. 7, 2013) (same); *Richardson v. CitiMortgage, Inc.*, 2010 U.S. Dist. LEXIS 123445, at *3, *13-14 (E.D. Tex. Nov. 22, 2010) (same), *and Nueces County v. MERSCORP Holdings, Inc.*, 2013 U.S. Dist. LEXIS 93424, at *20 (S.D. Tex. July 3, 2013); *In re Fontes*, 2011 Bankr. LEXIS 1792, at *11-13 (B.A.P. 9th Cir. Apr. 22, 2011); and *In re Weisband*, 427 B.R. 13, 20 (Bankr. D. Az. 2010) (MERS as mere "nominee" of mortgage holder lacks power to transfer enforceable mortgage).

[8] See discussion of the Texas U.C.C. below.  The Court also found that there was no meaningful evidence that Claim No. 1-2 was filed by Wells Fargo as Freddie Mac's agent or servicer or that Freddie Mac actually was the investor/owner of the loan, and, accordingly, granted that portion of the Debtor's summary judgment motion for an order declaring that Claim No. 1-2 was not filed in Wells Fargo's capacity as servicer or agent.

*6-7 (Bankr. N.D. Tex., July 13, 2010) (same).  *See also* Tex. Bus. & Com. Code § 3.301 (2014) ("A person

may be a person entitled to enforce the instrument even though the person is not the owner of the

instrument . . . ."); *Das v. Deutsche Bank Nat'l Trust Co.*, 2014 Tex. App. LEXIS 2541, at *6-7 (Tex. App.

Dallas March 5, 2014), *petition for review denied*, 2014 Tex. LEXIS 441 (Tex. May 30, 2014) (same);

*Martin v. New Century Mortg. Co.*, 377 S.W.3d 79, 84-5 (Tex. App. Houston 1st Dist. 2012) (same);

*Roberts v. Roper*, 373 S.W.3d 227, 232 (Tex. App. Dallas 2012) (same); *BAC Home Loans Servicing, LP. v.*

*Tex. Realty Hldgs., LLC*, 901 F. Supp. 2d 884, 907 (S.D.Tex. 2012) ("A holder of a note, as well as an

owner, may enforce the note."); *see generally* Joseph William Singer, "Foreclosure and the Failures of

Formality, or Subprime Mortgage Conundrums and How to Fix Them," 46 Conn. L. Rev. 497, 526 (Dec.

2013) ("Foreclosure and Failures") ("The prevailing view seems to be that most mortgage notes are

negotiable instruments governed by Article 3 of the Uniform Commercial Code (U.C.C.) and that

mortgage obligations are owed to 'the person entitled to enforce the note' within the meaning of U.C.C.

section 3-301; that person may be different from the person who 'owns' the note and has the ultimate

right to the economic value of the note."); James M. Davis, "Paper Weight:  Problems in the

Documentation and Enforcement of Transferred Mortgage Loans, and Proposal for an Electronic

Solution," 87 Am. Bankr. L.J. 305, 322-23 (2013) (discussing the difference between the right to enforce

a note under the U.C.C. and ownership of the note).  For the proposition that under Texas law the

holder of a note may enforce a deed of trust securing the note even if the deed of trust is not assigned

to the noteholder or in the noteholder's name, *see Kiggundu v. Mortg. Elec. Registration Sys.*, 469 Fed.

Appx. 330, 332 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 210, 184 L. Ed. 2d 41 (2012).

The Court therefore denied the Debtor's summary judgment motion for an order declaring that

Wells Fargo lacked standing to assert Claim No. 1-2.  Because discovery with respect to the bona fides of

the all-important blank indorsement appearing on the version of the Note attached to Claim No. 1-2,

was not complete, however, the Court scheduled an evidentiary hearing on that issue. [9]

After the completion of discovery, which included the depositions of Mr. Kennerty and Mr. Kyle

N. Campbell – the third witness offered by Wells Fargo to corroborate its possession of the Note

attached to Claim No. 1-2 and the propriety of the blank indorsement – the Court held an evidentiary

hearing in which it took testimony from Mr. Campbell and the Debtor.  The parties earlier agreed to the

admission of Mr. Kennerty's deposition transcript in lieu of his testimony, as well as to the admission

into evidence of the exhibits attached to Claim Nos. 1-1 and 1-2, as well as the original of the Note with

the blank ABN Amro indorsement, a copy of which was attached to Claim No. 1-2.

Based on the Court's review of the original of that document, the blank ABN Amro indorsement

has been stamped on the last page of the Note, although it is not discernable whether Margaret A.

Bezy's signature was separately written in on the signature line or was part of the stamp.  *See* December

3, 2013 Trial Transcript ("Trial Tr."), at 5-6 (The Court:  "So this is the second endorsement, the blank

endorsement, then is a file stamp?  It's a stamp?"  Mr. Dunn:  "I have no personal knowledge, but it

---

[9] Since this Court's March 1, 2012 bench ruling on the Debtor's summary judgment motion, many courts applying
Texas law have held not only that the holder of a note can enforce it in a foreclosure proceeding notwithstanding
that the noteholder does not hold the deed of trust or mortgage (the so-called "mortgage follows the note" rule
that applies in most jurisdictions and traces back at least to *Carpenter v. Longan, 83 U.S. 271, 274 (1872)*), *see
Kiggundu v. Mortg. Elec. Registration Sys.*, 469 Fed. Appx. at 332, but also that the secured party to a deed of trust
may enforce it against the collateral even if it does not hold the note secured thereby.  *See Morlock, L.L.C. v. Bank
of N.Y.*, 2014 Tex. App. LEXIS 9135, at *5-9 (Tex. App. Houston 1st Dist. Aug. 19, 2014), *reh'g den.*, 2014 Tex. App.
LEXIS 13907 (Tex. App. Houston 1st Dist. Dec. 30, 2014); *Morlock, L.L.C. v. JPMorgan Chase Bank, N.A.*, 2014 U.S.
App. LEXIS 17968, at *4-5 (5th Cir. Sept. 19, 2014); *Thomas v. Wells Fargo Bank, N.A.*, 2013 U.S. Dist. LEXIS 113220,
at *14-15 (N.D. Tex. July 16, 2013); *Calvino v. Conseco Fin. Servicing Corp.*, 2013 U.S. Dist. LEXIS 124343, at *18-20
(W.D. Tex. Aug. 29, 2013), and the cases cited therein.  Not all jurisdictions follow the latter rule, *see, e.g., Eaton v.
Fannie Mae*, 969 N.E.2d 1118, 1131-33 (Mass. 2012); *Bank of N.Y. v. Silverberg*, 926 N.Y.S.2d 532, 539 (N.Y. App.
Div. 2d Dep't 2011); Foreclosures and Failures, 46 Conn. L. Rev. at 526.  During the same period courts applying
Texas law have held that a borrower lacks standing to contest the fraudulent (as opposed to forged) assignment of
a deed of trust in certain circumstances, although the extent of the rule is not free from doubt. *Morlock, L.L.C. v.
Bank of N.Y.*, 2014 Tex. App. LEXIS 13907, at *2-5; *Reinagel v. Deutsche Bank Nat'l Trust Co.*, 735 F.3d 220, 224-25
(5th Cir. 2013); *Brinson v. Universal Mortg. Co.*, 2014 U.S. Dist. LEXIS 121685, at *10-13 (S.D. Tex. Sept. 2, 2014);
*Venegas v. U.S. Bank, Nat'l Ass'n*, 2013 U.S. Dist. LEXIS 66000, at *13-16 (W.D. Tex. May 9, 2013).  As noted above,
however, Wells Fargo has relied solely on being a holder of the Note to sustain Claim No. 1-2 and has not raised
the foregoing arguments.

appears to be." The Court: "Well, it appears to be. It doesn't look like it's a signature." Mr. Dunn: "It

appears to be an inked stamp." The Court: "Right." Mr. Dunn: "The endorsement in blank by ABN

Amro does appear to have been applied by a representative.").

While agreeing to the admission of the original version of the Note, the Debtor did not, of

course, agree to the validity of the blank ABN Amro indorsement, continuing to assert that it was forged.

The Debtor also objected to the admission of certain other proposed exhibits printed from Wells Fargo's

computer file for the loan at issue, which Wells Fargo offered as business records under Fed. R. Evid.

803(6).

After post-trial briefing on the Debtor's objection to the exhibits' admission, the Debtor also

moved to reopen the record to take further discovery of Wells Fargo based on the contention that she

had unearthed withheld evidence consisting of a Wells Fargo attorney manual that supported her

contention that Wells Fargo had an "indorsement team" that improperly added the blank indorsement

to the Note.[10]

The Court granted this motion, provided that the additional discovery would pertain only to the

loan and Note at issue. Several months passed until, after the Court's inquiry, the parties replied that

they were not going to present any more evidence and wanted a ruling on the merits of the Claim

Objection on the basis of the evidence previously submitted.

## Discussion

Because it is undisputed that (a) the Debtor signed the Note (and received the loan proceeds)[11]

and (b) a properly recorded lien on the Property secures the Debtor's obligation under the Note (albeit

that Wells Fargo does not rely independently on the Deed of Trust assigned to ABN AMRO and then

---

[10] *See* Supplement to Emergency Motion to Reopen and for Leave to Propound Additional Discovery to Defendant for Additional Evidence Withheld Prior to Trial, dated March 11, 2014.

[11] *See* Trial Tr. at 95-6 (testimony of the Debtor).

assigned to MERS as nominee for Washington Mutual Bank, FA (none of which has filed a proof of claim)

or the Assignment of Mortgage to sustain its claim), the only issue addressed by the parties is whether

Wells Fargo has standing to enforce the Note, and, thus, assert Claim No. 1-2.[12] This is because, as

stated above, Texas follows the majority rule that "[w]hen a mortgage note is transferred, the mortgage

or deed of trust is also automatically transferred to the note holder by virtue of the common-law rule

that 'the mortgage follows the note.'" *Campbell v. Mortg. Elec. Registration Sys., Inc.*, 2012 Tex. App.

LEXIS 4030, at *11-12 (Tex. App. Austin May 18, 2012), *quoting J.W.D., Inc. v. Fed. Ins. Co.*, 806 S.W.2d

327, 329-30 (Tex. App. Austin 1991).  *See also Kiggundu v. Mortg. Elec. Registration Sys., Inc.*, 469 Fed.

Appx. 330, 332; *Richardson v. Ocwen Loan Servicing, LLC*, 2014 U.S. Dist. LEXIS 177471, at *13 n.4 (N.D.

Tex.  Nov. 21, 2014); *Nguyen v. Fannie Mae.*, 958 F. Supp. 2d 781, 790 n.11 (S.D. Tex. 2013); *Trimm v.*

*U.S. Bank., N.A.*, 2014 Tex. App. LEXIS 7880, at *14 (Tex. App. Fort Worth July 17, 2014).

Wells Fargo's right to enforce the Note, and thus its standing to assert Claim No. 1-2, derives

from the Note's status as a negotiable instrument under Texas' version of the U.C.C.  *See* Tex. Bus. &

Com. Code § 3.104(a).  The Debtor has not disputed that the Note is negotiable, and the Note in any

event satisfies the requirements of a negotiable instrument under Texas law, as it is "an unconditional

promise . . . to pay a fixed amount of money . . . payable to . . . order at the time it [was] issued; . . .

payable . . . at a definite time; and does not state any other undertaking or instruction by the person

promising or ordering payment to do any act in addition to the payment of money" except as  permitted

by the statute.  *Id.*  S*ee also Farkas v. JP Morgan Chase Bank*, 2012 U.S. Dist. LEXIS 190194, at *6-7 (W.D.

Tex. June 22, 2012), *aff'd*, 544 Fed. Appx. 324 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 628, 187 L. Ed. 411

---

[12] One might argue, although Wells Fargo has not, that the parties' pre-bankruptcy course of dealing, including the Loan Modification Agreement signed by the Debtor on February 12, 2008 and attached to Claim No 1-2 (*See also* Trial Tr. at 96-104), would independently support Wells Fargo's right to assert Claim No. 1-2; however, if the blank ABN Amro indorsement were forged, the Loan Modification Agreement and course of dealing would ultimately improperly derive from Wells Fargo's fraudulent assertion of the right to enforce the Note and Deed of Trust.

(2013); *Steinberg v. Bank. of Am., N.A.*, 2013 Bankr. LEXIS 2230, at *12-14 (B.A.P. 10th Cir. May 30, 2013).

Under Texas law, a person entitled to enforce a negotiable instrument such as the Note includes "the holder of the instrument," Tex. Bus. & Com. Code § 3.301(i), and "a holder is 'the person in possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession.'" *Nguyen v. Fannie Mae*, 958 F. Supp. 2d at 787-88 (*quoting* Tex. Bus. & Com. Code § 1.201(b)(21)(A)). [13]

Under Texas' U.C.C.,

(a) If an indorsement is made by the holder of an instrument, whether payable to an identified person or payable to bearer, and the indorsement identifies a person to whom it makes the instrument payable, it is a 'special indorsement.' When specially indorsed, an instrument becomes payable to the identified person and may be negotiated[14] only by the indorsement of that person . . . .

(b) If an indorsement is made by the holder of an instrument and it is not a special indorsement, it is a 'blank indorsement.' When indorsed in blank, an instrument becomes payable to bearer and may be negotiated by transfer of possession alone until specially indorsed.

Tex. Bus. & Com. Code § 3.205. *See generally Venegas v. U.S. Bank Nat'l Assn*, 2013 U.S. Dist. LEXIS 66000, at *7 (W.D. Tex. May 9, 2013)*:*

Under Texas law, a holder is 'the person in possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession.' Tex. Bus. & Com. Code § 1.201(b)(21)(A). 'A person can become the holder of an instrument when the instrument is issued to that person, or he can become a holder by negotiation.' *Martin v. New Century Mortg. Co.*, 377 S.W.3d 79, 84 (Tex. App. Houston 2012) (citing Tex. Bus. & Com. Code § 3.201 cmt. 1). When the instrument is payable to an identified entity, 'negotiation requires transfer of possession of the instrument and its indorsement by the holder.' *Id.* (quoting Tex. Bus. & Com. Code § 3.201(b)). An instrument is payable to bearer when it is indorsed in blank. Tex. Bus. & Com. Code § 3.205(b).

---

[13] There are other ways to enforce a note without being a holder in possession, for example by establishing that one is a "nonholder in possession . . . with the rights of a holder" (Tex. Bus. & Com. Code § 3.301(ii)), or through a lost note affidavit (Tex. Bus. & Com. Code § 3.309), but Wells Fargo has not relied on these provisions.

[14] "'Negotiation' means a transfer of possession, whether voluntary or involuntary, of an instrument by a person other than the issuer to a person who thereby becomes a holder." Tex. Bus. & Com. Code § 3.201(a).

As discussed above, Wells Fargo's counsel provided the original Note to the Court at the evidentiary hearing, and it was admitted into evidence with the sole caveat that the Debtor disputes the bona fides of ABN Amro's blank indorsement that appears on it.  Trial Tr. at 4-7.  Thus, it is uncontroverted that the Note is in Wells Fargo's possession.  In accordance with the foregoing sections of Texas' U.C.C., therefore, if the blank ABN Amro indorsement is bona fide, Wells Fargo is the holder of the Note, entitled to enforce it.  *Trimm v. U.S. Bank, N.A.*, 2014 Tex. App. LEXIS 7880, at *13; *Das v. Deutsche Bank Nat'l Trust Co.*, 2014 Tex. App. LEXIS 2541, at *6 ("An instrument containing a blank endorsement is payable to the bearer and may be negotiated by transfer of possession alone.").  On the other hand, if the indorsement is forged, it is not valid, and – the only other indorsement on the Note being a specific indorsement to ABN Amro – Wells Fargo could not rely on the foregoing statutory provisions to establish that it is the holder of the Note.  *See In re Pastran*, 2010 Bankr. LEXIS 2237, at *10 ("[S]ince [claimant] is in possession of a promissory note endorsed in 'blank,' it is, by definition, a 'holder' under section 3.201(a).  This, of course, assumes that all of the indorsements on the Note are authentic and authorized.").

Texas' U.C.C. provides that, although Wells Fargo has the ultimate burden of proof, the indorsements on the Note, including ABN Amro's all-important blank indorsement by Margaret A. Bezy, Vice President, are presumed to be authentic:

> In an action with respect to an instrument, the authenticity of, and authority to make, each signature on the instrument are admitted unless specifically denied in the pleadings.  If the validity of a signature is denied in the pleadings, the burden of establishing validity is on the person claiming validity, but the signature is presumed to be authentic. . . .

Tex. Bus. & Com. Code § 3.308(a) (emphasis added).

Texas' U.C.C. defines "presumed" as follows:  "Whenever this title creates a 'presumption' with respect to a fact, or provides that a fact is 'presumed,' the trier of fact must find the existence of the fact unless and until evidence is introduced that supports a finding of its nonexistence."  *Id.* § 1.206(a).  *In re*

*Pastran*, 2010 Bankr. LEXIS 2237, at *10-11 ("Thus, [the claimant] is not required to prove that the indorsements on the Note are valid and authentic unless and until the Debtor overcomes the presumption by putting on evidence that supports a finding that the indorsements on the Note were somehow forged or unauthorized.").

"The presumption rests upon the fact that in ordinary experience forged or unauthorized signatures are very uncommon, and normally any evidence is within the control of, or more accessible to, the defendant."[15]  Official Comment to Tex. Bus. & Com. Code § 3.308 ("Off. Cmt.").  The presumption is effectively incorporated into Fed. R. Evid. 902(9), which provides that no extrinsic evidence of authenticity is required to admit "[c]ommercial paper, a signature on it, and related documents, to the extent allowed by general commercial law," and it is loosely analogous to the rebuttable presumption of the prima facie validity of a properly filed proof of claim under Fed. R. Bankr. P. 3001(f).

While Tex. Bus. & Com. Code §§ 3.308(a) and 1.206(a) provide that the presumption of an authentic signature applies "unless and until evidence is introduced that supports a finding of nonexistence," they do not state the quantum of evidence to overcome the presumption.  The Official Comment to § 3.308, however, refers to "some evidence" and to "some sufficient showing of the grounds for the denial before the plaintiff is required to introduce evidence," and then states, "[t]he defendant's evidence need not be sufficient to require a directed verdict, but it must be enough to support the denial by permitting a finding in the defendant's favor."  Off. Cmt. 1 to § 3.308.[16]  This suggests that the required evidentiary showing to overcome the presumption is similar to that needed

---

[15] This second rationale for the presumption does not apply here:  the Claim Objection is premised not on the forgery of the Debtor's signature but, rather, on the forgery of the blank ABN Amro indorsement.

[16] In contrast, Tex. Bus. & Com. Code § 3.302(a)(1) requires "<u>apparent</u> evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question" the authenticity of an instrument asserted to be held by a holder in due course, thus focusing on the face of the instrument itself as opposed to a wider range of possible evidence of forgery. (Emphasis added.)

to defeat a summary judgment motion:  the introduction of sufficient evidence so that a reasonable trier

of fact in the context of the dispute could find in the defendant's favor.  *See Matsushita Elec. Indus. Co.,*

*Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); 11 Moore's Fed. Prac. 3d § 56.22[2] (2014).

Because of the general factual context described in the Official Comment, which recognizes that "in

ordinary experience forged or unauthorized signatures are very uncommon," Off. Cmt. 1 to § 3.308,

courts have nevertheless required a significant amount of evidence to overcome the presumption.  *See*

*In re Phillips*, 491 B.R. 255, 273 n. 37 (Bankr. D. Nev. 2013) ("This evidence was inconclusive at best.

Against this background, the court is prepared to believe that it is more likely that [the claimant]

negligently failed to copy the Note and First Allonge when it filed its [first] Proof of Claim rather than it

forged the First Allonge later on.  In short, when both are equally likely, the court picks sloth over

venality."); *see also Congress v. U.S. Bank. N.A.*, 98 So. 3d 1165, 1169 (Civ. App. Ala. 2012) (referring to

requirement of substantial, though not clear and convincing, evidence to rebut the presumption under

U.C.C. §§ 3-308(a) and 1-206(a), although directing trial court on remand to apply preponderance-of-

the-evidence standard to whether the presumption was overcome).

It is important to keep in mind, however, that if the presumption is overcome, the ultimate

burden of proof under Tex. Bus. & Com. Code §§ 3.308(a) and 1.206(a) is on Wells Fargo.  *See People v.*

*Richetti*, 302 N.Y. 290, 298 (1951) ("A presumption of regularity exists only until contrary substantial

evidence appears. . . .  It forces the opposing party (defendant here) to go forward with proof but, once

he does go forward, the presumption is out of the case.").  Thus, in *In re Phillips*, 491 B.R. at 273 n. 37,

quoted above, if the presumption had been overcome by a preponderance of the evidence and the

burden shifted and forgery and negligence were found to be equally likely, the holder of the note should

lose.

What is the Debtor's evidence that the blank ABN Amro indorsement was forged or unauthorized, and is it sufficient to overcome the presumption under Tex. Bus. & Com. Code §§ 3.308(a) and 1.206(a)?

The Debtor first points out that the version of the Note attached to Wells Fargo's initial proof of claim, Claim No. 1-1, did not contain the blank ABN Amro indorsement.  Besides observing that the penalty for filing a false proof of claim, as stated in Official Form 10, can be substantial, the Debtor also observes that, with the exception of the versions of the Note attached, Claim Nos. 1-1 and 1-2 were otherwise identical and included copies of most if not all of the potentially operative documents from Wells Fargo's files, which, she argues, strongly suggests that Claim No. 1-1 was not merely sloppily prepared but, rather, reflected a thorough review of the files, thus suggesting a nefarious reason why the form of Note with the blank ABN Amro indorsement was not attached to that proof of claim but was attached to Claim No. 1-2.

Were this the Debtor's only evidence, the Court might nevertheless hold that she had not overcome the presumption in Tex. Bus. & Com. Code §§ 3.308(a) and 1.206(a).  That was the result in *In re Phillips*, 491 B.R. at 273,[17] as well as in *In re Hunter*, 466 B.R. 439, 449-50 (Bankr. E.D. Tenn. 2012), and *In re Wilson*, 442 B.R. 10, 15 n. 6 (Bankr. D. Mass 2011).  *See also Casterline v. OneWest  Bank, F.S.B.*, 537 Fed. Appx. 314, 318 (5th Cir. 2013) (without discussing Tex. Bus. & Com. Code §§ 3.308(a) and 1.206(a), court not bothered by inconsistencies between different forms of note submitted in foreclosure proceeding and in federal court proceeding); *Das v. Deutsche Bank Nat'l Trust Co.*, 2014 Tex. App. LEXIS 2541, at *7-8 (without discussing Tex. Bus. & Com. Code §§ 3.308(a) and 1.206(a), court granted summary judgment declaring lender to be current holder of note although a different version of the note was attached to proof of claim in earlier bankruptcy case).  *But see Ocwen Loan Servicing, LLC v.*

---

[17] It is worth noting, however, that the court in *Phillips* also found that the circumstances pertaining to the filing of the second version of the note did not lead to the inference that such version was filed (and concocted) in response to a problem raised by the debtor with regard to the first version.  *In re Phillips*, 491 B.R. at 273.

*Thompson*, 2014 U.S. Dist. LEXIS 2109, at *14-15 (E.D. Wisc. Jan. 7, 2014) ("[H]ere, faced with two

materially different versions of the same negotiable instrument (one sans allonge and the other

purportedly modified by an allonge), this Court is obliged to concur that application of FRE 902(9) to the

latter would be overly mechanistic."); *In re Tarantola*, 2010 Bankr. LEXIS 2435, at *13 (Bankr. D. Ariz. July

29, 2010) ("[I]n light of [claimant's] admission that it fabricated the Allonge, and in the absence of any

credible explanation for the difference of the Original from other filed versions of the Note, the Court

will not apply the usual evidentiary presumptions to the validity of the Endorsements.").

In addition, however, the Debtor relies on the Assignment of Mortgage from MERS, "as nominee

for Washington Mutual Bank, FA" having been executed by Mr. Kennerty, an officer of Wells Fargo (the

assignee), on behalf of the assignor.  Even more tellingly, it appears clear from the date of the

Assignment – only three days before the date of Claim No. 1-1 – as well as Mr. Kennerty's deposition

testimony, that the Assignment was prepared by Wells Fargo's then counsel to "improve" the record

supporting Wells Fargo's right to file a secured claim, similar to the "improvement" of the record in *In re*

*Tarantola*, cited above, on which the court relied, along with the two different versions of the note at

issue there, to find that the presumption of authenticity was rebutted.  2010 Bankr. LEXIS 2435, at *12-

13.[18]  (The timing of the filing of Claim No. 1-2 only after the Debtor pointed out the difficulty of Wells

Fargo's ability to enforce the form of Note attached to Claim No. 1-1 also distinguishes this matter from

the facts in *In re Phillips*, as discussed in note 17 above.)

It appears from Mr. Kennerty's deposition transcript, although his testimony on this point was at

times quite evasive, that during the period in question in 2010 he signed on average between 50 and

150 original documents a day in connection with Wells Fargo's administration and enforcement of

defaulted loans.  Deposition Transcript, dated October 15, 2012, of Herman John Kennerty ("Dep. Tr.")

---

[18] There is no evidence that Washington Mutual Bank, FA, which in July 2010 was in the midst of its own chapter 11 case and had merged with JPMorgan Chase Bank in September, 2008 (Claim Objection Ex. F) had anything to do with the Assignment of Mortgage.  See note 7 above for a discussion of MERS' lack of authority, through Mr. Kennerty, to effectively assign the mortgage/Deed of Trust.

at 89-92. This was part of his duties as the Wells Fargo manager in charge of "default documents." *Id.* at 44. In other words, on a daily basis Mr. Kennerty and his team, members of which he also testified signed a like number of documents each day, *id.*, processed a large volume of loan documents for enforcement with very little thought about what they were doing. It is not clear that Mr. Kennerty fully understood the legal consequences of signing these documents; for example, he testified when shown the Assignment of Mortgage that he executed it not on behalf of the assigning party but, rather, on behalf of the party "in getting the assignment," although he also testified that "I'm – I'm not an attorney, but the way I understand this document, it was assigning the mortgage, taking it out of MERS' name and putting into Wells Fargo Bank's name." *Id.* at 93-4. It is clear, however, that he pretty much signed whatever outside counsel working on the default put in front of him and that these documents often included assignments, including the Assignment of Mortgage, drafted by Wells Fargo's outside enforcement counsel to fill in missing gaps in the record.

Thus, in describing the work of his "assignment team" Mr. Kennerty stated, "[I]f there was not an assignment in there [that is, in Wells Fargo's loan file] then they would – excuse me, they would advise the attorney that we did not have it, that they would need to draft the – the appropriate assignment." *Id.* at 116. *See also id.* at 76 ("[I]f the assignment needed to be created they would have advised the attorney, the requesting attorney to – that we did not have the assignment in the collateral file, then they needed to draw up the appropriate document."); *id.* at 121 ("Once it [that is, the collateral file] was received then they would check to see if it was something that could be used or not used; and, if it's something that was in the file, but couldn't be used then they would advise the requesting attorney to go ahead and draft the actual document.").

Because Wells Fargo does not rely on the Assignment of Mortgage to prove its claim, the foregoing evidence is helpful to the Debtor only indirectly, insofar as it goes to show that the blank indorsement, upon which Wells Fargo <u>is</u> relying, was forged. Nevertheless it does show a general

willingness and practice on Wells Fargo's part to create documentary evidence, after-the-fact, when

enforcing its claims, WHICH IS EXTRAORDINARY.[19]

Moreover, Mr. Kennerty's testimony does not stop at describing manufactured mortgage

assignments.  He also testified that his "assignment team's" duties were not limited to processing

assignments, including, when determined necessary, creating them; in addition, the "assignment team"

included people tasked with endorsing notes.  *Id.*  at 136.  His testimony on this issue is critical and will

be quoted at length:

> Q.    Okay.  Did your department endorse notes?

> A.    Yes.

> Q.    Okay.  And how was it that your department would come to endorse notes?

> A.    I don't recall the specific process, but to the best of my recollection there's usually a – in – usually a – blank endorsement on – on the notes and there would – and then based on that they would complete the endorsement.

> Q.    So when you say they would complete the endorsement, who is they?

> A.    I'm sorry.  There was a – there – there were some processors that would perform that task.

> Q.    Okay.  When you say complete the endorsement, what do you mean by that?

---

[19] As discussed in note 7 above, within the last few years several Texas courts have accepted the general proposition that MERS had the power to transfer interests in mortgages and deeds of trust, at least where, as was not the case here, the original deed of trust named MERS and specifically conferred on it the power to sell the collateral and transfer interests therein in the name not only of its nominee but also to its own successors in interest.  What these courts do not address, perhaps because the issue was not raised, is that the authorized signing "officers" of MERS, if Mr. Kennerty is a typical example, never actually worked for that company, never had an agreement with that company, never received a paycheck from that company and were, in reality, really officers and employees of the lenders who were MERS members, Dep. Tr. at 99-102, and, therefore, that MERS could readily be used as a vehicle for self-dealing and fraud. That is, under the guise of being a MERS officer, an employee of Bank X could purport to transfer a mortgage held by MERS as nominee for Bank Y without Bank Y knowing about it or authorizing it with the exception of the fact that MERS had conferred signing authority on employees of its members, including employees of Bank X.  *See Culhane v. Aurora Loan Servs. of Nebraska*, 826 F. Supp. 2d 352, 374 (D. Mass. 2011), *decision reached on appeal*, 708 F.3d 282 (1st Cir. 2013) ("Equally troubling is the conflict of interest posed by these certifying officers wearing 'two hats' simultaneously:  that of assignor (as agent for MERS) and assignee (as employee of the note holder or its servicing agent).").

> A.    They would execute a note endorsement, a new note endorsement if there was a blank one on there.
>
> Q.    And they would do that with the original note from the collateral file?
>
> A.    To the best of my recollection, yes.
>
> Q.    Okay.  And at whose request would the processors perform that function?
>
> A.    Again, to the best of my recollection, it would be done at the – either the foreclosure attorney's request or the bankruptcy attorney's request.

*Id.* at 129-31.

Mr. Kennerty then testified about the process for receiving such requests from outside enforcement attorneys and how one or two people in his department had the job of endorsing notes. *Id.* at 131-32.  When questioned about how often such requests were made, whether on a daily basis or on rare occasions, Mr. Kennerty replied, "To the best of my recollection, it was on a regular basis."  *Id.* at 133.  He also testified about the information system or systems at Wells Fargo where such requests might be made and maintained.[20] *Id.* at 133-34.

He then testified as follows:

> Q.    And the actual procedure for endorsing an original note, if you could just walk me through that process.  What would the processor do?
>
> A.    To the best of my recollection, they would – the request would come in. Again, we would check to see if we had the collateral file.  If we – if we had it and depending on the status of the – of the loan itself, <u>if we had the note then we could check to see, you know, what was actually on the note to see what needed to be done.</u> If we did not have the collateral file then they would work – that processor would work with the collateral file ordering team to reach out with the appropriate attorney or, I'm sorry, the appropriate custodian to obtain the collateral file.  <u>And then they would look to – once the file came in they would look to ensure that the original note was in there and check to see if there was any endorsement on the back of the note.</u>
>
> Q.    Okay.  <u>And if there wasn't how would they go about – how would the processor go about endorsing the note</u>?
>
> A.    I don't recall specifically how they completed that particular task.

---

[20] Apparently no record of any such requests was produced in discovery.

19

>    Q.    Was it a rubber stamp?  Was it somebody signing?  How was it?
>
>    A.    <u>To the best of my recollection, a stamp was involved but then it had to
> be signed</u>.
>
>    Q.    Okay.  And if an endorsement was coming from an entity that no longer
> existed how would it be signed?
>
>    A.    I do not recall.

*Id.* at 135-36 (emphasis added).

Later in his deposition, Mr. Kennerty was shown the two forms of the Note attached to Claim

Nos. 1-1 and No. 1-2, respectively, and testified that he did not know how or when the indorsements

were placed on them.  *Id.* at 142-44.  He did have this to say, however:

>    Q.    Now, if any one of these endorsements were a rubber stamp and
> produced by your department would there be a record of that somewhere?
>
>    Mr. Cromwell:  Objection; misstates his testimony.
>
>    Witness.    I – the term rubber stamp is a – not accurate because although the –
> a stamp to produce the 'pay to order of' was used, the term to me, use of a rubber
> stamp, means it was signed, there was a signature on the – on the stamp itself and that
> – to my recollection, that was not the case.

*Id.* at 143-44.  Mr. Kennerty said nothing more that was relevant to the issue of whether Wells Fargo

forged the blank ABN Amro indorsement, with the exception of stating that "I am not familiar with

Margaret Bezy," *id.* at 143, who has not been identified as ever having been an employee of Wells Fargo

and presumably was an employee of ABN Amro.

I conclude that the foregoing evidence cumulatively shifts the burden to Wells Fargo under Tex.

Bus. & Com. Code §§ 3.308(a) and 1-206(a) to show the authenticity of the blank ABN Amro

indorsement to establish its status as a holder of the Note under Tex. Bus. & Com. Code §§ 3.301(i) and

3.201(a).  It constitutes substantial evidence that Wells Fargo's administrative group responsible for the

documentary aspects of enforcing defaulted loan documents created new mortgage assignments and

forged indorsements when it was determined by outside counsel that they were required to enforce

loans.  Given that evidence, Wells Fargo should have the burden to establish the bona fides of the blank

ABN Amro indorsement that did not appear on the Note attached to Claim No. 1-1 but did appear on the

Note attached to Claim No. 1-2.

Reading Mr. Kennerty's testimony carefully, it is conceivable that all of Wells Fargo's newly

created mortgage assignments and newly created indorsements were proper, that, for example, the

only time the indorsement processors wrote in or stamped new note indorsements (when, as Mr.

Kennerty testified, they were not already on the note) or prepared new mortgage assignments was

when endorsing notes <u>from</u> Wells Fargo <u>to</u> some other entity, whether as principal or agent, filling in the

blank indorsements to itself, or properly, with due authorization, assigning mortgages to it from a third

party.  However, that interpretation certainly does not leap out from Mr. Kennerty's testimony.   By no

means did he qualify his testimony to make it clear that his assignment team and indorsement

processers were limited by such restrictions.  Frankly, it does not appear that he understood the

difference between preparing legitimate assignments and indorsements <u>by</u> Wells Fargo and improper

assignments and indorsements <u>to</u> Wells Fargo.

Moreover, it is widely recognized that an agent or servicer can enforce a note and mortgage on

behalf of its principal.  *See, e.g., Martins v. BAC Home Loans Servicing, L.P.*, 722 F.3d 249, 255 (5th Cir.

2013); *see also In re Minbatiwalla*, 424 B.R. 104, 108-09 (Bankr. S.D.N.Y. 2010) (servicer has standing to

file proof of claim).  It also is widely recognized, as discussed above, that a holder of a note can enforce

the note and mortgage even if it does not "own" the loan, and, of course, that the holder of a note

indorsed in blank does not have to fill in the blank with its own name in order to enforce it.  Thus, why

would Wells Fargo's defaulted document enforcement group be creating new assignments and adding

indorsements on a regular basis from itself to, effectively, itself?  It would not need to.  Similarly, why

would Mr. Kennerty's group – Wells Fargo's defaulted document group – on a regular basis be creating

new documents and adding indorsements from itself to true third parties for the third parties' benefit?

True third parties were not enforcing the documents; Wells Fargo was.[21]  It is more reasonable to infer

from Mr. Kennerty's testimony that, instead, Wells Fargo was improving its own position by creating

new documents and indorsements from third parties to itself to ensure that it could enforce its claims.

Again, then, the burden should shift to Wells Fargo to show that it did not forge the blank ABN Amro

indorsement.

Wells Fargo has not carried that burden.  To do so, it offered only Mr. Campbell's testimony and,

through him, certain exhibits copied from Wells Fargo's loan file.  That testimony was not helpful to it.

Mr. Campbell was not involved in the administration of the Debtor's loan until he became a potential

witness in 2013. Trial Tr. at 37.  He was not involved in the preparation of Claim No 1-2.  *Id.* at 37.  He

had nothing to say about the circumstances under which the blank ABN Amro indorsement appeared on

the Note attached to Claim No. 1-2, with the exception that he located the earliest entry in the

electronic loan file where that version of the Note was recorded, pulled up its image and compared it to

the original shown him by Wells Fargo's counsel.  *Id.* at 33, 36, 49-50.  He was offered, therefore, only to

qualify Wells Fargo's proposed exhibits, copied from Wells Fargo's loan file, as falling within Fed. R. Evid.

803(6)'s business records exception to a hearsay objection under Fed. R. Evid. 802 and to testify that a

copy of the Note with the blank ABN Amro indorsement appears in Wells Fargo's electronic records

before the preparation of Wells Fargo's initial proof of claim in this case.

As noted above, the Debtor objected to Mr. Campbell's testimony to the extent that it was

intended to establish a business records exception to Fed. R. Evid. 802.  Because the loan file described

by Mr. Campbell was an electronic record[22] and thus potentially easily alterable, the Debtor contended

---

[21] Conceivably, moreover, there was such a third party here – Freddie Mac, which Wells Fargo and Freddie Mac
each claimed was the owner of the loan – yet there was no assignment or indorsement from Wells Fargo to or
from Freddie Mac or any other legally effective evidence of transfer to or from it.

[22] In fact, Mr. Campbell testified that Wells Fargo had two electronic records systems:  a "mortgage servicing
platform" and the "imaging system of record."  Trial Tr. at 40-1.  Although it is not clear how the two systems were
integrated, it appears that the loan file that Mr. Campbell accessed was the "imaging system."  *Id.* at 13-16, 21.

that (i) for Mr. Campbell to be a "qualified witness" under Fed. R. Evid. 803(6)(D), or (ii) to establish, for

purposes of Fed. R. Evid. 803(6)(E), that neither the possible source of information in the file nor other

circumstances indicate a lack of trustworthiness, Wells Fargo would have to show at least how data is or

can be inserted into the file and that such procedure has built-in safeguards to ensure accuracy and

identify errors.  *See Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 557-58 (D. Md. 2007); *In re Vee

Vinhnee*, 336 B.R. 437, 445-46 (B.A.P. 9th Cir. 2005); *In re Vargas*, 396 B.R. 511, 518-19 (Bankr. C.D. Cal.

2008).  The *Vee Vinhnee* court stated that the foregoing showing should include "details regarding

computer policy and system control procedures, including control of access to the database, control of

access to the program, recording and logging in of changes, backup practices, and audit procedures to

assure the continuing integrity of the records."  336 B.R. at 446-47.

In large measure, Mr. Campbell was not up to that task (and Wells Fargo offered no other

evidence to meet that standard, were the Court to impose it).  Mr. Campbell did not know whether

there was any person overseeing the accuracy of how the records in the system were stored and

maintained.  *Id.* at 32, 40, 42-3.  He did not know who controlled access to the system or the procedure

for limiting access, except to say "[A]ccess is granted as needed."  *Id.* at 40-1.  He did not know of any

procedures for backing up or auditing the system.  *Id.* at 42.  He stated, "I am not a technology person"

and was not able to answer what technology ensures the accuracy of the date and time stamping of the

entry of documents into the imaging system.  Trial Tr. at 22.  In his deposition, he testified that he did

not know whether the dates and times of the entry of documents in the system could be changed, but

at trial he stated that, after his deposition, "I attempted to look into this, and, to my knowledge, I am

not aware of any way to change or remove attachments into the imaging system," *id*. at 43, which, given

his general lack of knowledge about how the system works and failure to explain the basis for his

assertion, did not inspire confidence.

Mr. Campbell also undermined his credibility when he supported his statement that he is a custodian of Wells Fargo's electronic record files by stating, "I review and maintain them, yes," *id*. at 38, a remarkable contention in light of his other testimony discussed above.  And, indeed, it became clear when pressed on this issue that Mr. Campbell was not using the word "maintain" in its normal sense of ensuring that the system runs properly or even of auditing it by monitoring its inputs and outputs , but, rather, simply that he "asserts" its accuracy:  "I review and maintain that they're accurate, yes. . . . I have the ability to access and maintain records.  I can upload documents into an imaging system." *Id.* at 38.  That is (and his other testimony clearly corroborated this), Mr. Campbell vouched for the system based only on the facts that he and other people associated with Wells Fargo regularly use it and he can find documents on it that match originals that counsel has shown him, *id.* at 33, 36, although he does not know who originated them and put them there and how, and perhaps exactly when, they were put there.  *Id.* at 39-40, 43-5.

Nevertheless, Wells Fargo did not have to meet the heightened standard asserted by the Debtor for admission of electronic records under Fed. R. Evid. 803(6).  In the Second Circuit, application of the business records exception, including to electronic records, requires only that a qualified witness testify that the document was kept in the course of a regularly conducted business activity and that the making of such record was the regular practice of that activity.  *United States v. Komasa*, 767 F.3d 151, 156 (2d Cir. 2014);[23] *United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000), *cert. denied*, 531 U.S. 885 (2000).  To be "qualified," the witness need not have personal knowledge of the actual creation of the documents.  *Id.*  And "[u]sing an 'automated process' to compile the records in question [electronic loan files] does not render the documents inadmissible;" only regular use in reliance on the records' accuracy is required.  *Komasa*, 767 F.3d at 156; *see also In re Enron Creditors Recovery Corp.*, 376 B.R. 442, 454

---

[23] *Komasa* primarily analyzed admissibility under Fed. R. Evid. 902(11), 767 F.3d at 156, but the courts have applied an essentially identical approach to that Rule and Fed. R. Evid. 803(6).  5 Weinstein & M. Berger, *Weinstein's Federal Evidence* § 900.06[2][a] (2014) ("*Weinstein's Federal Evidence*").

(Bankr. S.D.N.Y.  2007) ("A business record may include data stored electronically and later printed out for presentation in court, as long as the original computer data compilation was prepared pursuant to a business duty in accordance with regular business practice. . . .  Moreover, if employees regularly retrieve data from the entity's computer system and rely on such information for commercial purposes, they bear sufficient indicia of trustworthiness.") (internal citations omitted); *In re Lo Sia*, 2013 Bankr. LEXIS 3559, at *16-18 (Bankr. D. N.J. Aug. 27, 2013); 5 *Weinstein's Federal Evidence* § 900.07[1][b][i] ("a company's trust in its computer records for routine business decisions is strong circumstantial evidence of the records' reliability").  Moreover, because of the general trustworthiness of such records and a policy favoring the admission of evidence with any probative value, the business records exception has been construed generously.  *United States v. Williams*, 205 F.3d at 34 ("We have stated that Rule 803(6) 'favors the admission of evidence rather than its exclusion if it has any probative value at all.'") (*quoting In re Ollag Constr. Equip. Corp.*, 665 F.2d 43, 46 (2d Cir. 1981)); *In re Enron Creditors Recovery Corp.*, 376 B.R. at 444-45.

Here, Mr. Campbell credibly testified that Wells Fargo widely and regularly used its electronic imaging system, Trial Tr. at 13-15, 17, and that he was sufficiently familiar with it to use it himself on a regular basis.  *Id.* at 15-16, 52-3.  He also testified that generally documents were entered into the system substantially contemporaneously with their receipt or preparation.  *Id.* at 16-17, 20-1.  Mr. Kennerty corroborated Wells Fargo's reliance on regularly kept loan files, Dep. Tr. at 73-4, 118-19, 148-49, 150 and 154, which is certainly reasonable considering that such files may be used to administer and enforce a large number of loans.  Accordingly, the Debtor's objection to the admission of Mr. Campbell's testimony and Wells Fargo's proposed exhibits A through G should be overruled and those exhibits admitted into evidence.

This of course leaves open whether, in the light of Mr. Campbell's testimony and Wells Fargo's Exhibits A through G, as well as the other evidence admitted suggesting forgery, Wells Fargo has carried its burden to substantiate the authenticity of the blank ABN Amro indorsement.

The evidence ultimately is not helpful to Wells Fargo.  As noted above and acknowledged by both Mr. Campbell and Wells Fargo's counsel, the primary purpose of his testimony was to show that the image of the version of the Note bearing the blank Wells Fargo indorsement appears in the loan file before the preparation of either of the two proofs of claim filed by Wells Fargo in this case.  Trial Tr. at 49-50 (Mr. Campbell:  "I was looking for the earliest copy of the note that had all the endorsements on it and that took me back to the [sic] December 28th of 2009."); *id.* at 68 (Mr. Dunn:  "[T]he question is whether the note in that form was in the possession of Wells Fargo prior to the time the amended proof of claim, or the original proof of claim, was filed, so the screenshot and the fact that it does appear and the witness was able to view it and verify it as an entry on the date identified back in 2009 is an indicator that it was, in fact, so indorsed.").[24]  *See also* Wells Fargo Ex. G, the index to Wells Fargo's electronic loan file, at 6 of 10 (showing the December 28, 2009 entry of a "Note," which Mr. Campbell testified was the first appearance in the file of the version of the Note with the blank ABN Amro indorsement).

That fact, however, at best merely muddies the picture.  As stated by Mr. Campbell in ¶ 1 of his Affidavit, dated July 2, 2013 ("Campbell Aff."), which, pursuant to the Court's direction was submitted in lieu of his direct testimony, "In February 2007 certain rights in and with respect to the loan at issue in this proceeding were transferred to Wells Fargo. . . .  The transfer of the Note and Mortgage to Wells

---

[24] Mr. Dunn also argued that Mr. Kennerty's testimony about his indorsement team only "relates to endorsements by Wells Fargo," Trial Tr. at 115 (emphasis added), not to Wells Fargo, but Wells Fargo offered no evidence to support this contention, which has been dealt with above.

Fargo in February 2007 was reflected in Wells Fargo's computerized business records, accessible on an

'AQN1' screen, which reflects Wells Fargo's acquisition of the loan."[25]

It is apparent from Mr. Campbell's testimony, though, that at <u>that</u> time Wells Fargo did not have

the original of the Note that bore the blank ABN Amro indorsement, and that it received, at best, only

the Note with just the special indorsement from Mortgage Factory Inc. to ABN Amro:

> When the mortgage loan was transferred to Wells Fargo, copies of the origination file
> were provided to Wells Fargo, and were recorded in its data system. This file included a
> copy of the Note containing an endorsement from Mortgage Factory to ABN Amro,
> [which] was recorded in Wells Fargo's imaging system.  A copy of this version of the
> Note was placed into Wells Fargo's system on March 26, 2007 and remains accessible to
> the present.

*Id.* ¶ 2.  What Mr. Campbell avoids saying here (but is clear from his admission during the evidentiary

hearing that the first time the Note with the blank ABN Amro indorsement appears in Wells Fargo's

records is December 28, 2009 (Trial Tr. at 49-50)), is that when the loan was transferred to Wells Fargo,

Wells Fargo did not receive the Note with the blank indorsement, only the Note with a special

indorsement that Wells Fargo could not enforce.[26]

Apparently, Mr. Campbell's reference in ¶ 2 of his Affidavit to the "origination file" was intended

to provide a rationale for why an allegedly outdated copy of the Note was the only version logged into

Wells Fargo's records between the transfer of the loan to it and December 28, 2009, the date identified

by Mr. Campbell as the first appearance in the file of the enforceable version with the blank ABN Amro

---

[25] Exhibit A to the Campbell Aff., gives the date of the transfer as June 21, 2007, in fact, not February 2007, but Exhibit B to the Campbell Aff., which consists of a "hello" letter from Wells Fargo to the Debtor, dated February 3, 2007, states that "As of February 16, 2007, Washington Mutual will transfer the servicing of your mortgage loan to Wells Fargo Home Mortgage, a division of Wells Fargo Bank, N.A." Both of these exhibits are internal Wells Fargo documents; it is worth reiterating that there is no document in the record that was executed by or comes from Washington Mutual Bank, FA evidencing transfer of the Note and Deed of Trust, or servicing rights and responsibilities related thereto, to Wells Fargo.

[26] Mr. Campbell refers to this document as a "copy," which suggests that Wells Fargo never held an original of the Note with only the special indorsement, but he offered no basis for that characterization.  Everything in the image file is a copy, an image, including the later appearance, on December 28, 2009 of the version of the Note with the blank indorsement.

indorsement.   Mr. Campbell's basis for stating that the Note without the blank indorsement was part of the "origination file" is shaky, however.  The index of documents entered into Wells Fargo's electronic file for this loan, attached as Exhibit G to the Campbell Aff., does designate, at page 9 of 10, a 51-page batch of documents logged in on March 27, 2007 as "Origination;" however, the Note (presumably with only the special indorsement) is separately logged in on that date solely as a "Note."  Ex. G, at 9 of 10.

Moreover, in addition to the fact that the specially indorsed version of the Note appears on its own in the file on March 27, 2007, and not as part of an "origination file," Wells Fargo has offered no explanation, let alone evidence, of who else, if not Wells Fargo, held the original of the Note with the blank ABN Amro indorsement before December 28, 2009, if, in fact, such a version then existed.  The file provided by the transferor should have included it, if it did exist during that period, because Washington Mutual Bank, FA would not have been able to enforce the Note, either, without the blank indorsement, and the Assignment of Deed of Trust attached to the proofs of claim states that both the Note and Deed of Trust were transferred to MERS as nominee for Washington Mutual Bank, FA on June 20, 2002, effective November 16, 2001.  In other words, why would only an outdated and unenforceable version of the Note have been logged in by Wells Fargo when it took over the file in February 2007 if the only enforceable version of the Note had in fact existed at that time (and should have existed since 2002)?  The far more likely inference, instead, is that when the loan was transferred to Wells Fargo, the Note with the blank ABN Amro indorsement did not exist.

Why would the Note with the blank ABN Amro indorsement have appeared in Wells Fargo's file only on December 28, 2009, twenty-two months later?  Wells Fargo has not provided an explanation, supported by evidence, replying only that the question is irrelevant.  All that matters, Wells Fargo contends, is that the enforceable document was imaged into its records before the Debtor's counsel started raising questions about Claim No 1-1.  What is, in fact, at least equally pertinent, however, is that the loan went into default well before the appearance of the blank-indorsed Note in the file.  Thus,

Wells Fargo would at that time have started to focus on the enforcement of its rights; thus the "default documents" team would then have become involved; thus, recognizing the absence of an enforceable Note, someone on Wells Fargo's behalf responsible for enforcement should then, consistent with Mr. Kennerty's testimony, have seen fit to add the necessary indorsement.

In fact, the loan went into default twice – first in October, 2007 (see Ex. C to Campbell Aff., consisting of an October 15, 2007 default letter from Wells Fargo to the Debtor) and then in November 2008.  Fairly soon after the first default, the parties entered into a Loan Modification agreement, on February 11, 2008.  Campbell Aff. ¶ 6.  The Debtor then defaulted under the loan modification agreement, however, starting in November, 2008, and remained in default thereafter, making only sporadic payments.  *Id.* ¶¶ 7-8.  It appears both from several entries on Exhibit G to the Campbell Aff. and the Debtor's testimony that workout discussions continued between Wells Fargo and its counsel, on the one hand, and the Debtor, on the other, after this second default, including until shortly before the Debtor commenced her bankruptcy case.  Ex. G at 2 of 10; Trial Tr. at 100-101.  It is reasonable to assume from the Debtor's testimony, however, that during this period she appeared less likely to be able to perform a new loan modification agreement that would be acceptable to Wells Fargo (she acknowledged that her financial condition worsened, she moved out of the Property, and there was storm damage to it during that period, Trial Tr. at 99-100), and that those responsible for enforcing the loan would then have seen the need for a blank indorsement on the Note and had it forged.

It is not conclusively proven that this is what happened, but, as discussed above, in the light of the evidence submitted by the Debtor Wells Fargo has the burden to show that the indorsement was genuine, and its only argument, based on the timing of the appearance of the blank-indorsed Note in the file record, does not address the reasonable contrary inference that Wells Fargo forged it when the Debtor became seriously in default.  Nor is there any evidence that anyone at ABN AMRO caused the original of the Note to be stamped and signed with the blank indorsement, nor any evidence that

anyone from Washington Mutual Bank, FA or MERS on its behalf held that version, let alone forwarded it to Wells Fargo after Wells Fargo took over the loan in February 2007.  Wells Fargo has not satisfied its burden.

Finally it is also worth noting that, unless the Debtor successfully invokes a separate power to transfer the Property free and clear, the Property is still encumbered by the Deed of Trust assigned to MERS as nominee for Washington Mutual Bank, FA, even if Wells Fargo has not sought to independently rely on it or the Assignment of Mortgage; in other words, there is a serious limitation to the notion that the Debtor now has a "free house."   On the other hand, there are certain bare minimums to proving one's claim.  The failure to timely file a claim in this case would have precluded the enforcement of an otherwise allowable claim against the Debtor, notwithstanding the Debtor's receipt of the money that formed the ultimate basis for the claim.  Wells Fargo's failure to establish that it is the holder of the Note similarly requires the Claim Objection to be granted and Claims 1-2 and 1-1 disallowed.

### Conclusion

For the foregoing reasons, the Claim Objection is granted.  Counsel for the Debtor should submit a proposed order to chambers consistent with this Memorandum of Decision.

Dated:  White Plains, New York
        January 28, 2015

                                        /s/ Robert D. Drain_____
                                        United States Bankruptcy Judge